# EXHIBIT C

12/13/2024 1:31 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 95300917
By: Jarod Stirrup
Filed: 12/13/2024 1:31 PM

## CAUSE NO. _____

| | | |
|---|---|---|
| **MUHAMMAD SHAHID** AND | § | **IN THE DISTRICT COURT OF** |
| **UJALA HAARIS** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **ALLSTATE INDEMNITY COMPANY** | § | |
| *Defendant.* | § | **_____ JUDICIAL DISTRICT** |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Muhammad Shahid and Ujala Haaris, complaining of Defendant Allstate Indemnity Company ("Allstate"), files this, their Original Petition; and in support thereof, Plaintiffs would respectfully show this Honorable Court as follows:

### I.
### DISCOVERY LEVEL

1. Plaintiffs intend for discovery to be conducted at Level 2, pursuant to Rule 190 of the Texas Rules of Civil Procedure.

### II.
### JURISDICTION & VENUE

2. This Court has jurisdiction to hear Plaintiffs' claims under Texas common law and Texas statutory law. Inarguably, the amount in controversy exceeds the minimum jurisdictional limits of this Court. Additionally, Venue is mandatory and proper in Harris County, Texas, in accordance with Section 15.002 of the Texas Civil Practice & Remedies Code, because all or a substantial part of the events giving rise to this suit occurred within this county.

---

## III.
## PARTIES

3.    Plaintiffs are individuals who reside in Cypress, Harris County, Texas.

4.    Defendant Allstate is a domestic for-profit corporation, duly registered with the Texas Department of Insurance to do business in Texas, which may be served with process by serving this Original Petition and a copy of the citation on its Registered Agent, CT Corporation System, 1999 Bryan Street STE 900, Dallas, Texas 75201-3136, or wherever it may be found.

## IV.
## FACTUAL BACKGROUND

5.    Plaintiffs are named insureds under a landlords package insurance policy issued by Allstate, insurance policy no. 436 220 450 (the "Policy").

6.    On or about January 16, 2024, Plaintiffs' real property, located at 14902 Cactus Wren Drive, Tomball, Texas 77377 ("Property"), was damaged by a pipe burst during an ice and/or freeze storm, which is a covered loss under their Policy. Pursuant to the obligations under the Policy, Plaintiffs timely filed an insurance claim.[1]

7.    Subsequently, Allstate denied Plaintiffs' claim despite clear evidence of their estimated damages and covered loss.

8.    The adjuster assigned to the claim by Allstate conducted a substandard investigation of the Property and damages, and incorrectly purported that Plaintiffs misrepresented and concealed material facts pertaining to the property damage, policy

---

[1] *See* Ex. 1.

---

**Plaintiffs' Original Petition**                                                        ( 2 )

application, and business conducted at the loss location.[2] These allegations are neither valid nor true.

9.    Upon acceptance of the claim by Allstate, adjuster Tai McKinnon, performed an inspection of the Property and Plaintiffs' damages.[3]

10.    To further cooperate with Allstate in their claim investigation, Plaintiffs both agreed to conduct individual examinations under oath ("EUO") in February of 2024.

11.    During the EUOs, Plaintiffs explained that they owned the property since September of 2023 and made various repairs and/or improvements to the Property to later rent out.[4] By the time of the pipe burst, ninety percent of the work was completed.[5]

12.    When the pipe burst was found on January 17, 2024, water was coming down the ceiling after a freeze event the night before.[6] Plaintiffs were present at the Property the day before, and there was no sign of any damage or concern.[7] Additionally, Plaintiffs made the effort to insulate the pipes and avoid any type of freeze event and pipe burst.[8]

13.    Plaintiffs had a family interested in renting the Property in February of 2024, but had to scratch those plans due to the incident and related damage.[9] When

---

[2] *See* Ex. 2.
[3] *See* Exhibits 3 - 4.
[4] *See* Ex. 3, pgs. 12-13; Ex. 4, pgs. 13-16.
[5] *See* Ex. 3, pgs. 12-13; Ex. 4, pg. 14.
[6] *See* Ex. 3, pgs. 13-14; Ex. 4, pgs. 16-17.
[7] *See Id.*
[8] *See* Ex. 3, pgs. 13-14; Ex. 4, pg. 18.
[9] *See* Ex. 3, pgs. 19-20; Ex. 4, pgs. 13-16.

---

**Plaintiffs' Original Petition**                                                    ( 3 )

questioned whether they utilized the property as a daycare, Plaintiffs made clear that they did not and merely had child items present for their own two children to keep busy while they worked on the Property.[10] Despite obvious testimony that the Property was not used as a daycare, Allstate still held the position that the Property was being utilized as a daycare based on a false accusation from Allstate's local representative.

14.   Despite having a potential and prospective business idea and listing the Property address as a business location when acquiring a NPI number and registering with the Texas Secretary of State's office, Plaintiffs made it clear that they were setting up the Property for only residential renting purposes.[11]

15.   The potential and prospective business was never finalized to date, no related business activities took place at the Property, and the subject Policy was acquired by Plaintiffs to solely provide adequate coverage for a rental property.[12]

16.   Plaintiffs' conduct with previous rental properties followed a similar set up path prior to renting.[13] Much like their other properties, only rental preparation activities were completed at this Property while the Policy coverage period was active and this is the purpose of the Policy, and it is clear that Plaintiffs' sole intention was always to treat this Property as rental property, which has been reiterated *ad nauseam* to Allstate.

---

[10]  *See* Ex. 3, pgs. 22-26; Ex. 4, pgs. 14-16, 20-21, 26-28.
[11]  *See* Ex. 3, pgs. 26-36; Ex. 4, pgs. 14-16.
[12]  *See* Ex. 3, pgs. 12-36; Ex. 4, pgs. 13-44.
[13]  *See* Ex. 3, pgs. 15,19, 35-36; Ex. 4, pgs. 19-20.

---

17.     In an effort of performing their due diligence in showing their extensive damages, Plaintiffs sought an additional and competent opinion, which was previously provided to Allstate for their consideration when evaluating the Claim, from GoCrafts, LLC ("GoCrafts"). GoCrafts discovered covered damages and determined that the total amount to properly perform necessary repairs, including work already completed to mitigate Plaintiffs' overall damages, totaled to $142,311.31.[14] This information and GoCrafts' estimate were apparently disregarded by Allstate.

18.     In accordance with their duties under the Policy, Plaintiffs mitigated their damages and repaired the burst pipe. This repair, which was included in the total estimate from GoCrafts, cost them $15,245.71.16 out of pocket.[15]

19.     Plaintiffs additionally prepared an inventory and relayed their personal property, made up of electronics and furniture inside the subject Property, was damaged in the amount of $10,460.03.[16] Allstate was also provided this information.

20.     Further, Plaintiffs experienced lost rent from the aforementioned incident, experienced damages of $26,400.00, and provided this information to Allstate.[17]

21.     With all of the evidence concerning the extent and amount of Plaintiffs' damages in hand, on April 25, 2024, Tai McKinnon improperly denied coverage for the damages to Plaintiffs' Property based upon misrepresentations of the facts.[18]

---

[14] *See* Ex. 5.
[15] *See* Ex. 6.
[16] *See* Ex. 7.
[17] *See* Ex. 8.
[18] *See* Ex. 9.

---

22.    Plaintiffs never concealed or provided any misrepresented material facts pertaining to the property damage, policy application, or business conducted at the loss location. The Property was always a residential rental property, and a prospective family was being lined up to rent the Property as a residence—the Property simply required that Plaintiffs complete necessary work in preparation of housing a tenant.

23.    All of this information was provided to Allstate by Plaintiffs. On May 1, 2024, a letter of representation was sent to Allstate by C. Bryan Beverly, a colleague within the same firm as undersigned counsel.[19] Plaintiffs, via counsel, have reiterated all of this information to Allstate in painstaking detail. However, Allstate continues to examine infinitesimal bits of information out of context and ignore Plaintiffs' testimony provided under oath with the goal of unjustly denying Plaintiffs' Claim and avoid paying Plaintiffs for their covered loss.

24.    Plaintiffs and Plaintiffs' counsel have worked tirelessly in an effort to amicably resolve this matter without the involvement of this Court. Unfortunately, Allstate continues to improperly deny coverage for this Claim based upon a false narrative of the loss and misrepresentations concerning coverage and Plaintiffs' actions, which amount to a breach of material terms of the Policy and damage Plaintiffs.[20]

25.    Despite available coverage under the Policy, clear estimated damages, Plaintiffs' diligence in protecting the Property, and Plaintiffs' proof of their valid claim, Allstate ignores the truth and denies coverage to avoid issuing funds, which it is

---

[19] *See* Ex. 10.
[20] *See* Ex. 2.

obligated to pay, to Plaintiffs. It is clear that Allstate knowingly and intentionally completed an unreasonable investigation into the cause of Plaintiffs' unpaid claim.

26.    Further, Allstate's performance of this results-based investigation of Plaintiffs' claim, led directly to a biased, unfair and inequitable evaluation of Plaintiffs' losses to the Property.

27.    As a result of the above issues, Plaintiffs did not receive the coverage for which they had originally contracted with Allstate. Therefore, Plaintiffs have been forced to file this suit in order to prove Allstate's allegations against them are false, and to recover damages arising from the above-referenced conduct and from the unfair refusal to pay insurance benefits in accordance with the Policy.

28.    As indicated in this Original Petition, Plaintiffs seek an extension to apply for any remaining replacement cost coverage as well as relief under the Policy, Texas common law, the Deceptive Trade Practices-Consumer Protection Act and the Texas Insurance Code.

## V.
### CLAIMS AGAINST ALLSTATE

29.    Plaintiffs hereby incorporate by reference all facts and circumstances set forth under the foregoing paragraphs.

30.    All acts by Allstate were undertaken and completed by its officers, agents, servants, employees, and representatives. Such were either done with the full authorization or ratification of Allstate and completed in its normal and routine course and scope of employment with Allstate.

---

**Plaintiffs' Original Petition**                                                                ( 7 )

### Claim 1. Breach of Contract

31.　According to the insurance coverage that Plaintiffs purchased from Allstate, Allstate had the absolute duty to reasonably investigate Plaintiffs' damages, and to properly pay Plaintiffs' policy benefits for the claims made due to the extensive storm-related damages.

32.　As a result of the storm-related event, Plaintiffs suffered devastating damages under the Policy.

33.　Despite objective evidence of such damages and no legitimate proof of misrepresentations or bad actions when acquiring the Policy, Allstate has breached its contractual obligations under the Policy by failing to pay Plaintiffs benefits relating to the cost to properly repair Plaintiffs' Property, as well as for related losses. As a result of this material breach, Plaintiffs have suffered actual and consequential damages.

### Claim 2. Violations of the Texas DTPA & Tie-In Statutes

34.　Allstate's collective actions constitute violations of the Texas Business & Commerce Code, colloquially known as the Texas Deceptive Trade Practices Act (the "DTPA"). Such violations include, at the very least, portions of Sections 17.46(b) and 17.50(a).

35.　Specifically in violation of Section 17.46(b), Allstate collectively engaged in false, misleading, or deceptive acts or practices that included, but were not limited to:

> (5):　Representing that its Policy, coverage and claim adjustment services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they did not have;

(7):    Representing that its Policy, coverage and claim adjustment services were of a particular standard, quality, or grade, and that the Policy was of a particular style or model, when they were of another; and

(12):    Representing that the Policy conferred or involved rights, remedies, or obligations which it did not have or involve.

36.    Moreover, and specifically in violation of Section 17.50(a), Allstate collectively engaged in the use of false, misleading and deceptive acts or practices outlined above, to which Plaintiffs relied on to their detriment, in addition to engaging in the following:

(3):    An unconscionable action or course of action; and

(4):    Violating Chapter 541 of the Texas Insurance Code.

37.    As described in this Original Petition, Allstate represented to Plaintiffs that the Policy and Allstate's adjusting and investigative services had characteristics or benefits that they actually did not have, which gives Plaintiffs the right to recover under Section 17.46(b)(5) of the DTPA.

38.    As described in this Original Petition, Allstate represented to Plaintiffs that the Policy and Allstate's adjusting and investigative services were of a particular standard, quality, or grade when they were of another, which also stands in violation of Section 17.46(b)(7) of the DTPA.

39.    By representing that Allstate would pay the entire amount needed (minus the Policy deductible) by Plaintiffs to repair the damages caused by the covered loss and then not doing so, Allstate has violated Sections 17.46(b)(5), (7), (12), and 17.50(a)(3) - (4) of the DTPA.

---

40.    Allstate's actions, as described herein, are unconscionable in that it took advantage of Plaintiffs' lack of knowledge, ability, and experience to a grossly unfair degree. Allstate's unconscionable conduct gives Plaintiffs the right to relief under Section 17.50(a)(3) of the DTPA.

41.    Allstate's conduct, acts, omissions, and failures, as described in this Original Petition, are violations of Chapter 541 of the Texas Insurance Code and are unfair practices in the business of insurance in violation of Section 17.50(a)(4) of the DTPA.

42.    Plaintiffs are consumers, as defined under the DTPA, who purchased insurance products and services from Allstate. Plaintiffs relied upon the foregoing false, misleading, and deceptive acts or practices conducted by Allstate to their detriment.

43.    Plaintiffs have also falsely been accused of breaching the Policy and misrepresenting and concealing materials facts pertaining to the property damage, policy application, and business conducted at the loss location. Plaintiffs have always been up front and honest in their conduct and were willing to work with Allstate to resolve their suspicions and questions. Plaintiffs were owed common decency by Allstate, and Allstate utilized illegitimate pieces of evidence and deceptive acts or practices to make a no coverage determination on this claim.

44.    A direct and proximate result of Allstate's collective acts and conduct, Plaintiffs have been damaged in an amount in excess of the minimum jurisdictional limits of this Court, for which Plaintiffs now sue. All of the above-described acts,

omissions, and failures of Allstate are a producing cause of Plaintiffs' damages that are described in this Original Petition.

45.    As a result of Allstate's collective actions and conduct that were committed knowingly and intentionally, Plaintiffs are entitled to recover, in addition to all damages described herein, mental anguish damages and additional penalty damages, in an amount not to exceed three times such actual damages, for Allstate having knowingly committed its conduct. Additionally, Plaintiffs are ultimately entitled to recover damages in an amount not to exceed three times the amount of mental anguish and actual damages due to Allstate having intentionally committed such conduct.

46.    As a result of Allstate's unconscionable, misleading, and deceptive actions and conduct, Plaintiffs have been forced to retain the legal services of the undersigned attorneys to protect and pursue these claims on their behalf. Accordingly, Plaintiffs also seek to recover their costs and reasonable and necessary attorneys' fees as permitted under Section 17.50(d) of the Texas Business & Commerce Code, as well as any other such damages to which Plaintiffs may show themself to be justly entitled at law and in equity.

**Claim 3. Violations of Chapter 541 of the Texas Insurance Code**

47.    Allstate's actions constitute numerous violations of the Texas Insurance Code, including Sections 541.051, 541.060(a) and 541.061.

48.    Under Section 541.051, Allstate committed the following unfair and deceptive acts or practices in the business of insurance:

---

(1)(A): Making statements misrepresenting the terms of the Policy; and

(1)(B): Making statements misrepresenting the benefits of the Policy.

49.    Continuing, in violation of Section 541.060(a), Allstate engaged in certain unfair settlement practices with respect to a claim by an insured that include the following:

(1):    Misrepresenting a material fact or policy provision relating to coverage;

(2)(A): Failing to make prompt, fair, and equitable settlement of a claim after the insurer's liability is established;

(3):    Failing to promptly provide a reasonable explanation of the basis for denial of a claim or for the offer of a compromise settlement; and

(7):    Refusing to pay a claim without conducting a reasonable investigation of the details of the claim.

50.    Further, Allstate violated Section 541.061 of the Texas Insurance Code, by committing unfair and deceptive acts or practices in the business of insurance to misrepresent an insurance policy by:

(1):    Making an untrue statement of material fact;

(2):    Failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

(3):    Making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact; and

(5):    Failing to disclose a matter required by law to be disclosed, including failing to make a disclosure in accordance with another provision of this code.

### Claim 4. Violations of Chapter 542 of the Texas Insurance Code

51.    Allstate has violated Section 542.058 of Chapter 542 of the Texas Insurance Code in its failure to adhere to the statutorily-prescribed deadlines in the handling, adjustment and payment of insurance claims. More specifically, Allstate committed the following violations:

(a):    Failing to, after receiving all items, statements, and forms reasonably requested and required under Section 542.055, Allstate delayed payment of the claim for a period exceeding the period more than 60 days.

52.    As a result of the above-referenced violations and acts committed by Allstate, and in accordance with Section 542.060 of the Texas Insurance Code, Allstate is liable to pay Plaintiffs, in addition to the amount of the claim, simple interest on the amount of the claim as damages each year at the rate determined on the date of judgment by adding five percent to the interest rate determined under Section 304.003, Finance Code, together with reasonable and necessary attorney's fees. Plaintiffs are also entitled to pre-judgment interest on the amount of the claim, as provided by law. Interest awarded under this subsection as damages accrues beginning on the date the claim was required to be paid.

53.    Since a violation of the Texas Insurance Code is a direct violation of the DTPA, and because Allstate's actions and conduct were committed knowingly and intentionally, Plaintiffs are entitled to recover, in addition to all damages described herein, mental anguish damages and additional damages in an amount not to exceed

three times the amount of actual damages, for Allstate having knowingly committed such conduct.

54.    As a result of Allstate's Texas Insurance Code violations, Plaintiffs have been forced to retain the legal services of the undersigned attorneys to protect and pursue these claims on their behalf. Accordingly, Plaintiffs also seek to recover their court costs, reasonable and necessary attorneys' fees as permitted under Section 17.50(d) of the Texas Business & Commerce Code or Section 541.152 of the Texas Insurance Code and any other such damages to which Plaintiffs may show themselves justly entitled by law and in equity.

### Claim 5. Breach of the Common Law Duty of Good Faith & Fair Dealing

55.    Allstate has breached its common law duty of good faith and fair dealing of Plaintiffs' claim by falsely accusing Plaintiffs of misrepresenting and concealing materials facts pertaining to the property damage, policy application, and business conducted at the loss location with no clear evidence supporting the same, inadequately adjusting Plaintiffs' claim, and failing to conduct a reasonable investigation to determine whether there was a reasonable basis for Allstate's coverage decision.

### VI.
### CONDITIONS PRECEDENT

56.    Plaintiffs hereby incorporate by reference all facts and circumstances set forth under the foregoing paragraphs. All conditions precedent to recovery by Plaintiffs have been met or have occurred.

---

**Plaintiffs' Original Petition**                                      **( 14 )**

## VII.
### WAIVER & ESTOPPEL

57.     Plaintiffs hereby incorporate by reference all facts and circumstances set forth under the foregoing paragraphs.

58.     Allstate has waived and is estopped from asserting any defenses, conditions, exclusions, or exceptions to coverage not contained in any Reservation of Rights or denial letters to Plaintiffs

## VIII.
### DAMAGES

59.     Allstate's acts have been the producing and/or proximate cause of damage to Plaintiffs, and Plaintiffs seek an amount in excess of the minimum jurisdictional limits of this Court. To be specific, Plaintiffs seek monetary relief of at least $250,000 but not more than $1,000,000.00, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees.

60.     Furthermore, Allstate's conduct was committed knowingly and intentionally. Accordingly, Allstate is liable for additional damages under Section 17.50(b)(1) of the DTPA, as well as all operative provisions of the Texas Insurance Code. Plaintiffs are, thus, clearly entitled to statutory penalty interest damages allowed by Section 542.060 of the Texas Insurance Code.

## IX.
### ATTORNEY'S FEES

61.     In addition, Plaintiff is entitled to all reasonable and necessary attorney's fees pursuant to the Texas Insurance Code, DTPA, and sections 38.001-38.005 of the Texas Civil Practice and Remedies Code.

62.    Plaintiffs attorney's seek fees on a contingency fee basis. If the attorney's fees must be broken down into an hourly rate, Plaintiffs seek fees at $450 per hour.

63.    Attorney's fees are awarded to the party as part of the damages owed by an insurance company that violates Chapter 542 of the Texas Insurance Code. We believe it consistent with the statute's purpose to require the insurer to pay a contingency fee, which may be greater than an hourly fee. The spectre of large attorney's fees serves as additional incentive to the insurance company to respond promptly and diligently to its insured's claims. *Mid-Century Ins. Co. v. Barclay*, 880 S.W.2d 807 (Tex. App. 1994).

## X.
### JURY DEMAND

64.    Plaintiffs demand a jury trial and tender the appropriate fee with this Original Petition.

## XI.
### RULE 193.7 NOTICE OF USE

65.    Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiffs hereby give actual notice to all parties that any and all documents produced may be used against the party producing the document at any pretrial proceeding and/or at the trial of this matter without the necessity of authenticating the documents.

### PRAYER

Based upon the foregoing, Plaintiffs Muhammad Shahid and Ujala Haaris pray that judgment be entered against Defendant Allstate Indemnity Company, that Plaintiffs be awarded all of their actual damages, consequential damages, pre-

judgment interest, additional statutory damages, post-judgment interest, reasonable and necessary attorney's fees, court costs, and that Plaintiffs be further awarded all such other relief, general or specific, in law or in equity, whether pled or un-pled within this Original Petition, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

THE VOSS LAW FIRM, P.C.

*Jonathon G. Nixon*

Jonathon G. Nixon
State Bar No. 24110165
jonathon@vosslawfirm.com
The Voss Law Center
26619 Interstate 45 South
The Woodlands, Texas 77380
Tel.  (713) 861-0015
Fax. (713) 861-0021

ATTORNEY FOR PLAINTIFFS,
MUHAMMAD SHAHID AND
UJALA HAARIS

---

**Plaintiffs' Original Petition**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Brittany Schmidt on behalf of Jonathon Nixon
Bar No. 24110165
brittany@vosslawfirm.com
Envelope ID: 95300917
Filing Code Description: Petition
Filing Description: Plaintiffs' Original Petition
Status as of 12/13/2024 2:05 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jonathon Nixon | | jonathon@vosslawfirm.com | 12/13/2024 1:31:07 PM | SENT |
| Brittany Schmidt | | brittany@vosslawfirm.com | 12/13/2024 1:31:07 PM | SENT |

CAUSE NO. 202486725

COPY OF PLEADING PROVIDED BY PLT

RECEIPT NO: 1011828

TRACKING NO: 74417079

| Plaintiff: | In The 011th |
|---|---|
| SHAHID, MUHAMMAD AND HAARIS, UJALA | Judicial District Court of |
| vs. | Harris County, Texas |
| Defendant: | 201 CAROLINE |
| ALLSTATE INDEMNITY COMPANY | Houston, Texas |

**CITATION CORPORATE**

**THE STATE OF TEXAS**
**County of Harris**

**To:    ALLSTATE INDEMNITY COMPANY (FOR-PROFIT CORPORATION) MAY BE SERVED BY ITS REGISTERED AGENT C T CORPORATION SYSTEM**
**1999 BRYAN STREET STE 900, DALLAS TX 75201-3136 OR WHEREVER IT MAY BE FOUND**

          Attached is a copy of: PLAINTIFF'S ORIGINAL PETITION

This instrument was filed on December 13, 2024 in the above cited cause number and court. The instrument attached describes the claim against you.

          **YOU HAVE BEEN SUED.**  You may employ an attorney.  If you or your Attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration date of 20 days after you were served this citation and petition, a default judgment may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit.  These disclosures generally must be made no later than 30 days after you file your answer with the clerk.  Find out more at TexasLawHelp.org.

          This citation was issued on December 13, 2024, under my hand and seal of said court.

Underline: Issued at the request of:

NIXON, JONATHON GENE
808 TRAVIS, SUITE 1100

HOUSTON, TX 77002
713-632-1722
Bar Number: 24110165

*Marilyn Burgess*, District Clerk

Harris County, Texas
201  CAROLINE     Houston  Texas
77002
(PO Box  4651,  Houston,  Texas
77210)

Generated By: JAROD STIRRUP

Tracking Number: 74417079

## CAUSE NUMBER: 202486725

| | |
|---|---|
| **PLAINTIFF: SHAHID, MUHAMMAD AND HAARIS, UJALA** | In the 011th |
| **vs.** | Judicial District Court of |
| **DEFENDANT: ALLSTATE INDEMNITY COMPANY** | Harris County, Texas |

OFFICER - AUTHORIZED PERSON RETURN

Came to hand at _____ o'clock ___. M. on the _____ day of _____, 20_____. Executed at

(Address)_____

_____ in

_____ County at o'clock ___. M. On the _____ day of _____, 20_____, by

Delivering to _____defendant, in person, a true copy of this Citation together with the accompanying _____ copy (ies) of the «Attachment». Petition attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _____day of _____, 20.

Fees $_____

_____
        By_____
            Affiant                                                          Deputy

On this day, _____, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, On this _____ day of _____, 20__.

_____
                                    Notary Public

# Exhibit 2



**Allstate** Indemnity Company
2775 SANDERS RD
NORTHBROOK IL 60062

You're in good hands.

VOSS LAW FIRM
26619 INTERSTATE 45
THE WOODLANDS TX 773801907

May 07, 2024

INSURED: MUHAMMAD SHAHID
DATE OF LOSS: January 16, 2024
CLAIM NUMBER: 0742346539 ATM

PHONE NUMBER: 972-915-5490
FAX NUMBER: 855-219-7494
OFFICE HOURS:

YOUR CLIENT(S): VOSS LAW FIRM

Dear VOSS LAW FIRM,

Allstate Indemnity Company, appreciates the opportunity to address the concerns raised by Attorney Beverly on behalf of our customers Muhammad Shahid and Ujala Harris. After completion of our investigation it has been concluded that the terms and conditions of the insurance policy were breached. We will include certified copies of the insurance policy, endorsements, notarized proof of loss and inventory form and denial letters for your review. We are unable to provide other requested documents without a subpoena due to our work product is proprietary.

Sincerely,

*TAI MCKINNON*

TAI MCKINNON
972-915-5490
Allstate Indemnity Company

GEN1001                                0742346539 ATM

4000020240508TR00300469900100100687S



[External] Claim No. 0742346539; Muhammad Shahid  (External)  ⊅  (Inbox x)

 **claims@claims.allstate.com**
to erika, me ▾                                                                  10:34 AM (0 minutes ago)

Hello,

Allstate Indemnity Company, appreciates the opportunity to address the concerns raised by Attorney Beverly on behalf of our customers Muhammad Shahid and Ujala Harris. After completion of our investigation it has been concluded that the terms and conditions of the insurance policy were breached. We will include certified copies of the insurance policy, endorsements, notarized proof of loss and inventory form and denial letters for your review. We are unable to provide other requested documents without a subpoena due to our work product is proprietary.

You will receive correspondence in the mail advising the same.

Thank you,

TAI MCKINNON
Allstate Indemnity Company
Phone: (972) 915-5490
Fax: (855) 219-7494
claims@claims.allstate.com

CONFIDENTIALITY/PRIVACY NOTICE: This e-mail, including any attachments, may contain personal, private and confidential information intended solely for use by the individual to whom it is addressed. If you are not the intended addressee, please be aware that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you received this message in error, please notify the sender immediately by e-mail and delete from your system.

**** Please do not delete your unique Conversation ID ****

*** Conversation ID: FR31db78943a1843 ***

-----------------------------------------------------------------------

From: erika@vosslawfirm.com
Sent: Wednesday, May 01, 2024 8:04 AM
To: claims@claims.allstate.com
CC: bryan@vosslawfirm.com
Subject: [External] Claim No. 0742346539; Muhammad Shahid

Good morning,

# Exhibit 1

 Allstate Indemnity Company
PO BOX 672041
DALLAS TX 75267

You're in good hands.

MUHAMMAD SHAHID
17230 FABLE SPRINGS LN
CYPRESS TX 774336468

January 18, 2024

INSURED: MUHAMMAD SHAHID                    PHONE NUMBER: 800-349-5600
DATE OF LOSS: January 16, 2024              FAX NUMBER:
CLAIM NUMBER: 0742346539 SPI

## Claim Acknowledgement Letter

Dear MUHAMMAD SHAHID,

We are writing to let you know that we received your claim and started working on it. Losses are always difficult, but please be assured that we will work to resolve your claim quickly and fairly.

We wanted to let you know that we will need your help to accurately estimate your damages which includes your input on the age and condition of the items before they were damaged. The options for condition are "new", "above average", "average", and "below average". Information about age and condition is used, in part, to determine the amount of any depreciation that may be applicable. "Depreciation" refers to a decrease in an item's value due to age and condition and other factors. We look forward to discussing these details with you as well as whether your policy provides the replacement cost coverage option.

We have a dedicated team of claim professionals that can assist you during the claim process. Just so you are aware, one or more Allstate Indemnity Company representatives may contact you about different aspects of your claim.

We're here to help. If you need additional information, please visit MyClaim.com or contact us.

Sincerely,

*Your Claim Team*

Your Claim Team
800-349-5600
Allstate Indemnity Company

PROA019                                    0742346539 SPI

# Exhibit 4

1    INSURANCE COMPANY            :    ALLSTATE INSURANCE COMPANY

2    INSURED                      :    MUHAMMAD SHAHID

3    POLICY NO.                   :    N/A

4    CLAIM NO.                    :    0742346539

5

6

7

8    _____

9

10                EXAMINATION UNDER OATH OF

11                     UJALA HAARIS

12                  APPEARING REMOTELY

13                  FEBRUARY 23, 2024

14

15   _____

16

17

18

19

20        EXAMINATION UNDER OATH OF UJALA HAARIS, produced as a

21   witness at the instance of MAYELLA GONZALEZ, on behalf of

22   ALLSTATE INSURANCE COMPANY, taken remotely via machine

23   shorthand on the February 23, 2024, in Houston, County of

24   Harris, State of Texas, before Winette Smith, a Notary Public

25   in and for the State of Texas.



Ujala Haaris                                        February 23, 2024
                                                           Page 2

```
 1                     REMOTE APPEARANCES

 2

 3   FOR ALLSTATE INSURANCE COMPANY:

 4         Mr. JORDAN KENNAMER-CHAPMAN

 5         LAW OFFICES OF MAYELLA GONZALEZ

 6         P.O. Box 224566

 7         Dallas , Texas 75222

 8         (713) 336-2800

 9         Jordan.kennamer-chapman@allstate.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23   ALSO PRESENT:

24         Name

25         TAI MCKINNON, CLAIM SPECIALIST
```



Ujala Haaris                                    February 23, 2024
                                                        Page 3

```
 1                    EXAMINATION INDEX

 2

 3                                                     PAGE

 4

 5   UJALA HAARIS

 6

 7

 8   Examination by Jordan Kennamer-Chapman..............     4

 9

10

11   Corrections & Signature...........................    44

12

13

14   Certificate.......................................    46

15

16

17

18

19                    EXHIBIT INDEX

20

21

22   NUMBER          DESCRIPTION                       PAGE

23   Exhibit 1       Google Search                      30

24   Exhibit 2       Google Search Result Photos        34

25   Exhibit 3       NPI Registration                   35
```



```
 1              THE REPORTER:  We are on the record.  Today's
 2   date is Friday, February 23, 2024.  The time is 1:00 p.m.  This
 3   is the examination under oath of UJALA HAARIS, and it is being
 4   conducted remotely by agreement of the parties.
 5              My name is Winette Smith with Magna Legal
 6   Services.  I am the court reporter.  I will be administering
 7   and reporting the examination under oath remotely by
 8   stenographic means.
 9              Would counsels please state their name and
10   appearance for the record.
11              JORDAN KENNAMER-CHAPMAN:  Jordan
12   Kennamer-Chapman for Allstate.
13                    UJALA HAARIS,
14   having been duly sworn, testified as follows:
15                    EXAMINATION
16   BY JORDAN KENNAMER-CHAPMAN:
17       Q.   Good afternoon.  Would you please state your legal
18   name?
19       A.   Ujala Haaris.
20       Q.   Ms. Haaris, my name is Jordan Kennamer-Chapman as you
21   heard me say a little bit a go.  I'm an attorney with Allstate.
22   On the zoom call with us today is Tai McKinnon.  She's a claim
23   specialist with Allstate that's assigned to the claim we are
24   here to talk about, and that's specifically Allstate claim
25   number 0742346539.
```



Ujala Haaris                                    February 23, 2024
                                                        Page 5

1              Have you ever given a examination under oath or
2    a deposition before?
3        A.   No, sir.
4        Q.   Before I get started with the questions I need to go
5    over with you I'm going to kind of explain how this process
6    will work overall to make sure we're on the same page and make
7    it run a little bit more efficiently than it otherwise would.
8              Most importantly, a little bit ago you were
9    asked to raise your hand, swear to tell the truth, the whole
10   truth, and nothing but the truth, and you did that, correct?
11       A.   Yes, sir.
12       Q.   And do you understand that means you are testifying
13   under oath today?
14       A.   Yes, sir.
15       Q.   And do you understand that when you testify under
16   oath your testimony is subject to the criminal penalty of
17   perjury?
18       A.   Yes.
19       Q.   Given all of that, it's very important that you
20   understand my questions before you answer them.  So if at any
21   point you don't for whatever reason, you couldn't hear me
22   because the audio cut out or I was talking softly or you could
23   hear me fine you just don't understand what I'm trying to ask
24   you, or whatever the case is, if you don't understand a
25   question will you please let me know so that I can clarify,



1    rephrase, repeat, or whatever else I need to do?

2        A.    Sure.

3        Q.    And unless you do that I will assume that when you

4    answer my questions you understood them; is that fair?

5        A.    Yes, sir.

6        Q.    The court reporter is taking down everything we are

7    saying and this will be reduced to a written transcript that

8    I'll talk a little bit more about in a minute.

9             But in order for us a get as accurate as a

10   transcript of your examination under oath today as possible

11   there's a few things that you and I need to try to do and not

12   do.

13            The big one is that she can only take down what

14   one of us is saying at a time so if you could please try to let

15   me finish my questions all the way through I'll do the same.  I

16   will do my best to let you finish your answers before I start

17   my next question.

18            There will possibly be some instances where I

19   will unintentionally interrupt you, and in those instances I

20   will also probably catch it, stop, and let you finish whatever

21   it was you were saying.  But in a rare event that I interrupt

22   you and don't let you finish what you are saying please let me

23   know and I will be happy to go back and let you finish whatever

24   it was you were saying before I cut you off, does that make

25   sense?



Ujala Haaris                                              February 23, 2024
                                                                    Page 7

```
 1        A.    Yes, sir.
 2        Q.    And when your answering my questions today please try
 3   to do so verbally with words.  And that sounds kind of goofy
 4   but really what I'm getting at is try not to shake or nod your
 5   head or uh-uh or uh-huh as those seems to be hard to be
 6   accurately reflected on the transcript.
 7              In the event that you do shake or nod your head
 8   or answer a question with uh-uh or uh-huh or something like
 9   that, it's not the end of the world.  I will catch it and ask
10   you to clarify.  For example, if you were to shake your head I
11   would ask, is that a "no?"  If you were to say uh-huh I would
12   say, is that a "yes?"
13              Again, that's just to make sure we get your
14   answers accurately reflected on the transcript and not me
15   trying to be difficult or rude or snarky or anything like that,
16   okay.
17        A.    Of course.
18        Q.    And similarly, there may be times that I ask you to
19   repeat an answer.  If I do that it's because I couldn't hear it
20   or I think the court reporter might not have heard it
21   correctly.  And again, that's just to make sure we understand
22   what your answers are and they are accurately reflected on the
23   transcript.
24              I also may ask you to spell things from
25   time-to-time.  That is so the court reporter can spell them
```



1    accurately in the transcript.  Kind of on that note, at the end

2    when we're all finished today you'll hear me say something

3    along the lines of, those are the all the questions I have and

4    we will conclude the examination under oath.

5              At that point if you can stay on the zoom call

6    for a minute because I will do my best to identify what I think

7    the court reporter might need spelling for but she may need

8    some other things that I didn't think of so that's when she

9    would ask you for those spellings, okay.

10   A.    Sure.

11   Q.    All right.  Now before I get into the questions I

12   have a couple of housekeeping matters I need to go over.  One,

13   do you have any documents or records in front of you that you

14   plan or relying on answering my questions today?

15   A.    No, sir.

16   Q.    Is there anybody else in the room that can overhear

17   the examination under oath?

18   A.    No, sir.

19   Q.    My understanding is that after taking your husband's

20   examination under oath y'all have two children, are either one

21   of them there with you?

22   A.    No.

23   Q.    Did you review any documentation or records in

24   preparation for your examination under oath today?

25   A.    Not really.



Ujala Haaris                                    February 23, 2024
                                                        Page 9

```
1         Q.   On that note, I'm just going to get some basic
2    background information from you and talk to you a little bit
3    more about that transcript.  What is your date of birth?
4         A.   2/12/91.
5         Q.   And what is your current residential address?
6         A.   17230 Fable Springs Lane, Cypress, Texas 77433.
7         Q.   And how long have you lived at that address?
8         A.   Like a year and some change.
9         Q.   And who lives at that address with you?
10        A.   Myself, my husband, and my two children.
11        Q.   And what is a good e-mail address for you?
12        A.   Haaris_shahid@hotmail.com.
13        Q.   Could you spell that out?
14        A.   H-A-A-R-I-S_S-H-A-H-I-D@hotmail.com.
15        Q.   And what is your cellphone number?
16        A.   (832) 374-4277.
17        Q.   And in the last six months have you utilized any
18   other cellphone number besides that one?
19        A.   Yes.  I had a Kentucky number.  I had to change that
20   number and I just got this one.
21        Q.   When did you get that 832 number?
22        A.   A couple of months ago.
23        Q.   Was it in 2024 or before that?
24        A.   It was before that.
25        Q.   And what was the Kentucky number that you had before
```



1    the 832 number?

2          A.     (502) 889-7260.

3          Q.     And before you lived at that address on Fable Springs

4    Lane, what was your address?

5          A.     14 Adams Manor Court.  That's in South Carolina.

6          Q.     What city or town is that?

7          A.     Around the Greenville area.

8          Q.     And one of the reasons why I was asking for your

9    current residential address and your e-mail address, is once

10   the court reporter has an opportunity to finalize the

11   transcript -- usually it takes a couple of weeks, a copy is

12   going to be sent so you.

13               It may be sent via e-mail, it may be sent like a

14   hard copy to -- in the mail or via Fed Ex or UPS.  I'll explain

15   why in just a second but as far as where that transcript is

16   sent to, is that the best e-mail address for us to send it to

17   you?

18         A.     Yes, sir.

19         Q.     And as far as if it's sent as a hard copy, is that

20   the best address to send it to?

21         A.     Yes, sir.  Fable Springs address.

22         Q.     And the reason it's being sent to you is so you have

23   an opportunity to review it.  And if you think that the court

24   reporter made any transcriptions errors there's a page at the

25   back that's pretty self-explanatory, but if you need help you



```
 1    can contact Allstate or my office can help you out with it.
 2                    There's a page toward the back where you can
 3    note any changes that you think need to be made to the
 4    transcript due to the errors on the court reporter's part.
 5                    An example would be, if you say the color blue
 6    but the transcript says boo like the sound a ghost makes, that
 7    would be the type of error you can fix.  What it's not for is
 8    changing the substance of anything you say.
 9                    So let's say you said the color blue but you
10    actually meant to say green, that's not the kind of thing those
11    changes are for so you'll have that opportunity.  And then
12    regardless of whether there are any changes that need to be
13    made to the transcript, at the very end of the transcript will
14    be a signature page.
15                    It will say something along the lines of my name
16    is and it will have your name and you'll fill it in.  I've had
17    an opportunity to review this, any changes I think need to be
18    made noted on the previous page, and you will sign it and send
19    it to back to whoever send it to you.
20                    If it's sent via e-mail you can scan it and send
21    it that way.  If it's sent to you in a hard copy it will
22    include a self-stamped envelope to put that page in and send it
23    back, does that all make sense?
24    A.    Yes, it does.
25    Q.    So continuing to go on with background questions,
```



1   what is your highest level of education?

2        A.   I have a bachelor's.

3        Q.   And what do you have that bachelor's in?

4        A.   English.

5        Q.   Is that the only bachelor's degree?

6        A.   Yes.

7        Q.   Do you have any associate's degrees?

8        A.   No.

9        Q.   At any point in your life have you obtained any

10  licenses or certificate or certifications in any professional

11  or special area?

12       A.   No, sir.

13       Q.   And are you currently employed?

14       A.   No, sir.

15       Q.   And when was the last time you were employed?

16       A.   Quite a while ago before my kids were born.

17       Q.   And it's my understanding your oldest is nine; is

18  that right?

19       A.   Yeah.  Like ten.

20       Q.   What did you do the last time you were employed?

21       A.   I worked at many jobs.  The last one was with Verizon

22  Wireless.  I was a sales associate.

23       Q.   Have you ever worked for any healthcare type

24  business?

25       A.   No, sir.



Ujala Haaris                                      February 23, 2024
                                                         Page 13

1       Q.   So the claim that we are here in connection with

2   relates to some water damage caused by a frozen and busted

3   pipe; is that correct?

4       A.   That is correct.

5       Q.   And what address did that loss occur at?

6       A.   14902 Cactus Wren Drive.

7       Q.   And is that a property that you and your husband own?

8       A.   Yes, sir.

9       Q.   All right.  And when did you purchase it?

10      A.   It was last year September some time.

11      Q.   And what was -- When you purchased it, what did you

12  intend to use it for?

13      A.   We were going to rent it out to a tenant whenever we

14  found one.

15      Q.   And when did that pipe burst?

16      A.   It was January 16th or the 17th.  One of those two.

17      Q.   Of 2024?

18      A.   Correct.  Yes, sir.

19      Q.   Prior to that date, what steps did you or your

20  husband take to try to find a tenant to rent that property out?

21      A.   We had some stuff we had to fix up in the house so

22  not really reaching out to anybody per se but we did let our

23  family members know and my cousin know that we had a house for

24  rent.

25                   If you know anyone who knows or my brother knows



1    that would be great if we can rent it out.

2        Q.    Okay.  Do you currently have a tenant that you're

3    renting the property out to?

4        A.    No.  We had someone interested by like the end of

5    February.  They actually reached out to me a couple of weeks

6    ago to let me know they had rented somewhere else to stay.

7        Q.    And what amount were you seeking for rent for that

8    property?

9        A.    Close to the 2000 mark.  Give or take around that

10   area.

11       Q.    And is that property subject to a homeowner's

12   association?

13       A.    No. I don't think so but I'm not really sure.

14       Q.    Do you know if that property on Cactus Wren falls

15   under any kind of zoning rules as far as what you can use the

16   property for?

17       A.    No, sir.  I'm not aware.

18       Q.    In between the time or date that you purchased the

19   property and closed on it and when -- and by property I'm

20   referring to the property at Cactus Wren.

21             In between the time that you purchased it,

22   closed on it, and the date of loss for this claim on January

23   16th or 17th of 2024, did you use that property for anything

24   else besides trying to fix it up to rent it out?

25       A.    No, sir.



1      Q.   And what did you need to fix in the property when you

2    purchased it -- the repairs that you mentioned that you needed

3    to complete?

4      A.   There were some walls that were damaged.  They had

5    pictures up, like nail damage that needed to be fixed up and

6    painted.  There were some kitchen things that needed to be

7    done.

8                I wanted to paint the kitchen cabinets.  There

9    were a couple of things that we needed to do.  I think there

10   were some pool issues too.  Like the filter of the pool had a

11   issue we needed to get fixed for people that were going to live

12   there.

13     Q.   And at the time that the pipe busted and the property

14   sustained that water damage, how far along were you as far as

15   completing the repairs and renovations that you needed to do?

16     A.   We were almost done.  We had to get the refrigerator

17   ordered and you know, as I said I wanted to paint the cabinets.

18                I didn't like the color.  I wanted it more white

19   so it seemed more open.  There were a couple of other things

20   but nothing major.  Just like little bitty things that were

21   left that we needed to do.

22                Again, we were going to rent at the end of

23   February so we were trying to get things ready.

24     Q.   So the plan was to rent it out by the end of

25   February?



Ujala Haaris

1     A.   Yes, sir.

2     Q.   At any point have you or your husband listed the

3 property for rent on any kind of like rental site such as,

4 Houston Area Realtor, Zillow, or anything like that?

5     A.   No, sir.  For the time being it was basically just

6 word of mouth until we got the place ready.

7     Q.   As far as the repairs and renovation work, is that

8 something y'all did yourself or did you hire people?

9     A.   It was mostly my husband.  He was doing the walls and

10 we hired someone to take care of the pool on a monthly basis.

11 And again, as I said it was a repair thing that had to happen

12 with the filters.

13         And the gate outside wasn't working so I was on

14 the phone with them trying to figure out the battery and stuff.

15 It was basically a team effort but I will give that to my

16 husband he did most of the work.

17     Q.   During the time -- Scratch that.  When did you

18 discover that the pipe had burst?

19     A.   I think it was the 16th or the 17.  Again, I'm not

20 sure of the date.  I was out grocery shopping.  I had to take

21 my mother to her appointment.  I was almost done and I received

22 a call from my husband and he said the water company called and

23 there was a pipe burst outside.

24         I had to cancel my mom's appointment and I

25 rushed over there.  The guys was in the back and he went ahead



1   and turned the water off and everything was good to go.

2                I actually wanted to go inside to check if that

3   one wall he had painted had dried and whenever I had opened the

4   door it was Niagara Falls in there.  It was pretty bad.

5        Q.   And so you said your husband called you and said he

6   had gotten a call from the water company?

7        A.   Yes, sir.  Correct.

8        Q.   Did anybody else call you and tell you that there was

9   a water leak besides your husband?

10       A.   No, sir.  No one else did.

11       Q.   And prior to receiving that call from your husband

12   saying hey look they said there was a water leak, when was the

13   last time that you had been to that property on Cactus Wren?

14       A.   I would go there almost every day because I wanted to

15   get things ready.  I was cleaning a lot, trying to get the

16   bedroom areas set up, I had to make the carpet thing.  Just

17   little things I could do.

18                Just to let you know my mom is a transplant

19   patient so I was kind of like in and out of appointments going

20   there but it was basically almost every day if not ever

21   alternative day.

22       Q.   And when you would go there almost every day like you

23   were describing, was it to -- I think you said to set up the

24   play room?

25       A.   Yes.



1      Q.   What other things would you be doing over there?

2      A.   As I said, like cleaning on the outside, decorating,

3  I was shopping.  I had some plants that I had to buy.

4  Decorations and all that good stuff.

5      Q.   And how often would your husband go over to the

6  property prior to the leak or busted pipe happening?

7      A.   He would go there after work mostly on the weekends.

8  He has every alternate Friday off.  So mostly after work but

9  you know we would be there for a couple hours after work.

10           Mostly on the weekends I would say we really got

11  down to it.  Of course I went to help paint.  It was like a

12  team effort kind of thing.

13      Q.   So prior to the date that you found out there was a

14  leak, who had been there -- between you and your husband who

15  had most recently been to the property?

16      A.   It was me.

17      Q.   And when you had most recently been there, had you

18  noticed any kind of water leaking from anywhere?

19      A.   No, sir.  It was a day prior I remember hearing about

20  the water freeze.  I had actually gone there to wrap up the

21  pipes outside the house.  I had a little blanket I wrapped it

22  up with and making sure that I turned on the tabs and

23  everything so we can prevent what happened but it happened.  Do

24  the best I could have done to prevent the pipe burst.

25      Q.   And about what time did you get that call from your



Ujala Haaris

February 23, 2024
Page 19

1   husband?

2      A.   Well, my mom's appointment was at 10:45 so around

3   9:30 to 10:00.

4      Q.   And it's my understanding that you and your husband

5   have a couple of other rental properties in Kentucky; is that

6   right?

7      A.   Yes, sir.  We have two.

8      Q.   And those properties in Kentucky that you rent out,

9   do you rent them out partially furnished or they're empty?

10      A.   Partially furnished with the bedrooms and everything.

11   We leave that up and in the office area.  We like to show them

12   the potential of the house if that makes sense.

13         And a play area for the kids so it seems homey

14   to the family.  And you know, we have a office set up right now

15   for friends and family at my house.  We try to kind of copy

16   that.  We kind of copy what we're comfortable with to present

17   to other people to rent.  Like we leave a sofa or recliner but

18   no major furnishings.

19      Q.   And the property on Cactus Wren, was the plan to rent

20   it out empty or partially or fully furnished?

21      A.   Partially furnished.

22      Q.   What kind of stuff were you going to partially

23   furnish it with?

24      A.   We had the living room and also the breakfast area

25   table, we had stools, the little play area.  We were going to



 1    leave the washer and dryer there, you know, stuff like that.

 2         Q.   And it sounds like in all three of your properties

 3    you either rented them out with like a kids play area or you

 4    intend to with respect to Cactus Wren, why do y'all have them

 5    set up for children?  Do you only rent to people with children?

 6         A.   Yeah.  Mostly because, you know, our take is -- and I

 7    try not to be bias about it but if you were to rent to college

 8    students I don't prefer that because of the parties and stuff.

 9    You can't really trust that so we tend to lean towards families

10    with children.

11         Q.   When you purchased the property at Cactus Wren, was

12    it empty or was there still stuff inside?

13         A.   There was a few things there.  Washer and dryer, some

14    other stuffs.  A couple of desk and chairs.  Stuff like that.

15         Q.   And was there anything on the walls?

16         A.   No.  My son likes to play with stickers and

17    everything.  To keep him occupied we tried to make it a little

18    accommodating to them to when we are fixing it.

19              It's a empty place so kind of to make it a

20    friendly place for them so they can let us do our work until we

21    can rent it out.

22         Q.   And so I want to make sure I'm understanding you

23    correctly.  As far as anything that was on the walls in the

24    pictures that were submitted or taken as part of this claim,

25    those would be things that y'all added to the walls yourself?



1      A.    I haven't seen the pictures but yeah I guess.

2      Q.    And what kind of things did you have for your kids as

3  far as to keep them entertained while you were doing your work?

4      A.    I had taken my son's trampoline, his scooter thing,

5  some other things.  I was going to leave it there because I

6  wanted to make a little nook for the kiddos of the family but

7  most of it were my kids toys so they could stay entertained.

8      Q.    Okay.  And it is my understanding that you and your

9  husband formed a limited liability company also known as an LLC

10  toward the end of 2023; is that right?

11      A.    Yes, sir.

12      Q.    And the name of that LLC is Conquest Centers LLC?

13      A.    Yes, sir.

14      Q.    Why did y'all form that LLC?

15      A.    We have been looking into the business doing market

16  research and everything.  I feel it's a good lucrative business

17  and we were just looking into that.  I love kids and I think I

18  would be able to do something to help a cause with down

19  syndrome and ADHD and stuff with autism.

20      Q.    So what kind of business would it be?

21      A.    It would be like a therapy center for people.

22      Q.    And do you have any experience as a therapist?

23      A.    No.  I do not.

24      Q.    What about your husband?

25      A.    He does not.



Ujala Haaris                                    February 23, 2024
                                                        Page 22

1    Q.    Okay.  I guess if that's the case and neither of

2    y'all have any of that experience, what's the plan as far as

3    how you were going to operate that business?

4    A.    We were going to hire people qualified to do it and

5    everything.

6    Q.    I guess, what got you and your husband interested in

7    starting that kind of business?

8    A.    Actually, I have a nephew who has developmental

9    disabilities and that's kind of what got me into this career

10   path.

11   Q.    Okay.  And you mentioned market research, how did you

12   go about researching that?

13   A.    I hired someone in Pakistan.  That's where we are

14   from.  They were doing post, at least that's what I heard.

15   Some post online that they did.  We also hired a guy to do a

16   website for us.

17              Just kind of see like the cost of course and --

18   It's basically really in a infancy stage so nothing too grand

19   that we did for that.

20   Q.    Given that it's a healthcare related business, have

21   y'all registered it as far as to get a NPI number or a tax ID

22   or anything like that?

23   A.    I'm not sure what that is.

24   Q.    An NPI number is the number that -- It's a unique

25   number that's given to healthcare providers so that when they



1   bill insurance companies or medicare or medicaid there's a

2   number that's attached to that provider or to that facility to

3   be used in the billing processing.  Do you know if that was

4   done?

5       A.   I don't know.

6       Q.   And what about a tax ID, do y'all have a tax ID for

7   that business?

8       A.   I don't know.  I'm so sorry.

9       Q.   Have you and your husband filed your taxes yet for

10  the 2023 year?

11      A.   I don't think so.

12      Q.   When you and your husband file your taxes do you have

13  a tax ID number for the rental properties, like do you consider

14  that an enterprise?

15      A.   To be honest with you he handles all of that.  I

16  basically just take care of the house so I can't give you any

17  input on that to be honest with you.

18      Q.   Do you know if you are going to be reporting any

19  income for Conquest Centers LLC?

20      A.   No.  It's not even functioning so I don't think so.

21      Q.   We are switching gears a little bit.  At the time

22  that the leak happened and you sustained the water damage last

23  month, were there any working security cameras at the property

24  on Cactus Wren?

25      A.   There were.  Yes, sir.



1      Q.   Did the security footage save anywhere like a local

2  hard drive or to the cloud or anything like that?

3      A.   All I know is it's motion sensors and we have to buy

4  some space on the cloud.  I would imagine so it would be saved

5  on the cloud if my husband was to buy some space.  I'm sure

6  he's done that.  I'm not really sure if he did or not.  I know

7  for sure it motion censored.

8      Q.   And after the pipe burst and you reported it to

9  Allstate, it's my understanding that somebody from Allstate

10  came out to the property while you were there and reviewed the

11  damage and talked to you about it, do you recall that?

12      A.   I do.  Yes, sir.

13      Q.   And do you recall when you were speaking to that

14  person that came out when you said you had last been there

15  prior to learning of the water damage?

16      A.   It was quite a long conversation here and there.

17  Could you repeat or rephrase the question please.

18      Q.   Yeah.  Do you recall what you told that person that

19  came out from Allstate as far as when the last time you had

20  been to the property prior to coming over and finding the water

21  damage?

22      A.   I don't recall.  We spoke about it's possibly but no.

23  Not off the top of my head.  I don't think I told him I was

24  here at this time.

25      Q.   And when that person from Allstate came out, who was



 1  there at the property beside you?

 2      A.    Myself and my contractors.

 3      Q.    What contractors?

 4      A.    The one -- Go Craft.

 5      Q.    And what were they working on?

 6      A.    They were taking off the bottom baseboards.  As

 7  directed by Allstate, we were told to do that just to prevent

 8  mold.  They were also fixing up the pipes in the attic area.

 9  That's what I remember happening.

10      Q.    As far as your discussions with the individual from

11  Allstate that came out, what do you remember being said between

12  y'all?

13      A.    Well, he came to the property, I shook his hand, I

14  said it's a mess in there.  He went outside and he looked

15  around and then immediately he started getting the water meter.

16            I think that's what it's called.  And he had

17  told my contractor -- They gave me a really cheap one.  They

18  were talking about that.  It was like guy talk.

19            I was on my phone and then I came back and my --

20  He was looking at some of the damage in the living room area

21  and I had gone to the kitchen and I told him, hey, whenever it

22  happened my husband and I came and assessed the damage.  The

23  doors and the kitchen had water in it.

24            And Mr. Emmanuel said I don't see any damage.  I

25  gave him a wet paper towel that was inside the drawer and he



```
 1    said I'll take a look at it.  My contractor went ahead and told

 2    him look it's swelling up over here.  It was like a corner of

 3    the cabinet and then he went, oh yeah, I'm going to write that

 4    down.

 5                    After that he did some more stuff.  I was

 6    outside talking on the phone.  He's doing his thing and he said

 7    he will be there for a while and I kind of left.  I had nothing

 8    else to do and it was just guys there so I just left.

 9         Q.   Okay.  I need to --

10                    JORDAN KENNAMER-CHAPMAN:  Let's go off the

11    record.

12                    (Off the record at 1:46 p.m.)

13                    REPORTER:  We are back on the record at 1:50

14    p.m.

15         Q.   (By Jordan Kennamer-Chapman)  Okay.  Ms. Haaris, one

16    of the reasons why I was asking you about the visit from that

17    Allstate representative after the loss, and I think you're

18    aware of this but according to that individual you had

19    mentioned to them that you hadn't been at the property for a

20    while and you had been using it as a daycare that they said you

21    said.

22         A.   He lied.

23         Q.   Okay.  And so there's no truth to you saying that you

24    had been using it as a daycare?

25         A.   That is correct.  I never said that to him.  I
```



1    e-mailed someone about that too.

2        Q.   I have seen that e-mail and that's one of the reasons

3    I'm bringing it up.  And one of the things you said in there --

4    and I don't want to misquote you so let me pull up the exact

5    thing.

6            In that e-mail says, she told me -- talking

7    about Janelle.  She told me that Emmanuel Muniz called her and

8    told her about the interaction he and I had.  I informed her

9    that was a complete lie and I told her we have a motion

10   detecting camera that records the front door and I can send her

11   the video of our interaction when he arrives to prove he is

12   lying.  Did you ever send that video in?

13       A.   I didn't get a chance to.  After the incident I spoke

14   to my husband about it and he said that he in fact had not

15   bought that space on the cloud.  So sadly I don't have that

16   video.

17            I was very sure I did but we don't.  I have no

18   reason to lie.  There's no reason for me to tell him I run a

19   daycare center here so whatever he said was a complete lie.

20       Q.   And so have you at any point in your life ever run a

21   daycare?

22       A.   No, sir.

23       Q.   The Conquest Centers LLC that you were talking about

24   what kind of business it would be -- you may have said this and

25   I'm not remembering it, but your patients or clients for that



Ujala Haaris                                        February 23, 2024
                                                              Page 28

1  business they would be predominately children; is that right?

2       A.    Not necessarily.  I said people because we are not

3  going to discriminate with age.  Anyone at any age would be

4  able to join the facility if they please.

5       Q.    Have you reviewed that website that you hired that

6  guy to build?

7       A.    Honestly I have not in a while.  Reason being my aunt

8  was suffering from terminal cancer and she passed last Sunday

9  so I was honestly kind of dealing with that.  I haven't gotten

10 a chance to review it.  I had other things to deal with.

11      Q.    Fair enough.  And I'm sorry for your loss.  So one of

12 the things that came up during Allstate's investigation of this

13 claim is what I'm going to show you right now.  Can you see my

14 screen?

15      A.    Yes, sir.  I can.

16      Q.    I searched Conquest Center LLC Texas.  The name of

17 the LLC you and your husband started and when I searched that

18 and when I clicked on that one which is northwest of Houston it

19 gives me this information here.

20            And it list the address for Conquest Centers as

21 14902 Cactus Wren Lane in Tomball, Texas which is the house

22 where this loss occurred, correct?

23      A.    Correct.

24      Q.    Do you know why that address is associated with

25 Conquest Centers LLC?



Ujala Haaris                                    February 23, 2024
                                                       Page 29

```
 1        A.    So as I mentioned I had hired a guy from Pakistan and
 2   I don't know if you're familiar but addresses that are written
 3   over there is completed different than how we write them over
 4   here.
 5              Whenever I gave him the website he was telling
 6   me I need to know how y'all write the address so I gave him my
 7   Fable Spring one, this one, and the one in Kentucky just to
 8   give him an idea.  I guess he put it on there without my
 9   permission.  Again, I haven't dealt with him in a while so
10   maybe that's the reason why.
11        Q.    Okay.  What is that individual's name?
12        A.    His name is Sajjad.  I know him as SJ.
13        Q.    Can you spell that first name?
14        A.    S-S-A-J-J-A-D.
15        Q.    And so it's your understanding that this information
16   that Google has when you search Conquest Centers LLC Texas is
17   information input by that individual that did the website?
18        A.    I would imagine so.  Yes, sir.  He was looking over
19   these things.  As I said, I haven't looked at these things for
20   a minute just because she was basically dying and I wanted to
21   be there for her and focus on that.  If there are some
22   discrepancies that need to be addressed then yeah.
23        Q.    And we will attach this as exhibit one.  And it has
24   hours of operation, for example, it says closes at 5:30 p.m.,
25   do you know where those hours of operation came from?
```



1      A.    It's just like a general idea that he might have.

2   Again, in Pakistan everything is closed on Friday so he was

3   asking me what hours do you work and I just basically gave him

4   like my husband use to work nine to five.

5                 I gave him a basic idea and he went 30 minutes

6   above the five.  I just gave him a basic idea of what I needed

7   and that's what he put.

8                 (Exhibit No. 1 was marked.)

9      Q.    Why was he needing hours of operation if y'all hadn't

10  even found a location for the business yet?

11     A.    I mean, we don't have to have a location to figure

12  out hours of operation.

13     Q.    I guess if you are in the beginning early stages of

14  that company you don't even have -- I think you said you were

15  going to hire somebody to be a therapist, why were you setting

16  hours of operation?

17     A.    Because it was going to be a business.  I'm really

18  not sure what you're trying to ask.  Clearly it's going to be a

19  business and it's going to have hours of operation.  I don't

20  know how to answer that.

21                We are doing everything as best as we know

22  trying to hire people.  Going a little bit cheaper route going

23  out of the country but why would we not have hours of

24  operation?

25     Q.    Well, because hours of operation -- Like it says it's



Ujala Haaris                                    February 23, 2024
                                                         Page 31

1   open if you look at the bottom where my curser is, but it's not

2   an open functioning business though, correct?

3        A.   It's not.  No.  As I said, again, he must've just put

4   it on there.  I don't think it's supposed to be online yet so I

5   will have to talk to him about that.

6             It's not supposed to be up and running right now

7   because it's the early -- maybe he did something that made it

8   available to public but it was not meant to be public.

9        Q.   Okay.  And then there's these pictures associated

10  with Conquest Centers, do you see those right here?

11       A.   Yes.  I do.

12       Q.   What are they photos of?

13       A.   It's the house.

14       Q.   At Cactus Wren, right?

15       A.   Yes.

16       Q.   Do you know how those photos were provided and ended

17  up being linked to Conquest Centers like they are here?

18       A.   I'm not sure.  I provided him that address.  From

19  what I see it's probably from the old owners like Zillow or

20  something.  I really don't know where he got it from.

21       Q.   I'm going to stop sharing my screen for a second.

22  Before I forget, have you gotten to know any of the neighbors

23  that live around that address on Cactus Wren?

24       A.   No, sir.

25       Q.   Have you ever spoken to any of the neighbors?



1    A.    No. Just waved.  That's it.

2    Q.    Do you have any of their phone numbers?

3    A.    No, sir.

4    Q.    Did any of the water that leaked from your property

5    get onto any of the neighbor's property?

6    A.    I don't think so.  No.

7    Q.    What I want to show you now -- Let me know when you

8    can see my screen.

9    A.    I can see it.

10    Q.    Those pictures that I was showing you on the Google

11    search result for Conquest Centers, if you click on them -- and

12    I've copied them and pasted them into a PDF.  But if you click

13    on them it shows you who linked them to Conquest Centers.  And

14    can you see that name right here that my cursor is on?

15    A.    Yeah.  I see it.

16    Q.    That's your husband isn't it?

17    A.    It is.

18    Q.    And about three months ago he put this picture up for

19    Conquest Centers LLC as well as this one down here, and those

20    are both photos of the property at Cactus Wren; is that

21    correct?

22    A.    No.  Let me correct you.  As I said, we had hired

23    someone and he has access to my Facebook and all that stuff.

24    And my husband has really nothing to hide so he probably did

25    it.  It was not my husband.



Ujala Haaris                                February 23, 2024
                                                    Page 33

1          Q.    He has access to your husband's Google account?

2          A.    Yeah.

3          Q.    Let me see if I'm understanding you correctly.  Why

4      do you believe that it was the individual you hired to make the

5      website instead of your husband that posted these photos of the

6      property at Cactus Wren in connection with Conquest Centers?

7          A.    Because I had provided everything he would basically

8      need and whatever he asked for.  And my husband works long

9      hours so he doesn't have the time to do that.

10         Q.    Is your confidence that it was not your husband

11     having anything to do with the fact that y'all weren't using

12     this address for this business and therefore your husband

13     wouldn't have linked those photos to the account?

14         A.    Could you repeat the question?

15         Q.    Is your confidence that your husband is not the

16     person who linked these photos to Conquest Centers have

17     anything to do with the fact that y'all were not using this

18     property for Conquest Centers and therefore there would be no

19     reason for him to link them to Conquest Centers?

20         A.    Absolutely.

21         Q.    And what information did you provide that individual

22     who was helping y'all with the website and whatnot as far as

23     the property on Cactus Wren?

24         A.    I gave him the address at the Fable Springs house, my

25     Kentucky address just to show him this is how we would write



Ujala Haaris                                          February 23, 2024
                                                              Page 34

1   the address, the name of the number, the name of the street.

2   Blah, blah, blah.  Other than that I gave him my Google

3   password.  Whatever he asked for that had to do with the

4   internet and his business.

5        Q.   Did you provide him any photos of Cactus Wren?

6        A.   No. I did not.

7                  JORDAN KENNAMER-CHAPMAN:  Okay.  I will stop

8   sharing my screen and I will attach this as exhibit two.

9                  (Exhibit No. 2 was marked.)

10       Q.   So earlier I was asking you if you and your husband

11  ever obtained an NPI number for that business Conquest Centers

12  LLC and you explained that you didn't know what that meant?

13                 So NPI stands for national provider identifier,

14  and it was part of -- it falls under the -- it's something that

15  was started with the Hippa which you may or may not ever heard

16  of.  It's an health insurance portability and accountability

17  act.

18                 The reason I'm bringing all of this up again is

19  that when I conducted your husband's examination under oath he

20  confirmed that he did in fact register the LLC with the

21  national provider identifiers registry and got the NPI number

22  for the LLC.

23                 And I want to show you what the NPI shows as far

24  as that registration.  So this is a six page PDF and we will

25  attach it as exhibit three.  And on page two there's a bunch of





1   information that's not all that helpful or relevant to what I

2   need to ask you about.

3                On page three it says, providers organization

4   name Conquest Centers.  Provider first line business malling

5   address 14902 Cactus Wren Drive in Tomball, Texas 77377.

6                Provider first line business practice location

7   address 14902 Cactus Wren Drive, and then provider business

8   practice location address phone number is (832) 374-4277, and

9   that's your cellphone number, correct?

10        A.    That's correct.  Yes, sir.

11              (Exhibit No. 3 was marked.)

12        Q.    And now that I'm showing you all this, do you

13   remember being involved when your husband registered the LLC

14   for an NPI number?

15        A.    No.  I was never involved.  I don't know what a NPI

16   is to be honest with you.

17        Q.    And you would agree with me that according to the

18   records from that registration that we're looking at it does

19   show that the mailing address and the actual practice address

20   for that is 14902 Cactus Wren Drive, correct?

21        A.    That's what it says, however, you know, when you're

22   online and you're filling out some stuff it's very possible

23   that mailing address got auto-copied somehow.  Again, he knows

24   more than I do so I really have nothing to do with this.

25        Q.    If it was auto-filled like you were just suggesting



1    it could've been -- wouldn't it be your Fable Springs Drive

2    address that would auto-fill on it and not the Cactus Wren

3    address?

4        A.    No. If you see it says mailing address.  The first

5    line of mailing address, it's very possible he wanted the mail

6    to go there and it just auto-filled the rest of the

7    application.  It's a guess I really don't know.

8        Q.    Do you know why he wanted the mail to go there if

9    y'all were going to rent out that property to somebody else?

10       A.    Just to keep things separate until someone else gets

11   the house.  Just to keep it separate from our mail here and not

12   get stuff confused.

13       Q.    And y'all bought the property on Cactus Wren in

14   October?

15       A.    Last year sometime in September or October.  I'm not

16   sure exactly when we closed on it but it was last year around

17   September.

18       Q.    Because this NPI number was obtained on September

19   11th of 2023, do you see that here?

20       A.    I do.

21       Q.    So at this point and like we said earlier this

22   examination under oath is under oath and carries with it the

23   potential criminal penalty of perjury.  And at this point we

24   have seen that when your husband registered for this NPI number

25   in September of 2023 or obtained that NPI number he listed the



 1    address as Cactus Wren.

 2              If you do a Google search for that business

 3    Conquest Centers LLC it comes up as Cactus Wren as the address

 4    and then has photos of the property that were posted by an

 5    account bearing your husband's name.  And I know you explained

 6    that you think it was the other guy --

 7         A.   I know it was the other guy.

 8         Q.   And then we have -- Okay.  How do you know that?

 9         A.   Because I'm the one taking care of that aspect of the

10    business.  He's not.

11         Q.   Okay.  I guess you gave him -- and by him I mean the

12    guy that was helping you with the internet stuff on the

13    website.  You gave him your Google account information,

14    correct?

15         A.   Mine and my husband.  Yes, sir.

16         Q.   My question is, given the information combined with

17    the representation of the individual Emmanuel that came out for

18    Allstate and said you told him you were running a daycare out

19    of there, is there anything about your testimony so far that

20    you would like to change before we wrap up?

21              And I'm not quite done yet but I want to give

22    you that opportunity before we go any further.

23         A.   Absolutely not.  He completely lied about it.  I

24    never said that to him.  I don't know why he said that or why

25    he's doing what he's doing.  I'm not sure what question you're



1  asking exactly but talking about him he lied.  What's your

2  other question?

3      Q.   No. My question is simply if there's anything now

4  that you have seen this information about the NPI number, and

5  the Google search results and that kind of thing, and the stuff

6  that we've gone over, and given that your testimony is under

7  oath here, is there anything before we finish that you wanted

8  to change or go back and revise any of your testimony from

9  earlier?

10     A.   The NPI has nothing to do with me.  I don't know what

11 it is or what it stands for so I can't comment on that but

12 everything else I said I stand by it.

13     Q.   Okay.  I need about 15 minutes to go over everything

14 that we've talked about and some other notes and make sure I've

15 covered all my basis as far as what Allstate wants me to talk

16 to you about.  We will go off the record and come back about

17 2:30.

18                 (Off the record at 2:16 p.m.)

19                 REPORTER:  We are back on the record at 2:31

20 p.m.

21     Q.   (By Jordan Kennamer-Chapman)  Ms. Haaris, We are back

22 on the record now and you're still under oath.  Do you

23 understand both of these things?

24     A.   Yes, sir.

25     Q.   Not too much to go over with you.  I wanted to talk



```
 1   to you a little bit more about your interactions with Emmanuel

 2   from Allstate.  And of course we talked about when he came out

 3   to the property, did you ever speak to him on the phone after

 4   that?

 5       A.   Yes.  Once.

 6       Q.   Do you remember what was said between y'all on this

 7   subsequent phone call?

 8       A.   He just said that our property was under

 9   investigation and he was going to be out of town for the next

10   four days and not to bother him.  And then he said that he had

11   sent a letter regarding the investigation and I told him okay.

12       Q.   What did he tell you the reason it was being

13   investigated?

14       A.   He didn't tell me.

15       Q.   Did you ask?

16       A.   No.

17       Q.   So he did not tell you it was being investigated due

18   to the representation that he says -- I know you refuted but

19   that he says you made when he visited the property that you

20   were using the property as a daycare?

21       A.   I don't remember that on the phone call.

22       Q.   Okay.  When did you find out that there was a

23   suspicion that the property had been being used as a daycare?

24       A.   So Janelle had called my husband even though we were

25   told by Allstate Janelle had nothing to do with this.  I was
```



1    trying to get in touch with somebody because Mr. Emmanuel was

2    not to be -- I couldn't talk to him for the next four days.

3                    And she had called my husband saying Emmanuel

4    had said whenever I had opened I door I shook his hand and I

5    said, oh, I run a daycare here.  That doesn't make sense.

6                    Anyway, she was telling him that's what your

7    wife said to me.  Why not call me?  Why is she calling my

8    husband?  But anyway, so of course that's not a fact and he

9    told her why would she even say that.

10                   And then I called Janelle and I was like what's

11   going on?  Why are there being words put into my mouth?  I was

12   sure I had the video of our interaction whenever he had said

13   alledgedly what I had said to him.

14                   Sadly I don't but that's how I found out that he

15   was lying and putting words into my mouth in the event that it

16   never happened.

17        Q.    Okay.  So I want to go through a few things and make

18   sure that your positions are clear on them.  So when Emmanuel

19   said that you told him you were running a daycare out of that

20   residence where the loss happened that is not true?

21        A.    This is not true.  I never said that.

22        Q.    Did you ever tell Emmanuel that the water had been

23   running for two days before it was discovered?

24        A.    No. I never said that.

25        Q.    Did you ever tell Emmanuel that you had not been at



1     the property for a period of time because the kids at the

2     daycare were on break?

3          A.   No. I didn't say that.  In fact I told him I was just

4     here.  I had wrapped all the pipes.  I had turned all the water

5     on.  I don't even know how this happened so I don't know why he

6     would even say that but knowing him whatever.

7          Q.   And did you ever tell Emmanuel that you learned of

8     the water leaking from your neighbor next door?

9          A.   No, sir.  I never said that.  That didn't happen.

10         Q.   Did you ever tell Emmanuel that your neighbor had

11    reported to you that there was water coming out of your

12    detached garage and flowing into your neighbor's property?

13         A.   No.  I never said that to him.

14         Q.   And we talked about this a minute ago but sitting

15    here today, you don't remember Emmanuel ever telling you that

16    the claim was being further investigated due to the alleged

17    representation of it was being used as a daycare, he never told

18    you that?

19         A.   I don't think he did.  I just remember him telling me

20    they wanted to make sure it wasn't vacant.  I mean, off the top

21    of my head that's what I remember.  And he said that he was

22    going to send a letter where we have to provide utility bills

23    to prove that we were in fact taking care of the property.

24    That's all I remember to be honest with you.

25         Q.   Okay.  Do you recall ever telling Emmanuel --



1    specifically Emmanuel that you were not using the property as a

2    daycare?

3         A.    There was no talk of a daycare.  I don't even know

4    why that came up out of his mouth.  I remember opening the door

5    and I shook his hand and said it's a mess in there.  That's all

6    I said to him.

7              The rest was mostly a conversation with my

8    contractor.  Any other conversation was before we showed up he

9    had said he had a pipe burst at his property in College Station

10   and we were talking about stuff happens.

11             I shook his hand and told him it's a mess in

12   there and the rest was basically with my contractor.  I really

13   didn't talk to him after that besides the fact whenever I

14   pointed out how there was leakage in there.

15        Q.    Okay.  A few times today you have referenced -- I

16   will characterize it as frustration with how Emmanuel from

17   Allstate has been as far as handling this claim, is there

18   anything else about his conduct one way or the other that you

19   have an issue with besides what we've already discussed today?

20        A.    No.  I think any human being would be absolutely

21   upset at something that never uttered out of their mouth.  I'm

22   very disappointed in what he had said and lying.

23             Of course he's an Allstate representative but

24   lying is not the right thing to do.  It's unethical to be

25   honest with you.  I don't really care for him to be honest.  I

**MAGNA**
**LEGAL SERVICES**

Ujala Haaris

1  never said that and I'm a very honest person and I don't like

2  when people lie about me or lie about what I have said.  That's

3  one of my pet peeves.

4          Q.   Okay.  Fair enough.

5                JORDAN KENNAMER-CHAPMAN:  Tai, is there anything

6  else you want me to ask Ms. Haaris about?

7                TAI MCKINNON:  No.  That's all.

8                JORDAN KENNAMER-CHAPMAN:  In that case we will

9  conclude the examination under oath and go off the record.

10               (Off the record at 2:39 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Ujala Haaris

February 23, 2024
Page 44

```
1               WITNESS CORRECTIONS AND SIGNATURE

2    Please indicate changes on this sheet of paper, giving the

3    change, page number, line number and reason for the change.

4    Please sign each page of changes.

5

6    PAGE/LINE           CORRECTION       REASON FOR CHANGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                        _____

25                        UJALA HAARIS
```



Ujala Haaris                                    February 23, 2024
                                                     Page 45

1        I, UJALA HAARIS, have read the foregoing transcript and

2   hereby affix my signature that same is true and correct, except

3   as noted above on the previous pages(s), and that I am signing

4   this before a Notary Public

5

6

7                           UJALA HAARIS

8   THE STATE OF Texas)

9   COUNTY OF Harris)

10

11       Before me, Winette Smith, on this day personally appeared,

12  UJALA HAARIS, known to me or proved to me under oath or through

13                        (description of identity card or other

14  document), to be the person whose name is subscribed to the

15  foregoing instrument and acknowledged to me that they executed

16  the same for the purposes and consideration therein expressed.

17

18       Given under my hand and seal of office on this, the 23rd

19  day of February, 2024.

20

21

22

23                           Notary Public in and for

24                           The State of Texas

25                           Commission Expires: 04/30/2027



```
1    INSURANCE COMPANY          :    ALLSTATE INSURANCE COMPANY

2    INSURED                    :    MUHAMMAD SHAHID

3    POLICY NO.                 :    N/A

4    CLAIM NO.                  :    0742346539

5

6                      CERTIFICATION TO THE

7                   EXAMINATION UNDER OATH OF

8                         UJALA HAARIS

9                  TAKEN ON FEBRUARY 23, 2024

10

11

12

13

14

15        I, Winette Smith, Notary Public in and for the State of

16   Texas, hereby certify that this examination under oath

17   transcript is a true record of the testimony given by with

18   witness named herein, after said witness was duly

19   sworn/affirmed by me.

20        I further certify that I am neither attorney nor counsel

21   for, related to, nor employed by any of the parties to the

22   action in which this testimony was taken.  Further, I am not a

23   relative or employee of any attorney of record in this cause,

24   nor do I have a financial interest in the action.

25        The original examination under oath transcript was
```



Ujala Haaris                                    February 23, 2024
                                                       Page 47

1    delivered to the attorney party who asked the first question

2    appearing in the transcript on February 23, 2024.  JORDAN

3    KENNAMER-CHAPMAN, was the counsel present at the time of the

4    taking of this examination under oath.

5

6

7

8

9

10

11

12                    _W̲.̲R̲.̲S̲.̲_

13    _____

14    WINETTE SMITH

15    Notary Public in and for

16    The State of Texas

17    My Commission expires 04/30/2027

18

19

20    Magna Legal Services

21    700 Milam St. Ste. 1300

22    Houston, Texas 77002

23    866 624-6221

24    WWW.MagnaLS.com

25





# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



Ujala Haaris

February 23, 2024
Index: 0742346539..aunt

| 0 |
| --- |

**0742346539** 4:25

| 1 |
| --- |

**1** 30:8
**10:00** 19:3
**10:45** 19:2
**11th** 36:19
**14** 10:5
**14902** 13:6 28:21 35:5,7,20
**15** 38:13
**16th** 13:16 14:23 16:19
**17** 16:19
**17230** 9:6
**17th** 13:16 14:23
**1:00** 4:2
**1:46** 26:12
**1:50** 26:13

| 2 |
| --- |

**2** 34:9
**2/12/91** 9:4
**2000** 14:9
**2023** 21:10 23:10 36:19,25
**2024** 4:2 9:23 13:17 14:23
**23** 4:2
**2:16** 38:18
**2:30** 38:17
**2:31** 38:19
**2:39** 43:10

| 3 |
| --- |

**3** 35:11
**30** 30:5

| 5 |
| --- |

**502 889-7260** 10:2
**5:30** 29:24

| 7 |
| --- |

**77377** 35:5
**77433** 9:6

| 8 |
| --- |

**832** 9:21 10:1
**832 374-4277** 9:16 35:8

| 9 |
| --- |

**9:30** 19:3

| A |
| --- |

**absolutely** 33:20 37:23 42:20
**access** 32:23 33:1
**accommodating** 20:18
**account** 33:1,13 37:5,13
**accountability** 34:16
**accurate** 6:9
**accurately** 7:6,14,22 8:1
**act** 34:17
**actual** 35:19
**Adams** 10:5
**added** 20:25
**address** 9:5,7,9,11 10:3,4,9,16,20,
  21 13:5 28:20,24 29:6 31:18,23
  33:12,24,25 34:1 35:5,7,8,19,23
  36:2,3,4,5 37:1,3
**addressed** 29:22
**addresses** 29:2
**ADHD** 21:19
**administering** 4:6

**afternoon** 4:17
**age** 28:3
**agree** 35:17
**agreement** 4:4
**ahead** 16:25 26:1
**alledgedly** 40:13
**alleged** 41:16
**Allstate** 4:12,21,23,24 11:1 24:9,
  19,25 25:7,11 26:17 37:18 38:15
  39:2,25 42:17,23
**Allstate's** 28:12
**alternate** 18:8
**alternative** 17:21
**amount** 14:7
**answering** 7:2 8:14
**answers** 6:16 7:14,22
**appearance** 4:10
**application** 36:7
**appointment** 16:21,24 19:2
**appointments** 17:19
**area** 10:7 12:11 14:10 16:4 19:11,
  13,24,25 20:3 25:8,20
**areas** 17:16
**arrives** 27:11
**aspect** 37:9
**assessed** 25:22
**assigned** 4:23
**associate** 12:22
**associate's** 12:7
**association** 14:12
**assume** 6:3
**attach** 29:23 34:8,25
**attached** 23:2
**attic** 25:8
**attorney** 4:21
**audio** 5:22
**aunt** 28:7



Ujala Haaris

February 23, 2024
Index: autism..comment

**autism** 21:19

**auto-copied** 35:23

**auto-fill** 36:2

**auto-filled** 35:25 36:6

**aware** 14:17 26:18

---

**B**

---

**bachelor's** 12:2,3,5

**back** 6:23 10:25 11:2,19,23 16:25 25:19 26:13 38:8,16,19,21

**background** 9:2 11:25

**bad** 17:4

**baseboards** 25:6

**basic** 9:1 30:5,6

**basically** 16:5,15 17:20 22:18 23:16 29:20 30:3 33:7 42:12

**basis** 16:10 38:15

**battery** 16:14

**bearing** 37:5

**bedroom** 17:16

**bedrooms** 19:10

**beginning** 30:13

**bias** 20:7

**big** 6:13

**bill** 23:1

**billing** 23:3

**bills** 41:22

**birth** 9:3

**bit** 4:21 5:7,8 6:8 9:2 23:21 30:22 39:1

**bitty** 15:20

**blah** 34:2

**blanket** 18:21

**blue** 11:5,9

**boo** 11:6

**born** 12:16

**bother** 39:10

**bottom** 25:6 31:1

**bought** 27:15 36:13

**break** 41:2

**breakfast** 19:24

**bringing** 27:3 34:18

**brother** 13:25

**build** 28:6

**bunch** 34:25

**burst** 13:15 16:18,23 18:24 24:8 42:9

**business** 12:24 21:15,16,20 22:3, 7,20 23:7 27:24 28:1 30:10,17,19 31:2 33:12 34:4,11 35:4,6,7 37:2, 10

**busted** 13:2 15:13 18:6

**buy** 18:3 24:3,5

---

**C**

---

**cabinet** 26:3

**cabinets** 15:8,17

**Cactus** 13:6 14:14,20 17:13 19:19 20:4,11 23:24 28:21 31:14,23 32:20 33:6,23 34:5 35:5,7,20 36:2, 13 37:1,3

**call** 4:22 8:5 16:22 17:6,8,11 18:25 39:7,21 40:7

**called** 16:22 17:5 25:16 27:7 39:24 40:3,10

**calling** 40:7

**camera** 27:10

**cameras** 23:23

**cancel** 16:24

**cancer** 28:8

**care** 16:10 23:16 37:9 41:23 42:25

**career** 22:9

**Carolina** 10:5

**carpet** 17:16

**carries** 36:22

**case** 5:24 22:1 43:8

**catch** 6:20 7:9

**caused** 13:2

**cellphone** 9:15,18 35:9

**censored** 24:7

**center** 21:21 27:19 28:16

**Centers** 21:12 23:19 27:23 28:20, 25 29:16 31:10,17 32:11,13,19 33:6,16,18,19 34:11 35:4 37:3

**certificate** 12:10

**certifications** 12:10

**chairs** 20:14

**chance** 27:13 28:10

**change** 9:8,19 37:20 38:8

**changing** 11:8

**characterize** 42:16

**cheap** 25:17

**cheaper** 30:22

**check** 17:2

**children** 8:20 9:10 20:5,10 28:1

**city** 10:6

**claim** 4:22,23,24 13:1 14:22 20:24 28:13 41:16 42:17

**clarify** 5:25 7:10

**cleaning** 17:15 18:2

**clear** 40:18

**click** 32:11,12

**clicked** 28:18

**clients** 27:25

**Close** 14:9

**closed** 14:19,22 30:2 36:16

**closes** 29:24

**cloud** 24:2,4,5 27:15

**college** 20:7 42:9

**color** 11:5,9 15:18

**combined** 37:16

**comfortable** 19:16

**comment** 38:11



companies 23:1

company 16:22 17:6 21:9 30:14

complete 15:3 27:9,19

completed 29:3

completely 37:23

completing 15:15

conclude 8:4 43:9

conduct 42:18

conducted 4:4 34:19

confidence 33:10,15

confirmed 34:20

confused 36:12

connection 13:1 33:6

Conquest 21:12 23:19 27:23
28:16,20,25 29:16 31:10,17 32:11,
13,19 33:6,16,18,19 34:11 35:4
37:3

contact 11:1

continuing 11:25

contractor 25:17 26:1 42:8,12

contractors 25:2,3

conversation 24:16 42:7,8

copied 32:12

copy 10:11,14,19 11:21 19:15,16

corner 26:2

correct 5:10 13:3,4,18 17:7 26:25
28:22,23 31:2 32:21,22 35:9,10,20
37:14

correctly 7:21 20:23 33:3

cost 22:17

could've 36:1

counsels 4:9

country 30:23

couple 8:12 9:22 10:11 14:5 15:9,
19 18:9 19:5 20:14

court 4:6 6:6 7:20,25 8:7 10:5,10,
23 11:4

cousin 13:23

covered 38:15

Craft 25:4

criminal 5:16 36:23

current 9:5 10:9

curser 31:1

cursor 32:14

cut 5:22 6:24

Cypress 9:6

---

**D**

damage 13:2 15:5,14 23:22 24:11,
15,21 25:20,22,24

damaged 15:4

date 4:2 9:3 13:19 14:18,22 16:20
18:13

day 17:14,20,21,22 18:19

daycare 26:20,24 27:19,21 37:18
39:20,23 40:5,19 41:2,17 42:2,3

days 39:10 40:2,23

deal 28:10

dealing 28:9

dealt 29:9

decorating 18:2

Decorations 18:4

degree 12:5

degrees 12:7

deposition 5:2

describing 17:23

desk 20:14

detached 41:12

detecting 27:10

developmental 22:8

difficult 7:15

directed 25:7

disabilities 22:9

disappointed 42:22

discover 16:18

discovered 40:23

discrepancies 29:22

discriminate 28:3

discussed 42:19

discussions 25:10

documentation 8:23

documents 8:13

door 17:4 27:10 40:4 41:8 42:4

doors 25:23

drawer 25:25

dried 17:3

drive 13:6 24:2 35:5,7,20 36:1

dryer 20:1,13

due 11:4 39:17 41:16

duly 4:14

dying 29:20

---

**E**

e-mail 9:11 10:9,13,16 11:20 27:2,
6

e-mailed 27:1

earlier 34:10 36:21 38:9

early 30:13 31:7

education 12:1

efficiently 5:7

effort 16:15 18:12

Emmanuel 25:24 27:7 37:17 39:1
40:1,3,18,22,25 41:7,10,15,25
42:1,16

employed 12:13,15,20

empty 19:9,20 20:12,19

end 7:9 8:1 11:13 14:4 15:22,24
21:10

ended 31:16

English 12:4

enterprise 23:14

entertained 21:3,7



Ujala Haaris

February 23, 2024
Index: envelope..helping

envelope 11:22

error 11:7

errors 10:24 11:4

event 6:21 7:7 40:15

exact 27:4

examination 4:3,7,15 5:1 6:10
8:4,17,20,24 34:19 36:22 43:9

exhibit 29:23 30:8 34:8,9,25 35:11

experience 21:22 22:2

explain 5:5 10:14

explained 34:12 37:5

---

**F**

Fable 9:6 10:3,21 29:7 33:24 36:1

Facebook 32:23

facility 23:2 28:4

fact 27:14 33:11,17 34:20 40:8
41:3,23 42:13

fair 6:4 28:11 43:4

falls 14:14 17:4 34:14

familiar 29:2

families 20:9

family 13:23 19:14,15 21:6

February 4:2 14:5 15:23,25

Fed 10:14

feel 21:16

figure 16:14 30:11

file 23:12

filed 23:9

fill 11:16

filling 35:22

filter 15:10

filters 16:12

finalize 10:10

find 13:20 39:22

finding 24:20

---

fine 5:23

finish 6:15,16,20,22,23 38:7

finished 8:2

fix 11:7 13:21 14:24 15:1

fixed 15:5,11

fixing 20:18 25:8

flowing 41:12

focus 29:21

footage 24:1

forget 31:22

form 21:14

formed 21:9

found 13:14 18:13 30:10 40:14

freeze 18:20

Friday 4:2 18:8 30:2

friendly 20:20

friends 19:15

front 8:13 27:10

frozen 13:2

frustration 42:16

fully 19:20

functioning 23:20 31:2

furnish 19:23

furnished 19:9,10,20,21

furnishings 19:18

---

**G**

garage 41:12

gate 16:13

gave 25:17,25 29:5,6 30:3,5,6
33:24 34:2 37:11,13

gears 23:21

general 30:1

ghost 11:6

give 14:9 16:15 23:16 29:8 37:21

good 4:17 9:11 17:1 18:4 21:16

---

goofy 7:3

Google 29:16 32:10 33:1 34:2
37:2,13 38:5

grand 22:18

great 14:1

green 11:10

Greenville 10:7

grocery 16:20

guess 21:1 22:1,6 29:8 30:13 36:7
37:11

guy 22:15 25:18 28:6 29:1 37:6,7,
12

guys 16:25 26:8

---

**H**

H-a-a-r-i-s_s-h-a-h-i-d@
hotmail.com. 9:14

Haaris 4:3,13,19,20 26:15 38:21
43:6

Haaris_shahid@hotmail.com.
9:12

hand 5:9 25:13 40:4 42:5,11

handles 23:15

handling 42:17

happen 16:11 41:9

happened 18:23 23:22 25:22
40:16,20 41:5

happening 18:6 25:9

happy 6:23

hard 7:5 10:14,19 11:21 24:2

head 7:5,7,10 24:23 41:21

health 34:16

healthcare 12:23 22:20,25

hear 5:21,23 7:19 8:2

heard 4:21 7:20 22:14 34:15

hearing 18:19

helpful 35:1

helping 33:22 37:12



hey 17:12 25:21

hide 32:24

highest 12:1

Hippa 34:15

hire 16:8 22:4 30:15,22

hired 16:10 22:13,15 28:5 29:1 32:22 33:4

homeowner's 14:11

homey 19:13

honest 23:15,17 35:16 41:24 42:25 43:1

honestly 28:7,9

hours 18:9 29:24,25 30:3,9,12,16, 19,23,25 33:9

house 13:21,23 18:21 19:12,15 23:16 28:21 31:13 33:24 36:11

housekeeping 8:12

Houston 16:4 28:18

human 42:20

husband 9:10 13:7,20 16:2,9,16, 22 17:5,9,11 18:5,14 19:1,4 21:9, 24 22:6 23:9,12 24:5 25:22 27:14 28:17 30:4 32:16,24,25 33:5,8,10, 12,15 34:10 35:13 36:24 37:15 39:24 40:3,8

husband's 8:19 33:1 34:19 37:5

---

**I**

ID 22:21 23:6,13

idea 29:8 30:1,5,6

identifier 34:13

identifiers 34:21

identify 8:6

imagine 24:4 29:18

immediately 25:15

important 5:19

importantly 5:8

incident 27:13

include 11:22

income 23:19

individual 25:10 26:18 29:17 33:4, 21 37:17

individual's 29:11

infancy 22:18

information 9:2 28:19 29:15,17 33:21 35:1 37:13,16 38:4

informed 27:8

input 23:17 29:17

inside 17:2 20:12 25:25

instances 6:18,19

insurance 23:1 34:16

intend 13:12 20:4

interaction 27:8,11 40:12

interactions 39:1

interested 14:4 22:6

internet 34:4 37:12

interrupt 6:19,21

investigated 39:13,17 41:16

investigation 28:12 39:9,11

involved 35:13,15

issue 15:11 42:19

issues 15:10

---

**J**

Janelle 27:7 39:24,25 40:10

January 13:16 14:22

jobs 12:21

join 28:4

Jordan 4:11,16,20 26:10,15 34:7 38:21 43:5,8

---

**K**

Kennamer-chapman 4:11,12,16, 20 26:10,15 34:7 38:21 43:5,8

Kentucky 9:19,25 19:5,8 29:7 33:25

kiddos 21:6

kids 12:16 19:13 20:3 21:2,7,17 41:1

kind 5:5 7:3 8:1 11:10 14:15 16:3 17:19 18:12,18 19:15,16,22 20:19 21:2,20 22:7,9,17 26:7 27:24 28:9 38:5

kitchen 15:6,8 25:21,23

knowing 41:6

---

**L**

Lane 9:6 10:4 28:21

leak 17:9,12 18:6,14 23:22

leakage 42:14

leaked 32:4

leaking 18:18 41:8

lean 20:9

learned 41:7

learning 24:15

leave 19:11,17 20:1 21:5

left 15:21 26:7,8

legal 4:5,17

letter 39:11 41:22

level 12:1

liability 21:9

licenses 12:10

lie 27:9,18,19 43:2

lied 26:22 37:23 38:1

life 12:9 27:20

likes 20:16

limited 21:9

lines 8:3 11:15

link 33:19

linked 31:17 32:13 33:13,16

list 28:20

listed 16:2 36:25

live 15:11 31:23



Ujala Haaris

February 23, 2024
Index: lived..p.m.

| | | |
|---|---|---|
| **lived** 9:7 10:3 | **medicare** 23:1 | **noted** 11:18 |
| **lives** 9:9 | **members** 13:23 | **notes** 38:14 |
| **living** 19:24 25:20 | **mentioned** 15:2 22:11 26:19 29:1 | **noticed** 18:18 |
| **LLC** 21:9,12,14 23:19 27:23 28:16, 17,25 29:16 32:19 34:12,20,22 35:13 37:3 | **mess** 25:14 42:5,11 | **NPI** 22:21,24 34:11,13,21,23 35:14, 15 36:18,24,25 38:4,10 |
| | **meter** 25:15 | |
| **local** 24:1 | **Mine** 37:15 | **number** 4:25 9:15,18,19,20,21,25 10:1 22:21,24,25 23:2,13 34:1,11, 21 35:8,9,14 36:18,24,25 38:4 |
| **location** 30:10,11 35:6,8 | **minute** 6:8 8:6 29:20 41:14 | |
| **long** 9:7 24:16 33:8 | **minutes** 30:5 38:13 | **numbers** 32:2 |
| **looked** 25:14 29:19 | **misquote** 27:4 | |
| **loss** 13:5 14:22 26:17 28:11,22 40:20 | **mold** 25:8 | **O** |
| | **mom** 17:18 | |
| **lot** 17:15 | **mom's** 16:24 19:2 | **oath** 4:3,7 5:1,13,16 6:10 8:4,17, 20,24 34:19 36:22 38:7,22 43:9 |
| **love** 21:17 | **month** 23:23 | |
| **lucrative** 21:16 | **monthly** 16:10 | **obtained** 12:9 34:11 36:18,25 |
| **lying** 27:12 40:15 42:22,24 | **months** 9:17,22 32:18 | **occupied** 20:17 |
| | **mother** 16:21 | **occur** 13:5 |
| **M** | **motion** 24:3,7 27:9 | **occurred** 28:22 |
| | **mouth** 16:6 40:11,15 42:4,21 | **October** 36:14,15 |
| **made** 10:24 11:3,13,18 31:7 39:19 | **Muniz** 27:7 | **office** 11:1 19:11,14 |
| **Magna** 4:5 | **must've** 31:3 | **oldest** 12:17 |
| **mail** 10:14 36:5,8,11 | | **online** 22:15 31:4 35:22 |
| **mailing** 35:19,23 36:4,5 | **N** | **open** 15:19 31:1,2 |
| **major** 15:20 19:18 | | **opened** 17:3 40:4 |
| **make** 5:6 6:24 7:13,21 11:23 17:16 20:17,19,22 21:6 33:4 38:14 40:5, 17 41:20 | **nail** 15:5 | **opening** 42:4 |
| | **national** 34:13,21 | **operate** 22:3 |
| | **necessarily** 28:2 | **operation** 29:24,25 30:9,12,16,19, 24,25 |
| **makes** 11:6 19:12 | **needed** 15:2,5,6,9,11,15,21 30:6 | |
| **making** 18:22 | **needing** 30:9 | **opportunity** 10:10,23 11:11,17 37:22 |
| **malling** 35:4 | **neighbor** 41:8,10 | |
| **Manor** 10:5 | **neighbor's** 32:5 41:12 | **order** 6:9 |
| **mark** 14:9 | **neighbors** 31:22,25 | **ordered** 15:17 |
| **marked** 30:8 34:9 35:11 | **nephew** 22:8 | **organization** 35:3 |
| **market** 21:15 22:11 | **Niagara** 17:4 | **overhear** 8:16 |
| **matters** 8:12 | **nod** 7:4,7 | **owners** 31:19 |
| **Mckinnon** 4:22 43:7 | **nook** 21:6 | |
| **means** 4:8 5:12 | **northwest** 28:18 | **P** |
| **meant** 11:10 31:8 34:12 | **note** 8:1 9:1 11:3 | |
| **medicaid** 23:1 | | **p.m.** 4:2 26:12,14 29:24 38:18,20 43:10 |



Ujala Haaris

February 23, 2024
Index: paint..registered

**paint** 15:8,17 18:11

**painted** 15:6 17:3

**Pakistan** 22:13 29:1 30:2

**paper** 25:25

**part** 11:4 20:24 34:14

**partially** 19:9,10,20,21,22

**parties** 4:4 20:8

**passed** 28:8

**password** 34:3

**pasted** 32:12

**path** 22:10

**patient** 17:19

**patients** 27:25

**PDF** 32:12 34:24

**peeves** 43:3

**penalty** 5:16 36:23

**people** 15:11 16:8 19:17 20:5 21:21 22:4 28:2 30:22 43:2

**period** 41:1

**perjury** 5:17 36:23

**permission** 29:9

**person** 24:14,18,25 33:16 43:1

**pet** 43:3

**phone** 16:14 25:19 26:6 32:2 35:8 39:3,7,21

**photos** 31:12,16 32:20 33:5,13,16 34:5 37:4

**picture** 32:18

**pictures** 15:5 20:24 21:1 31:9 32:10

**pipe** 13:3,15 15:13 16:18,23 18:6, 24 24:8 42:9

**pipes** 18:21 25:8 41:4

**place** 16:6 20:19,20

**plan** 8:14 15:24 19:19 22:2

**plants** 18:3

**play** 17:24 19:13,25 20:3,16

**point** 5:21 8:5 12:9 16:2 27:20

**36:21,23**

**pointed** 42:14

**pool** 15:10 16:10

**portability** 34:16

**positions** 40:18

**possibly** 6:18 24:22

**post** 22:14,15

**posted** 33:5 37:4

**potential** 19:12 36:23

**practice** 35:6,8,19

**predominately** 28:1

**prefer** 20:8

**preparation** 8:24

**present** 19:16

**pretty** 10:25 17:4

**prevent** 18:23,24 25:7

**previous** 11:18

**prior** 13:19 17:11 18:6,13,19 24:15,20

**process** 5:5

**processing** 23:3

**professional** 12:10

**properties** 19:5,8 20:2 23:13

**property** 13:7,20 14:3,8,11,14,16, 19,20,23 15:1,13 16:3 17:13 18:6, 15 19:19 20:11 23:23 24:10,20 25:1,13 26:19 32:4,5,20 33:6,18,23 36:9,13 37:4 39:3,8,19,20,23 41:1, 12,23 42:1,9

**prove** 27:11 41:23

**provide** 33:21 34:5 41:22

**provided** 31:16,18 33:7

**provider** 23:2 34:13,21 35:4,6,7

**providers** 22:25 35:3

**public** 31:8

**pull** 27:4

**purchase** 13:9

**purchased** 13:11 14:18,21 15:2 20:11

**put** 11:22 29:8 30:7 31:3 32:18 40:11

**putting** 40:15

---

### Q

**qualified** 22:4

**question** 5:25 6:17 7:8 24:17 33:14 37:16,25 38:2,3

**questions** 5:4,20 6:4,15 7:2 8:3, 11,14 11:25

---

### R

**raise** 5:9

**rare** 6:21

**reached** 14:5

**reaching** 13:22

**ready** 15:23 16:6 17:15

**Realtor** 16:4

**reason** 5:21 10:22 27:18 28:7 29:10 33:19 34:18 39:12

**reasons** 10:8 26:16 27:2

**recall** 24:11,13,18,22 41:25

**received** 16:21

**receiving** 17:11

**recently** 18:15,17

**recliner** 19:17

**record** 4:1,10 26:11,12,13 38:16, 18,19,22 43:9,10

**records** 8:13,23 27:10 35:18

**reduced** 6:7

**referenced** 42:15

**referring** 14:20

**reflected** 7:6,14,22

**refrigerator** 15:16

**refuted** 39:18

**register** 34:20

**registered** 22:21 35:13 36:24



**registration**  34:24 35:18

**registry**  34:21

**related**  22:20

**relates**  13:2

**relevant**  35:1

**relying**  8:14

**remember**  18:19 25:9,11 35:13
   39:6,21 41:15,19,21,24 42:4

**remembering**  27:25

**remotely**  4:4,7

**renovation**  16:7

**renovations**  15:15

**rent**  13:13,20,24 14:1,7,24 15:22,
   24 16:3 19:8,9,17,19 20:5,7,21
   36:9

**rental**  16:3 19:5 23:13

**rented**  14:6 20:3

**renting**  14:3

**repair**  16:11

**repairs**  15:2,15 16:7

**repeat**  6:1 7:19 24:17 33:14

**rephrase**  6:1 24:17

**reported**  24:8 41:11

**reporter**  4:1,6 6:6 7:20,25 8:7
   10:10,24 26:13 38:19

**reporter's**  11:4

**reporting**  4:7 23:18

**representation**  37:17 39:18 41:17

**representative**  26:17 42:23

**research**  21:16 22:11

**researching**  22:12

**residence**  40:20

**residential**  9:5 10:9

**respect**  20:4

**rest**  36:6 42:7,12

**result**  32:11

**results**  38:5

**review**  8:23 10:23 11:17 28:10

**reviewed**  24:10 28:5

**revise**  38:8

**room**  8:16 17:24 19:24 25:20

**route**  30:22

**rude**  7:15

**rules**  14:15

**run**  5:7 27:18,20 40:5

**running**  31:6 37:18 40:19,23

**rushed**  16:25

─────────── S ───────────

**S-S-A-J-J-A-D**  29:14

**sadly**  27:15 40:14

**Sajjad**  29:12

**sales**  12:22

**save**  24:1

**saved**  24:4

**scan**  11:20

**scooter**  21:4

**Scratch**  16:17

**screen**  28:14 31:21 32:8 34:8

**search**  29:16 32:11 37:2 38:5

**searched**  28:16,17

**security**  23:23 24:1

**seeking**  14:7

**self-explanatory**  10:25

**self-stamped**  11:22

**send**  10:16,20 11:18,19,20,22
   27:10,12 41:22

**sense**  6:25 11:23 19:12 40:5

**sensors**  24:3

**separate**  36:10,11

**September**  13:10 36:15,17,18,25

**Services**  4:6

**set**  17:16,23 19:14 20:5

**setting**  30:15

**shake**  7:4,7,10

**sharing**  31:21 34:8

**shook**  25:13 40:4 42:5,11

**shopping**  16:20 18:3

**show**  19:11 28:13 32:7 33:25
   34:23 35:19

**showed**  42:8

**showing**  32:10 35:12

**shows**  32:13 34:23

**sign**  11:18

**signature**  11:14

**similarly**  7:18

**simply**  38:3

**sir**  5:3,11,14 6:5 7:1 8:15,18 10:18,
   21 12:12,14,25 13:8,18 14:17,25
   16:1,5 17:7,10 18:19 19:7 21:11,13
   23:25 24:12 27:22 28:15 29:18
   31:24 32:3 35:10 37:15 38:24 41:9

**site**  16:3

**sitting**  41:14

**SJ**  29:12

**Smith**  4:5

**snarky**  7:15

**sofa**  19:17

**softly**  5:22

**son**  20:16

**son's**  21:4

**sound**  11:6

**sounds**  7:3 20:2

**South**  10:5

**space**  24:4,5 27:15

**speak**  39:3

**speaking**  24:13

**special**  12:11

**specialist**  4:23

**specifically**  4:24 42:1

**spell**  7:24,25 9:13 29:13



spelling  8:7

spellings  8:9

spoke  24:22 27:13

spoken  31:25

Spring  29:7

Springs  9:6 10:3,21 33:24 36:1

stage  22:18

stages  30:13

stand  38:12

stands  34:13 38:11

start  6:16

started  5:4 25:15 28:17 34:15

starting  22:7

state  4:9,17

Station  42:9

stay  8:5 14:6 21:7

stenographic  4:8

steps  13:19

stickers  20:16

stools  19:25

stop  6:20 31:21 34:7

street  34:1

students  20:8

stuff  13:21 16:14 18:4 19:22 20:1,
8,12,14 21:19 26:5 32:23 35:22
36:12 37:12 38:5 42:10

stuffs  20:14

subject  5:16 14:11

submitted  20:24

subsequent  39:7

substance  11:8

suffering  28:8

suggesting  35:25

Sunday  28:8

supposed  31:4,6

suspicion  39:23

sustained  15:14 23:22

swear  5:9

swelling  26:2

switching  23:21

sworn  4:14

syndrome  21:19

—————————————————

T

—————————————————

table  19:25

tabs  18:22

Tai  4:22 43:5,7

takes  10:11

taking  6:6 8:19 25:6 37:9 41:23

talk  4:24 6:8 9:2 25:18 31:5 38:15,
25 40:2 42:3,13

talked  24:11 38:14 39:2 41:14

talking  5:22 25:18 26:6 27:6,23
38:1 42:10

tax  22:21 23:6,13

taxes  23:9,12

team  16:15,18:12

telling  29:5 40:6 41:15,19,25

ten  12:19

tenant  13:13,20 14:2

tend  20:9

terminal  28:8

testified  4:14

testify  5:15

testifying  5:12

testimony  5:16 37:19 38:6,8

Texas  9:6 28:16,21 29:16 35:5

therapist  21:22 30:15

therapy  21:21

thing  11:10 16:11 17:16 18:12 21:4
26:6 27:5 38:5 42:24

things  6:11 7:24 8:8 15:6,9,19,20,
23 17:15,17 18:1 20:13,25 21:2,5
27:3 28:10,12 29:19 36:10 38:23
40:17

time  4:2 6:14 12:15,20 13:10
14:18,21 15:13 16:5,17 17:13
18:25 23:21 24:19,24 33:9 41:1

time-to-time  7:25

times  7:18 42:15

today  4:22 5:13 6:10 7:2 8:2,14,24
41:15 42:15,19

Today's  4:1

told  24:18,23 25:7,17,21 26:1 27:6,
7,8,9 37:18 39:11,25 40:9,19 41:3,
17 42:11

Tomball  28:21 35:5

top  24:23 41:20

touch  40:1

towel  25:25

town  10:6 39:9

toys  21:7

trampoline  21:4

transcript  6:7,10 7:6,14,23 8:1 9:3
10:11,15 11:4,6,13

transcriptions  10:24

transplant  17:18

true  40:20,21

trust  20:9

truth  5:9,10 26:23

turned  17:1 18:22 41:4

type  11:7 12:23

—————————————————

U

—————————————————

uh-huh  7:5,8,11

uh-uh  7:5,8

Ujala  4:3,13,19

understand  5:12,15,20,23,24 7:21
38:23

understanding  8:19 12:17 19:4
20:22 21:8 24:9 29:15 33:3

understood  6:4

unethical  42:24

unintentionally  6:19



Ujala Haaris

**unique**  22:24

**UPS**  10:14

**upset**  42:21

**utility**  41:22

**utilized**  9:17

**uttered**  42:21

---

**V**

**vacant**  41:20

**verbally**  7:3

**Verizon**  12:21

**video**  27:11,12,16 40:12

**visit**  26:16

**visited**  39:19

---

**W**

**wall**  17:3

**walls**  15:4 16:9 20:15,23,25

**wanted**  15:8,17,18 17:2,14 21:6 29:20 36:5,8 38:7,25 41:20

**washer**  20:1,13

**water**  13:2 15:14 16:22 17:1,6,9,12 18:18,20 23:22 24:15,20 25:15,23 32:4 40:22 41:4,8,11

**waved**  32:1

**website**  22:16 28:5 29:5,17 33:5, 22 37:13

**weekends**  18:7,10

**weeks**  10:11 14:5

**wet**  25:25

**whatnot**  33:22

**white**  15:18

**wife**  40:7

**Winette**  4:5

**Wireless**  12:22

**word**  16:6

**words**  7:3 40:11,15

**work**  5:6 16:7,16 18:7,8,9 20:20 21:3 30:3,4

**worked**  12:21,23

**working**  16:13 23:23 25:5

**works**  33:8

**world**  7:9

**wrap**  18:20 37:20

**wrapped**  18:21 41:4

**Wren**  13:6 14:14,20 17:13 19:19 20:4,11 23:24 28:21 31:14,23 32:20 33:6,23 34:5 35:5,7,20 36:2, 13 37:1,3

**write**  26:3 29:3,6 33:25

**written**  6:7 29:2

---

**Y**

**y'all**  8:20 16:8 20:4,25 21:14 22:2, 21 23:6 25:12 29:6 30:9 33:11,17, 22 36:9,13 39:6

**year**  9:8 13:10 23:10 36:15,16

---

**Z**

**Zillow**  16:4 31:19

**zoning**  14:15

**zoom**  4:22 8:5



# Exhibit 5

**GOCRAFTS LLC**
**wajahat anjum  •  +12815490954**
13921 Richmond Avenue, Houston, Texas, 77082

**Bill To**
Allstate Insurance
Muhammad Haaris Shahid and
Ujala Haaris
claims@claims.allstate.com
haaris_shahid@hotmail.com
14902 CACTUS WREN DR,
Tomball, Texas, 77377

# Estimate    Claim # 0742346539

🗓 **Date Created:  Jan 26, 2024**

**Your Estimate**

**Items**

| # | Item | | Qty | Material | Labor | Cost | Total |
|---|---|---|---|---|---|---|---|
| **1** | **Preliminaries** | | **7** | **$1,428.00** | **$7,200.00** | **$8,628.00** | **$8,628.00** |
| 1.1 | General sundries<br>Unit: Pieces | | 1 | $780.00 | $0.00 | $780.00 | $780.00 |
| 1.2 | Skip bin<br>Unit: Weeks | | 3 | $216.00 | $0.00 | $216.00 | $648.00 |
| 1.3 | Site Manager<br>Unit: Weeks | | 3 | $0.00 | $2,400.00 | $2,400.00 | $7,200.00 |
| **2** | **Demolition** | | **2** | **$0.00** | **$7,920.00** | **$7,920.00** | **$7,920.00** |
| 2.1 | Strip Out carpet and debris and insulation<br>Unit: Sq. Feet | | 1 | $0.00 | $2,160.00 | $2,160.00 | $2,160.00 |
| 2.2 | Remove Kitchen & cut drywall<br>Unit: Pieces | | 1 | $0.00 | $5,760.00 | $5,760.00 | $5,760.00 |
| **3** | **Carpentry** | | **202** | **$1,832.40** | **$2,092.80** | **$3,925.20** | **$3,925.20** |
| 3.1 | Working in to Existing Roof<br>Unit: Pieces | | 1 | $900.00 | $1,800.00 | $2,700.00 | $2,700.00 |

| # | Item | Qty | Material | Labor | Cost | Total |
|---|------|-----|----------|-------|------|-------|
| 3.2 | **Timber Skirting**<br>Unit: Lin. Feet | 200 | $4.56 | $1.44 | $6.00 | $1,200.00 |
| 3.3 | **Plywood Timber Subflooring**<br>Unit: Sq. Feet | 1 | $20.40 | $4.80 | $25.20 | $25.20 |
| **4** | **Drywall** | **1,450** | **$5,412.00** | **$4,572.00** | **$9,984.00** | **$9,984.00** |
| 4.1 | **1/4 in thick Plasterboard Sheeting to Wall & Ceiling**<br>Unit: Sq. Feet | 250 | $2.64 | $2.16 | $4.80 | $1,200.00 |
| 4.2 | **Wall and Ceiling Insulation**<br>Unit: Sq. Feet | 1200 | $3.96 | $3.36 | $7.32 | $8,784.00 |
| **5** | **Painting** | **3,944** | **$18,864.00** | **$11,163.60** | **$30,027.60** | **$30,027.60** |
| 5.1 | **Internal Walls & Ceilings**<br>Unit: Sq. Feet | 1320 | $3.60 | $3.60 | $7.20 | $9,504.00 |
| 5.2 | **External Stucco Walls**<br>Unit: Sq. Feet | 2500 | $4.80 | $2.39 | $7.19 | $17,970.00 |
| 5.3 | **Skirting & Moulding**<br>Unit: Lin. Feet | 120 | $2.40 | $1.68 | $4.08 | $489.60 |
| 5.4 | **Doors**<br>Unit: Pieces | 4 | $456.00 | $60.00 | $516.00 | $2,064.00 |
| **6** | **Joinery** | **201** | **$7,896.00** | **$2,400.00** | **$10,296.00** | **$10,296.00** |
| 6.1 | **Kitchen**<br>Includes Benchtop, End Panel, oven, Base Cabinets, Top Cabinets, Full Height Cabinets, Kickboard & Splashback<br>Unit: Pieces | 1 | $5,760.00 | $1,440.00 | $7,200.00 | $7,200.00 |
| 6.2 | **Kitchen BackSplash**<br>Unit: Sq. Feet | 200 | $10.68 | $4.80 | $15.48 | $3,096.00 |

| # | Item | Qty | Material | Labor | Cost | Total |
|---|------|-----|----------|-------|------|-------|
| **7** | **Waterproofing** | **140** | **$2,016.00** | **$2,352.00** | **$4,368.00** | **$4,368.00** |
| 7.1 | **Wet Areas** <br> Unit: Sq. Feet | 140 | $14.40 | $16.80 | $31.20 | $4,368.00 |
| **8** | **Flooring finishes** | **1,225** | **$4,336.50** | **$3,660.30** | **$7,996.80** | **$7,996.80** |
| 8.1 | **Carpet** <br> Unit: Sq. Feet | 1225 | $3.54 | $2.99 | $6.53 | $7,996.80 |
| **9** | **Miscellaneous** | **1** | **$0.00** | **$4,800.00** | **$4,800.00** | **$4,800.00** |
| 9.1 | **Make Good Disrupted Areas** <br> Unit: Pieces | 1 | $0.00 | $4,800.00 | $4,800.00 | $4,800.00 |
| **10** | **Tiling** | **100** | **$3,000.00** | **$3,000.00** | **$6,000.00** | **$6,000.00** |
| 10.1 | **Bathrooms & Laundry (Floors & Walls)** <br> Unit: Sq. Feet | 100 | $30.00 | $30.00 | $60.00 | $6,000.00 |
| **11** | **Mitigation** | **3** | **$12,120.00** | **$21,000.00** | **$33,120.00** | **$33,120.00** |
| 11.1 | **Drainage and Remediation chemicals** <br> Unit: Pieces | 1 | $4,920.00 | $9,840.00 | $14,760.00 | $14,760.00 |
| 11.2 | **Emergency Response Services Fee** | 1 | $0.00 | $960.00 | $960.00 | $960.00 |
| 11.3 | **Electrical & Communication (Provisional Sum)** <br> Unit: Pieces | 1 | $7,200.00 | $10,200.00 | $17,400.00 | $17,400.00 |

| Subtotal | $127,065.60 |
| Tax | $0.00 |
| **Total** | **$127,065.60** |
| Amount Paid | $0.00 |
| Balance | $127,065.60 |

## Payments

**$127,065.60**  🕐 Upcoming

**Deposit**

Due: Feb 10, 2024



Pay Now

**Terms and Conditions**

Terms and Conditions for Construction Services by GOCRAFTS LLC

1. Definitions
   1.1 "Client" refers to the individual or entity engaging the services of GOCRAFTS LLC.
   1.2 "GOCRAFTS LLC" refers to the construction company providing services under these Terms and Conditions.
   1.3 "Contract" refers to the agreement formed between the Client and GOCRAFTS LLC, which includes these Terms and Conditions.
2. Scope of Work
   2.1 GOCRAFTS LLC agrees to provide construction services as detailed in the mutually agreed-upon project scope, specifications, and plans.
   2.2 Changes or modifications to the original scope of work must be agreed upon in writing by both parties and may result in additional costs and/or time extensions.
3. Payment Terms
   3.1 The Client agrees to pay GOCRAFTS LLC in accordance with the payment schedule outlined in the Contract.
   3.2 Payments shall be made in the currency specified in the Contract.
   3.3 Late payments may incur interest charges at a rate of [X]% per month on the outstanding amount.
4. Project Timeline
   4.1 GOCRAFTS LLC will make reasonable efforts to adhere to the agreed-upon project timeline. However, the timeline may be subject to change due to unforeseen circumstances, force majeure, or changes in project scope.
5. Changes to the Contract
   5.1 Changes to the Contract must be mutually agreed upon in writing by both parties.
   5.2 GOCRAFTS LLC reserves the right to adjust the contract price and timeline for any approved changes.
6. Quality of Work
   6.1 GOCRAFTS LLC agrees to perform all work in a professional and workmanlike manner, in accordance with industry standards and applicable codes.
   6.2 The Client shall promptly notify GOCRAFTS LLC of any defects or deficiencies in the work, and GOCRAFTS LLC shall remedy such issues within a reasonable timeframe.
7. Insurance and Liability
   7.1 GOCRAFTS LLC shall maintain appropriate insurance coverage, including but not limited to liability and worker's compensation insurance.
   7.2 The Client shall not be held liable for any accidents or injuries that occur on the construction site unless caused by the Client's negligence.
8. Termination
   8.1 Either party may terminate the Contract with written notice if the other party breaches a material term of the Contract.
   8.2 The Client shall compensate GOCRAFTS LLC for work performed up to the termination date and any costs incurred due to early termination.
9. Governing Law
   9.1 This Contract shall be governed by and construed in accordance with the laws of [Your Jurisdiction].
10. Dispute Resolution
   10.1 Any disputes arising out of or in connection with this Contract shall be resolved through mediation or arbitration in accordance with the rules of [Your Preferred Dispute Resolution Service], and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.
11. Confidentiality
   11.1 Both parties agree to keep confidential all non-public information obtained during the course of the project.
12. Miscellaneous
   12.1 These Terms and Conditions, along with the Contract, constitute the entire agreement between the parties and supersede all prior discussions and agreements.
   12.2 Any amendments or modifications to this Contract must be in writing and signed by both parties.

**Signature**                                                                                                    **Click here to sign**

### GOCRAFTS LLC

-------------------------------------------------                    -------------------------------------------------

Company Signature                                                                      Client Signature

# Exhibit 6



**GOCRAFTS LLC**
wajahat anjum • +12815490954
5718 Westheimer Rd, Suite 1000W, Houston, Texas, 77057

**Bill To**
Muhammad Haaris Shahid and
Ujala Haaris
haaris_shahid@hotmail.com
14902 CACTUS WREN DR,
Tomball, Texas, 77377

# Invoice   IN-1904

📅 **Due Date:** Feb 20, 2024   📅 **Date Created:** Feb 5, 2024

**Invoice for Plumbing**

## Items

| # | Item | Qty | Material | Labor | Cost | Total |
|---|------|-----|----------|-------|------|-------|
| 1 | **Preliminaries** | | $1,060.00 | $0.00 | $1,060.00 | $1,060.00 |
| 1.1 | **General sundries**<br>Unit: Pieces | 1 | $350.00 | $0.00 | $350.00 | $350.00 |
| 1.2 | **Skip bin**<br>Unit: Weeks | 1 | $710.00 | $0.00 | $710.00 | $710.00 |
| 2 | **Demolition** | | $0.00 | $2,500.00 | $2,500.00 | $2,500.00 |
| 2.1 | **Demo & disposal**<br>Removal and disposal of all kitchen ceiling, copper pipes, debris and cut drywall | 1 | $0.00 | $2,500.00 | $2,500.00 | $2,500.00 |
| 3 | **Services** | | $4,100.00 | $6,200.00 | $10,300.00 | $10,300.00 |
| 3.1 | **Plumbing & drainage**<br>3/4 Inch Red PEX pipe 3x300 Lineal Ft.<br>3/4 Inch Blue PEX pipe 3x300 Lineal Ft.<br>1/2 Inch Blue PEX pipe 2x300 Lineal Ft.<br>1/3 Inch Insulation 2x300 Lineal Ft<br><br>Unit: Hours | 1 | $4,100.00 | $6,200.00 | $10,300.00 | $10,300.00 |
| 4 | **Mitigation** | | $0.00 | $960.00 | $960.00 | $960.00 |
| 4.1 | **Emergency response** | 1 | $0.00 | $960.00 | $960.00 | $960.00 |

| | |
|---|---|
| Subtotal | $14,820.00 |
| **Tax**  Sales Tax (8.25%) | $425.71 |
| **Total** | **$15,245.71** |
| Amount Paid | $0.00 |
| Balance | $15,245.71 |

**Payments**

**$15,245.71**  🕐 Upcoming

**Payment 1**

Due: Feb 21, 2024



Pay Now

# Exhibit 9



Allstate Indemnity Company
2775 SANDERS RD
NORTHBROOK IL 60062

MUHAMMAD SHAHID UJALA HAARIS
17230 FABLE SPRINGS LN
CYPRESS TX 774336468

April 25, 2024

INSURED: MUHAMMAD SHAHID
DATE OF LOSS: January 16, 2024
CLAIM NUMBER: 0742346539 ATM
POLICY NUMBER: 000436220450
LOSS LOCATION: 14902 CACTUS WREN DR, TOMBALL
LOSS TYPE: Property

PHONE NUMBER: 972-915-5490
FAX NUMBER: 855-219-7494

Dear MUHAMMAD SHAHID UJALA HAARIS,

We have completed our investigation of the aforementioned loss and our findings render Allstate Indemnity Company unable to pay your claim for the following reasons:

Based upon our investigation, Allstate has concluded that you have breached the terms and conditions of the insurance policy and the implied covenant of good faith and fair dealings in that: you have misrepresented and concealed material facts pertaining to the property damage, policy application and business conducted at the loss location.

Your Allstate Indemnity Company Texas Landlords Package Policy, Form AS153, 000436220450 contains certain conditions, which must be met prior to receiving settlement. Please refer to the section entitled, Misrepresentation, Fraud Or Concealment, which reads as follows:

Misrepresentation, Fraud Or Concealment

We may void this policy if it was obtained by misrepresentation, fraud or concealment of material facts. If we determine that this policy is void, all premiums paid will be returned to you since there has been no coverage under this policy.

We do not cover any loss or occurrence in which any insured person has concealed or misrepresented any material fact or circumstance.

Section I Conditions

Action Against Us

No one may bring an action against us in any way related
to the existence or amount of coverage, or the amount of
loss for which coverage is sought, under a coverage to
which Section I Conditions applies, unless:

a) there has been full compliance with all policy terms;
and
b) he action is commenced within two years and one day from the date
the cause of action first accrues.

0742346539 ATM

If you have any questions regarding the full denial of your claim, please feel free to contact me.

**Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.**

Sincerely,

*TAI MCKINNON*

TAI MCKINNON
972-915-5490
Allstate Indemnity Company

SIUD002                                          0742346539 ATM

## *Notice*

Information from the credit report(s) we obtained pursuant to your written authorization were used in connection with our investigation of claim #0742346539, which was denied in whole or in part.

You have a right to obtain, under Section 615 of the Fair Credit Reporting Act, a free copy of these report(s) from the consumer reporting agencies that furnished us with the reports. You also have the right, under Section 611 of the Fair Credit Reporting Act, to dispute with the consumer reporting agencies the accuracy or completeness of any information in the consumer report(s) furnished by the agencies.

To take advantage of these rights, be sure to request a copy of your report(s) within 60 days. Please keep in mind that the consumer reporting agencies did not decide to deny the claim, so they will be unable to provide you with any specific reasons regarding our decision.

You may contact the consumer reporting agency at:

Trans Union National Disclosure Center
2 Baldwin Place
PO Box 1000
Chester, PA 19022
Phone: (888) 503-0048

0742346539 ATM

# Exhibit 10

# THE VOSS ★ LAW FIRM

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
THE VOSS LAW CENTER
26619 INTERSTATE 45
THE WOODLANDS, TEXAS 77380
TELEPHONE (713) 861-0015
FACSIMILE (713) 861-0021
TOLL FREE (866) 203-5411
www.VossLawFirm.com

May 1, 2024

*__Via Priority Mail and__*
*__Via Email: claims@claims.allstate.com__*
Tia McKinnon
Allstate Indemnity Company
P.O. Box 672041
Dallas, TX 75267

|        |                          |                                                  |
|--------|--------------------------|--------------------------------------------------|
| **RE:** | ***Our Client/Your Insured*** | **: *Muhammad Shahid***                       |
|        | ***Claim Number***       | **: *0742346539***                               |
|        | ***Policy Number***      | **: *436220450***                                |
|        | ***Property Address***   | **: *14902 Cactus Wren Drive, Tomball, TX 77377*** |
|        | ***Date of Loss***       | **: *January 16, 2024***                         |

Dear Ms. McKinnon:

Please be advised that this law firm has been retained by Muhammad Shahid as legal counsel regarding all his claims and causes of action against Allstate Indemnity Company. Effective immediately, please direct all communications to the undersigned at the above-listed address. As you know, my client suffered a covered loss under his Allstate Indemnity Company policy, which resulted in severe damage to his covered property. Subsequently, a valid claim was submitted by my client in a timely fashion.

To date, Allstate Indemnity Company has woefully failed to properly investigate, evaluate or pay the full amount of policy proceeds due and owed to my client regarding his active claim. Moreover, our investigation reveals that Allstate Indemnity Company's unreasonable investigation and mishandling of this matter proximately caused of my client's damages for which Allstate Indemnity Company is ultimately responsible. Please know that we are in the process of accumulating additional evidence and any remaining information as to my client's damage model will be presented to you without delay.

**In addition to the above, you are hereby on notice that our firm's representation relates to any and all claims made by Muhammad Shahid regarding the above referenced loss and specified property.  Accordingly, as it relates to our client, the specified location and claim, or any other**

related property or claim for insurance proceeds, your communication must be conducted under the conditions specified above, with payments made accordingly. This requires that our law firm listed as a payee on any payment draft from this point forward.

Pursuant to all relevant law, you are hereby further on notice that you are to immediately provide me with a full and accurate certified copy of my client's insurance policy. We also demand complete copies of both your claims file and underwriting file related to this covered property and loss. Allstate Indemnity Company has fifteen (15) days to comply with this request.

Moving forward, and consistent with my client's rights under the subject policy, please forward any and all copies of the following to my attention immediately:

a) All applications for coverage by our client, including any and all modifications or amendments thereto;

b) All letters, emails, texts and other forms of communications sent by and between Muhammad Shahid and Allstate Indemnity Company;

c) All documents regarding the processing of the above claim;

d) A description outlining exactly why the above claim has not been paid in full;

e) Any videos and photographs taken or received regarding the above claim;

f) The full payment log listing amounts and coverages paid to date;

g) All engineering and other investigative reports regarding the above claim;

h) All emails, text messages, internal correspondence and other forms of communication by and between Allstate Indemnity Company and any third party regarding the above claim;

i) Allstate Indemnity Company's underwriting files referring or relating in any way to the policy and property at issue in this action, including the file folders in which the underwriting documents are kept and drafts of all documents in the file; and

j) Allstate Indemnity Company's complete claim files from the home, regional, local offices, and third party adjusters/adjusting firms regarding the claim that is the subject of this matter, including copies of the file jackets, "field" files, notes, and drafts of documents.

This entire letter is a pertinent communication with respect to the resolution of this case. A prompt response is therefore expected, as defined within the provisions. of the Tex. Ins. Code and Tex. Admin. Code.

Respectfully submitted,

C. Bryan Beverly
Attorney at Law
bryan@vosslawfirm.com

CBB:eb

# Exhibit 3

Muhammad Shahid                                        February 23, 2024

```
1   INSURANCE COMPANY           :    ALLSTATE INSURANCE COMPANY

2   INSURED                     :    MUHAMMAD SHAHID

3   POLICY NO.                  :    N/A

4   CLAIM NO.                   :    0742346539

5

6

7

8        _____

9

10               EXAMINATION UNDER OATH OF

11                    MUHAMMAD SHAHID

12                  APPEARING REMOTELY

13                   FEBRUARY 23, 2024

14

15       _____

16

17

18

19

20        EXAMINATION UNDER OATH OF MUHAMMAD SHAHID, produced as a

21   witness at the instance of MAYELLA GONZALEZ, on behalf of

22   ALLSTATE INSURANCE COMPANY, taken remotely via machine

23   shorthand on the February 23, 2024, in Houston, County of

24   Harris, State of Texas, before Winette Smith, a Notary Public

25   in and for the State of Texas.
```



Muhammad Shahid                                    February 23, 2024
                                                            Page 2

```
 1                    REMOTE APPEARANCES

 2

 3   FOR ALLSTATE INSURANCE COMPANY:

 4        Mr. JORDAN KENNAMER-CHAPMAN

 5        LAW OFFICES OF MAYELLA GONZALEZ

 6        P.O. Box 224566

 7        Dallas , Texas 75222

 8        (713) 336-2800

 9        Jordan.kennamer-chapman@allstate.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23   ALSO PRESENT:

24        Name

25        TAI MCKINNON, ALLSTATE ADJUSTER
```



Muhammad Shahid                                    February 23, 2024
                                                          Page 3

```
1                    EXAMINATION INDEX

2

3                                                      PAGE

4

5   MUHAMMAD SHAHID

6

7

8   Examination by Jordan Kennamer-Chapman..............    4

9

10

11  Corrections & Signature............................   39

12

13

14  Certificate........................................   41

15

16

17

18                     EXHIBIT INDEX

19

20

21  NUMBER          DESCRIPTION                        PAGE

22  Exhibit 1        Photos                              22

23  Exhibit 2        NPI Number Info                     30

24  Exhibit 3        Certificate Of Formation            34

25  Exhibit 4        Website Screen shot                 34
```



```
 1                THE REPORTER:  We are on the record.  Today's
 2   date is Friday, February 23, 2024.  The time is 10:00 a.m.
 3   This is the examination under oath of MUHAMMAD SHAHID, and it
 4   is being conducted remotely by agreement of the parties.
 5                My name is Winette Smith with Magna Legal
 6   Services.  I am the court reporter.  I will be administering
 7   and reporting the examination under oath remotely by
 8   stenographic means.
 9                Would counsels please state their name and
10   appearance for the record.
11                JORDAN KENNAMER-CHAPMAN:  Jordan
12   Kennamer-Chapman for Allstate.
13                        MUHAMMAD SHAHID,
14   having been duly sworn, testified as follows:
15                        EXAMINATION
16   BY JORDAN KENNAMER-CHAPMAN:
17       Q.   Good morning.  Would you please state your full legal
18   name.
19       A.   Muhammad Haaris Shahid.
20       Q.   Mr. Shahid, I appreciate you joining us today.  My
21   name is Jordan Kennamer-Chapman.  I'm an attorney with
22   Allstate.  On the zoom call with us today is Tai McKinnon.
23   She's a claim specialist with Allstate that's assigned to the
24   claim we're here to talk about today and that claim number is
25   0742346539.
```



1          Have you ever given a examination under oath or

2   a deposition before?

3      A.   No, sir.

4      Q.   Before I get started with the questions I need to go

5   over with you I'm going to go over a little bit of how this

6   process will work, just generally speaking so we can hopefully

7   be on the same page and it will be more efficient that way.

8          So most importantly a little bit go you were

9   asked to raise your hand and swear to tell the truth, the whole

10  truth, and nothing but the truth, and you did that, correct?

11     A.   Yes.

12     Q.   And you understand that means you're testifying under

13  oath today?

14     A.   Correct.

15     Q.   And do you understand that when you testify under

16  oath that means that your testimony is subject to the criminal

17  penalty of perjury?

18     A.   Sure.

19     Q.   So because of all that, it's very important that you

20  understand my questions before you answer them.  So if at any

21  point you don't for whatever reason, like you can't hear me

22  because we're doing this via zoom or the audio cuts out.

23          Or you can hear me fine but you just don't

24  understand what I'm trying to ask you, whatever the case is, if

25  you don't understand a question will you please let me know so



 1   that I can clarify, rephrase, repeat, or whatever else I need

 2   to do so you understand it?

 3       A.   Yes, I will.

 4       Q.   Perfect.  And unless you do that I'll assume that

 5   when you answer my questions today you understood them, is that

 6   fair?

 7       A.   Yes.  That's fair unless there's a technical

 8   difficulty and I can't hear you or you don't hear me.

 9       Q.   Yeah.  And that's what I was getting at.  So if you

10   can't hear me just let me know and I'll repeat my question or

11   do whatever else I need to do so you can hear me and understand

12   me, okay.

13       A.   Okay.  And if you can't hear me let me know.

14       Q.   And I will.  And I was about to go over that.  So the

15   court reporter she's taking down everything that we are saying

16   and this will be reduced to a written transcript that I will

17   talk about a little bit more in a bit.

18              In order for us to get as accurate as a

19   transcript as possible, there's a few things that you and I

20   need to try to do and not do.  The big one is she can only take

21   down what one of us is saying at a time so we want to try our

22   best not to talk over each other.

23              So if you can try to let me finish my questions

24   all the way through before you start answering I will do the

25   same.  I will try to let you finish your answers all the way



1    through before I move on to my next question.

2                    Having said that, I've been doing these via zoom

3    ever since the pandemic first hit and it's a very usual

4    occurrence that I will unintentionally interrupt the witness a

5    couple of times during the examination under oath.

6                    If I do that I will probably catch it myself,

7    stop, and let you finish.  However, if at any point I don't and

8    I just interrupt you and I don't let you finish just let me

9    know and I will be happy to let you go back and finish whatever

10   it was you were saying before I interrupted you, does that make

11   sense?

12        A.    Yes, it does.

13        Q.    And when you're answering my questions today please

14   try to do so verbally with words.  And that sounds kind of

15   goofy but really what I'm getting at is try not to shake or nod

16   your head or uh-huh or uh-uh as those things can be hard to get

17   accurately reflected on the transcript and we want to make sure

18   we get your answers accurately reflected.

19                    Having said that, those are manners in which we

20   communicate or a lot of us communicate in our day-to-day lives.

21   I find that sometimes the witness will revert back to them as

22   the examination under oath goes forward.  If you do it's not

23   the end of the world.  I will probably catch it and ask you to

24   clarify.

25                    So if you were to shake your head I would say,



Muhammad Shahid

February 23, 2024
Page 8

1    is that a no?  If you were to say uh-huh I would say, is that a

2    yes?  Again, if I do that it's just to make sure we get your

3    answers accurately reflected on the transcript and not me

4    trying to be difficult or rude or snarky or anything like that,

5    okay.

6            A.    I understand.

7            Q.    And kind of related to that and what you were

8    mentioning earlier, there may be times where I ask you to

9    repeat an answer because I think it was hard to hear.  Either I

10   didn't understand it or I think the court reporter might not

11   have gotten it.  So I will say can you say that again or can

12   you repeat that?  Something to that effect.

13                 I may also ask you to spell things from

14   time-to-time.  That's because the court reporter needs to know

15   how to spell it for the transcript and if I think she might

16   need that I will go ahead and ask you.

17                 If I miss something that you need to spell that

18   I didn't ask you about, at the end when we're done she will

19   probably ask you to spell them.  So once we are fully done

20   today I will say something along the effects of, those are all

21   the questions I have and I'm concluding the examination under

22   oath.

23                 Then we will go off the record.  Mr. Shahid, if

24   you can stay on for a minute after that in case she needs

25   anything as far as getting those spellings from you that would



1    be greatly appreciated, okay.

2         A.   Okay.

3         Q.   And one other thing.  Kind of related to what we're

4    talking about that I need to ask you, do you have any documents

5    or records in front of you that you plan or relying on and

6    answering my questions today?  It's okay if you do I just need

7    to know what they are.

8         A.   No, I don't.

9         Q.   And is there anyone in the room with you that can

10   overhear this examination under oath right now?

11        A.   No.

12        Q.   Will you agree that if that chances -- if someone

13   does come in the room or does get in a position that they can

14   overhear, can you let me know so that we can put that on the

15   record?

16        A.   Yes.

17        Q.   So I will start with some basic background questions

18   with you.  What is your date of birth?

19        A.   July 18th, 1985.

20        Q.   Okay.  And what is your current residential address?

21        A.   17230 Fable Springs Lane, Cypress, Texas 77433.

22        Q.   And regarding the claim we are here about today, it

23   relates to some water damage caused by a frozen pipe at that

24   Fable Springs Lane address, correct?

25        A.   No.  That is incorrect.  That is a different



1    property.   That's an investment property that I have.

2         Q.    What's the address where the pipe burst?

3         A.    It was 14902 Cactus Wren Drive, Tomball, Texas.

4         Q.    And you said Cactus, what was that second word?

5         A.    Wren.   W-R-E-N.

6         Q.    And that address on Fable Springs Lane in Cypress,

7    how long have you lived there?

8         A.    One year and four months.

9         Q.    Okay.   And what is a good e-mail address for you?

10        A.    Haaris_shahid@hotmail.com.

11        Q.    And one of the reasons why I asked about your

12   residential address and e-mail address is because once the

13   transcript is completed a copy of it will be sent to you.

14              It will probably be about two weeks from now

15   give or take.   It's going to be sent to you either via e-mail

16   or a physical copy delivered to you via Fed Ex or UPS.

17              Regardless of whether it's a physical copy or a

18   e-mail address, is that residential address you provided on

19   Fable Springs and that hot mail e-mail address you provided,

20   are those the two best places to send that transcript to?

21        A.    Yes, they are.

22        Q.    One of the main reasons why the transcript is going

23   to be sent to you is so that you have an opportunity to review

24   it.   And if you think the court reporter made any mistakes in

25   how she transcribed what you were saying you can note those on



1    a page at the end.

2              And it will kind of be self-explanatory how to

3    do it but if you have any questions you can contact me or

4    Allstate and we will help you out with how to do that.  But

5    you'll have an opportunity to note those in case there's

6    anything that you think was miss transcribed.

7              And by miss transcribed what I'm taking about

8    is, let's say you said the color blue but the court reporter

9    wrote down boo like the sound a ghost makes, conversely, it's

10   not the type of thing where you were trying to say -- you meant

11   to say green but you said blue instead.

12             That's not the kind of correction that we're

13   talking about making on there.  But regardless of whether you

14   think there are any mistakes the court reporter made, what

15   Allstate will ask you to do is sign the signature page that's

16   at the end of the transcript and send it back however it was

17   send to you.

18             If it was e-mailed to you, you can scan it and

19   send it back that way.  If it's sent as a physical copy there

20   will be a self-addressed stamped envelope with it.  You just

21   sign the signature page, put it back in the envelope, and send

22   it out.  Does that all make sense?

23        A.   Yes.

24        Q.   So.  The address where this loss occurred was on

25   Cactus Wren in Tomball, Texas, correct?



1      A.   Correct.

2      Q.   When did you purchase that property?

3      A.   September 2023.

4      Q.   When you purchased that property did you pay cash or

5   did you have to finance a portion of it?

6      A.   Finance.

7      Q.   Do you know who the mortgage lender is?

8      A.   Texas Day Credit Union.

9      Q.   And when you purchased that property, for what reason

10  were you purchasing it?

11     A.   It's an investment property.

12     Q.   Okay.  Did you -- Normally when people say investment

13  property they mean they are going to rent it out or do some

14  remodelling and flip it, was it one of those two things?

15     A.   Renting was my purpose.

16     Q.   So we're in February of 2024 now.  Since you

17  purchased the property on Cactus Wren, have you had any

18  residential tenants there?

19     A.   No.  Not so far.

20     Q.   Is there any particular reason for that?

21     A.   Yes.  The house needed some work.  We had to do some

22  repairs, painting, we had to furnish it, so we needed to do all

23  those things before we could rent it.

24     Q.   What kind of work did it need beside the painting?

25     A.   The painting was a big thing.  All the rooms needed



1   painting.  The previous owners had did a lot of touchups and

2   the touchups were obvious so we had to paint a lot of walls in

3   the house.

4              The pool needed several repairs.  The pump on

5   the pool needed repairs.  Multiple things on the pool.  There

6   were some fixtures we had to replace.  Those were the main

7   things.

8       Q.   Okay.  And how much of that renovation had been

9   completed by the time the pipe had burst?

10      A.   We only had a few walls left to paint.  I would say

11  90 percent was completed.

12      Q.   Speaking of which, when did that pipe burst?

13      A.   January 17th is when we discovered it.

14      Q.   And that's of course 2024, correct?

15      A.   Correct.

16      Q.   And how did you discover it?

17      A.   My wife went to the property around 10 a.m. that

18  morning and when she got there she opened the door and she

19  discovered water everywhere.

20             The ceiling got caved in, watering was coming

21  down the ceiling.  Actually, before that the water company --

22  The name is Undine.  They were doing some work in the area

23  because there was a freeze that night on January 16th.

24             So January 17 they were doing some walkthroughs

25  and they called me on my cellphone and said there was water



1    draining out of your fence in the back of your garage.  And at

2    this point I called my wife and said go over there and check it

3    out.  She was grocery shopping at a store.  She went over there

4    immediately and as she entered the house that's when she found

5    that.

6        Q.    Okay.  And who was it that notified you of seeing the

7    water?

8        A.    The water utility company Undine.  U-N-D-I-N-E.

9        Q.    Give me just a second.  And prior to your wife going

10   over to the property at Cactus Wren on the 17th, when was the

11   last time you had been there?

12       A.    The day before on the 16th my wife went there to wrap

13   the outside pipes for instillation intake because of the

14   freeze.  She was preparing the outside pipes.

15       Q.    Okay.  And prior to the 16th when she went over there

16   to wrap the pipes, when was the last time you or your wife had

17   been to the property on Cactus Wren?

18       A.    Maybe a day or two before.  We were going there

19   pretty regularly a couple of times a week at least.

20       Q.    Okay.  And was there ever a period of time between

21   when you purchased the property and January 17th when you

22   discovered that the pipe had burst that you or your wife

23   neither of you had gone to that property for a full week?

24       A.    No.  I have gone every week.

25       Q.    Okay.  So I'm going to switch gears here for a little



1   bit.  I want to ask you about what you do as far as how you

2   earn your income.  So obviously it sounds like part of how you

3   earn your income is through investment properties; is that

4   right?

5        A.   That is correct.

6        Q.   How many investment properties do you own?

7        A.   Three total.

8        Q.   And does that include the Cactus Wren?

9        A.   Yes.

10       Q.   And where are the other two?

11       A.   In Kentucky.  One is in Louisville, Kentucky and one

12  is in Lebron, Kentucky.

13       Q.   And besides your rental properties and the income you

14  earn from those, what other sources of income do you have?

15       A.   I have a full-time job.

16       Q.   And what is that?

17       A.   BASF Corporation.

18       Q.   What kind of business is that?

19       A.   It's a chemical manufacturing company.

20       Q.   And how long have you worked there?

21       A.   Since 2018.  I had a couple of different roles.  This

22  is my most recent role.

23       Q.   So do you -- It's my understanding that you also own

24  a business outside of your rental properties; is that right?

25       A.   Yeah.  I registered an LLC and we have been looking



Muhammad Shahid

February 23, 2024
Page 16

```
 1   into that business but we have not started it so far.
 2        Q.   And as far as that LLC goes, is it Conquest Centers
 3   LLC?
 4        A.   Correct.
 5        Q.   What kind of business do you intend to run under that
 6   name?
 7        A.   It's a therapy business.  To provide therapy to
 8   people with ADHD, down syndrome, autism, conditions like that.
 9        Q.   And do you or your wife have a background in that
10   kind of therapy?
11        A.   No.  Our goal was to hire a therapist if and when we
12   decide to start.  But basically what intrigued our interest
13   over the years is we've lived in several different states and
14   communities and we've meet several people that have these
15   conditions and we recognize the need and the support with this
16   kind of therapy.
17             Some people who are getting it and some people
18   that are not getting it so we considered this idea -- potential
19   business idea but as I said we are researching right now to
20   determine the feasibility of the business but we haven't
21   starting anything yet.
22        Q.   Okay.  And does that business -- Does Conquest
23   Centers LLC have a business address, like a home office?
24        A.   No.  As I said we haven't started it yet.  There is
25   no address.
```



Muhammad Shahid                                    February 23, 2024
                                                          Page 17

1        Q.    Did you ever associate the Cactus Wren address with

2    the Conquest Centers LLC?

3        A.    No.

4        Q.    Do you know if your wife ever did?

5        A.    Not that I know of.  It's no reason for her to do

6    that.

7        Q.    So when you purchased -- scratch that.  Besides

8    Conquest Centers LLC, do you own or have any ownership-interest

9    in any other companies?

10       A.    Just my rental property business.

11       Q.    Do you run that rental property business under a name

12   or under a incorporated entity?

13       A.    No.  On my tax return it's shown under enterprise

14   number one.  That's like a generated name by default but other

15   than that I didn't generate an LLC or anything for the rental

16   property business.

17       Q.    And do you have any other sources of income besides

18   the ones that we have already gone over?

19       A.    I have some stocks in some companies.  I have a 401K

20   plan and I have stocks through that as well.  I have a saving

21   account I get some interest on but no other business.

22       Q.    And what does your wife do for a living?

23       A.    She's a homemaker.

24       Q.    When was the last time she was employed?

25       A.    More than a decade ago.



Muhammad Shahid

February 23, 2024
Page 18

1    Q.    And do you and your wife have any children?

2    A.    Yes.  Two.

3    Q.    And how old are they?

4    A.    Nine and five.

5    Q.    Okay.  And when you purchased the address on Cactus

6    Wren, did it have any furnishings in it at that point?

7    A.    Yeah.  Some things that the previous owner left.

8    Q.    Do you recall what those were?

9    A.    There were some tables and chairs.  The washer and

10   dryer they left behind.  That's about it for the most part.

11   Q.    Anything else that you can recall?

12   A.    Not right now.

13   Q.    Okay.  And when you say tables and chairs, are we

14   talking like dining room chairs or office furniture, what are

15   we talking about?

16   A.    No.  So they were small tables.  Like a few of those

17   and some chairs of different sizes.  There were one or two pool

18   chairs that were outside and there were some chairs inside.

19   Q.    Okay.  And the time between the purchase of the

20   property and when the pipe burst in January, you had mentioned

21   that you needed to furnish it, did you add any furnishings to

22   the property?

23   A.    Yes.

24   Q.    What did you add?

25   A.    I furnished the living room, the dining area, the



1   play room.  I also set up a little office space.

2        Q.   Do you normally rent out your investment properties

3   fully furnished?

4        A.   Yes.

5        Q.   Do you know what the previous owner of Cactus Wren

6   had used that property for, were they living there or renting

7   it out or using it for a business?

8        A.   I'm not sure.

9        Q.   Was it --

10       A.   From my understanding it was residential but I can't

11   confirm that.

12       Q.   Okay.  Did you install any security systems on the

13   property at Cactus Wren after you purchased it?

14       A.   I installed some security cameras not a security

15   system.

16       Q.   And were those security cameras working as of January

17   1st, 2024?

18       A.   Yes.  When the incident happened then they went down

19   because the electricity had to be disconnected.

20       Q.   When did they go down and for how long?

21       A.   The day of the incident January 17th they were down

22   for a couple of weeks.

23       Q.   At any point have you advertised on any platform that

24   Cactus Wren property to be rented out?

25       A.   Not yet.  I spoke to my friends and family that I'm



Muhammad Shahid

February 23, 2024
Page 20

1  preparing this property if you know someone interested they can

2  reach out to me.  There was one family that was interested in

3  renting at the end of February but we had this incident

4  happened so I lost that.

5       Q.   Have you listed it on any website?

6       A.   Not so far.

7       Q.   Okay.  At any point prior to the pipe bursting, did

8  you or your wife ever stay at that property over night?

9       A.   No.

10      Q.   And when you would go over there you mentioned you

11 would go over there a couple of times a week, what were you

12 going over there for?

13      A.   The work we had to do.  Sometimes we would be

14 overseeing the repairs and sometimes we would be painting.  I

15 did all the painting myself.

16      Q.   You mentioned overseeing work, I take it you hired

17 contractors to come in and do some of that work?

18      A.   Correct.

19      Q.   I don't need it right this second but do you have the

20 names and contact information for those contractors?

21      A.   Yes.  The pool repairs were done by Swan Point Pool.

22      Q.   Any others that you remember off the top of your

23 head?

24      A.   Everything else we did ourselves.

25      Q.   When were the pool repairs completed?



1     A.    I don't recall the exact date.  But pretty quickly

2  after we purchased the property we started that work.

3     Q.    Was it the pool repairs that was fully completed when

4  the pipe burst?

5     A.    Yes.

6     Q.    I am going to share my screen with you in just a

7  minute once I get this together.  Let me know when you can see

8  it.

9     A.    Yes.  I can see it.

10    Q.    Okay.  So this is a photo of the inside of the

11 property at Cactus Wren, correct?

12    A.    Seems like it.

13    Q.    What I have here is a 17-page PDF that has a bunch of

14 photos.  I will scroll through them.  After seeing me scroll

15 through them, are those photos of the inside of the house at

16 Cactus Wren?

17    A.    Yeah.  Most of them look like it.  I can't see all of

18 them.  Yes.

19    Q.    And I know that we are scheduled to complete your

20 wife's examination under oath today as well, where is she

21 currently located?

22    A.    She would be at the house.

23    Q.    And where are you currently located?

24    A.    I am in Pasadena, Texas.

25    Q.    At a house or business or in your car?



1      A.    Business.

2      Q.    Where you work at BASF?

3      A.    Correct.

4      Q.    So we'll attach this as exhibit one.  Here on this

5 first page -- this photo on the first page there's a white

6 board and then this -- I don't know exactly how to describe it.

7 This thing that says glue, doors, books, lock, and desk, was

8 that something that was on the wall when you purchased the

9 property or was that something you added to it?

10     A.    We added that.

11           (Exhibit No. 1 was marked.)

12     Q.    And why is that?

13     A.    It's a play room.  That's what kids like to do.  They

14 like to draw on the board.  They like to learn things in the

15 play room.

16           My wife would take our kids sometimes there when

17 we were working there.  Our kids would go there and they would

18 play in the play room.  They would draw on the board and do

19 what kids do.

20     Q.    And that white board to me looks approximately maybe

21 three feet off of the ground as far as where the bottom of it

22 is, does that sound about right?

23     A.    I can't tell exactly.  It's hard to say.

24     Q.    Okay.  And on page two of this PDF file there's a

25 calendar here, is that something you added as well?



Muhammad Shahid

February 23, 2024
Page 23

1      A.   Yes.

2      Q.   On page three there's a television on the wall, is

3  that something you mounted?

4      A.   Yes.

5      Q.   And when did you mount that television?

6      A.   I don't remember an exact date.  Sometime between

7  when I brought the property and the loss.

8      Q.   And there's like some kind of inflatable ring, like

9  an inflatable boxing ring or something but it's clearly for a

10 child or children, do you see that on the right side?

11     A.   Yes.

12     Q.   Is that something that came with the property or you

13 put that in there?

14     A.   No.  We put that in there.

15     Q.   And is this the same play room where we were looking

16 at pictures of on page two?

17     A.   Yes.  Correct.

18     Q.   Here there looks like -- On page five looks like the

19 balls that you put in the ball pit and then a slide, do you

20 that?

21     A.   Yes.

22     Q.   And that's something y'all brought over there as

23 well?

24     A.   Correct.

25     Q.   And is this the same room or a different room than



MAGNA
LEGAL SERVICES

Muhammad Shahid

February 23, 2024
Page 24

1   the one with the inflatable ring and TV on the wall that we

2   were just looking at?

3       A.    Same.

4       Q.    On page eight of this PDF there's this kind of -- It

5   looks like matting that you can put together like a puzzle

6   here, do you see what I'm talking about?

7       A.    Yes.

8       Q.    Is that something y'all brought over as well?

9       A.    Yes.

10      Q.    Is this the same room where all that other stuff that

11  we were just looking at like the TV, slide, inflatable ring?

12      A.    Yes.

13      Q.    Okay.  There we go.  Now we can see it all here.  I

14  apologize I didn't realize this photo was in there.  So this is

15  page nine.

16            And then on page ten, there's a few different

17  rooms shown but there's a room here in the back with a circular

18  rug, a little tiny table, and some decorations on the wall, do

19  you see that?

20      A.    Yes.

21      Q.    And that's a different room than the one we were just

22  looking at a moment ago, correct?

23      A.    Correct.

24      Q.    Did you put that table and chair in there?

25      A.    This was in the play room as long as I remember.



1    Maybe the contractors moved it there but this was in the play

2    room.

3        Q.   And when you say contractors, you're referring to the

4    contractors that started doing work after the loss; is that

5    right?

6        A.   Yes.

7        Q.   And do you have the -- either right now or later on

8    the names and contact information for those contractors?

9        A.   Yeah.

10       Q.   Is that something you can provide now?

11       A.   Yeah.  They are called Go Crafts.  That's the name of

12   the company.  I don't know the name of the individuals.

13       Q.   Okay.  On page 15 it's a different view of that room

14   with the circular rug in the middle and the stuff on the wall,

15   and in this version of the photo we can see there is actually

16   two tables, do you agree with me?

17       A.   Yeah.

18       Q.   Okay.  This was stuff that was in the play room that

19   you think was moved either by the contractors or someone else

20   beside you?

21       A.   Correct.

22       Q.   And do you see here where there's a child safety

23   mechanism on this door handle?

24       A.   Yes.

25       Q.   Who added that?



1      A.    We did.

2      Q.    And why is that?

3      A.    For our kids because when I was painting they would

4    open the door and come in and touch the paint and tools so I

5    installed those on most of the doors so they would not bother

6    us when we are doing work.

7      Q.    All right.  I will stop sharing my screen with you.

8    When your kids would write on that white board, would they need

9    a stool or something to stand on in order to get that high?

10     A.    No.  My son is pretty tall.  He's nine years old.  He

11   was able to reach the board without any problems.

12           My daughter would have to get on her tippy toes

13   but she could reach it too.

14     Q.    So at any time since you purchased the property at

15   Cactus Wren, have you or your wife operated any businesses out

16   of it?

17     A.    No.

18     Q.    At any time in the last ten years, have you or your

19   wife operated any kind of childcare businesses anywhere

20   regardless of the address?

21     A.    No.

22     Q.    All right.  So I don't think I have too much to go

23   over with you.  I need to kind of look over everything again

24   and make sure I've covered what I need to cover and then come

25   back and ask you whatever else I need to ask you and we'll



1    finish up.

2                So let's go ahead and take a ten minute maybe 15

3    minute break and come back on.  If you want to mute your

4    microphone and turn your camera off feel free to do so and I

5    will do the same.  I will come back on and turn my mic and

6    camera on when I'm ready to finish up, okay.

7        A.    Sounds good.

8                (Off the record at 10:48 a.m.)

9                REPORTER:  We are now back on the record at

10    11:08 a.m.

11        Q.    (By Jordan Kennamer-Chapman)  There's a few things I

12    need to go over with you that I didn't yet.  What cellphone

13    numbers do you currently use?

14        A.    My cell number is (225) 436-9320.

15        Q.    Okay.  Is that your only cellphone that you use?

16        A.    Yes.

17        Q.    Since you purchased the property on Cactus Wren, is

18    that the only cellphone number you've utilized?

19        A.    That is correct.

20        Q.    What is your wife's cellphone number?

21        A.    (832) 374-4277.

22        Q.    And is that the only cellphone number that she's

23    utilized since y'all purchased the property on Cactus Wren?

24        A.    She had a different number.  I don't recall when she

25    changed it.  She use to have a Kentucky number before she



Muhammad Shahid                                         February 23, 2024
                                                               Page 28

1    changed it.  I believe some time last year.

2         Q.    Okay.  And what about -- Do you know anyone who has

3    the phone number (832) 374-4288?

4         A.    No.

5         Q.    And so the business Conquest Centers LLC or the LLC

6    that we've been discussing, what steps beside forming the

7    business and registering it with the Texas Secretary of State

8    office, what other steps, if any, have you made in furtherance

9    to starting that business?

10        A.    I mean, we have been doing some research.  Market

11   research to see what kind of demand is out there for this

12   therapy.  There are several support groups in this area, for

13   example, for down syndrome there is Houston Association of Down

14   Syndrome.

15                  There is National Society of Down Syndrome.  For

16   ADHD there is ADDA.  For autism there is Texas Society of

17   Autism.  All these support groups we went to their events.

18   They have events throughout the year.

19                  We went to the event, met people who had these

20   conditions and kind of try to understand if they would be

21   interested in this kind of therapy.  Also posted on some of

22   those website's to get some feedback but nothing beyond

23   research has been done.

24        Q.    Is there anybody else who has any ownership-interest

25   in Conquest Centers LLC besides you and your wife?



Muhammad Shahid

February 23, 2024
Page 29

1       A.    No.

2       Q.    Okay.  Have you hired anybody or paid anybody to do

3  any further development of that business?

4       A.    We had hired a person to build a website.  They

5  started building it but it's not complete yet.  They just

6  started it and I think they are maybe halfway or something.  I

7  haven't spoken to them in a little bit.

8       Q.    Do you know what -- Well, let me ask this.  Have you

9  obtained a tax ID number for that business?

10      A.    Yes.

11      Q.    Have you filed any tax documents relating to that

12 business?

13      A.    No.

14      Q.    Do you know what an NPI number is?

15      A.    Yes.

16      Q.    And what is that?

17      A.    It stands for national provider something.

18      Q.    And did you ever obtain one of those -- a NPI number

19 for the Conquest Centers LLC?

20      A.    Yes.

21      Q.    And when you -- My understanding is when you obtain a

22 NPI number, one piece of information you have to provide is a

23 business address like a provider practice location, do you

24 recall providing one of those to get that NPI number?

25      A.    I don't remember.  I don't think that is needed.



1    It's been a while so I don't remember exactly what you need to

2    provide.

3        Q.    When did you obtain that NPI number?

4        A.    Several months ago.  It was around the time I

5    registered the LLC.

6        Q.    So what I'm going to do is share my screen with you

7    again.

8        A.    Okay.

9        Q.    A little bit ago I searched to see if there was an

10    NPI number for Conquest Centers LLC.  This is a printout of

11    that search.  You can see here it's a six page PDF.  We will

12    attach it as exhibit two.

13            You can see the date at the top and that's

14    today's date and that's where I searched it.  My first question

15    is, is that NPI number that you know associated with Conquest

16    Centers?

17        A.    I will have to look that up.  I don't remember off

18    the top of my head.

19            (Exhibit No. 2 was marked.)

20        Q.    Okay.  And then here you would agree with me that

21    under provider practice location it says 14902 Cactus Wren

22    Drive?

23        A.    It does say that but that is incorrect.  It was no

24    practice at this address.

25        Q.    And then down here under authorized official it says,



Muhammad Shahid

February 23, 2024
Page 31

1    Muhammad Haaris Shahid, and it has a phone number

2    (225) 436-9320, that's your name and phone number, correct?

3        A.    Yes.

4        Q.    And so according to the NPI database it shows that

5    Cactus Wren is the provider and physically located at 14902

6    Cactus Wren Drive, correct?

7        A.    Correct.  I will have to update that information.

8    I'm not sure where they're getting that from.

9        Q.    Okay.  What's interesting to me about it is that --

10   Well one of the things that's interesting is that, it says the

11   NPI number was issued on September 11th, 2023, and I believe

12   that was before you even purchased the property on Cactus Wren

13   Drive; is that right?

14       A.    I think so. Again, I don't recall the exact date.

15       Q.    And is this -- I will show you a website that I

16   found.  Is this the website that you hired somebody to start

17   working on?

18       A.    They made some changes.  This is not the one I saw

19   the last time.  He made some changes on it but yes.

20       Q.    But it is the website that you retained somebody to

21   build; is that correct?

22       A.    Yes.  This is the structure.

23       Q.    Okay.  And what address is that, do you know?

24       A.    I'm not sure.  I don't have any address associated

25   with that business as I said before.  There is no physical



1   location and that phone number is also wrong.

2               REPORTER:  I'm sorry.  It's breaking up on my

3   end so could you repeat that last question and answer?

4               JORDAN KENNAMER-CHAPMAN:  Sure.  No problem.

5       Q.   (By Jordan Kennamer-Chapman)  Mr. Shahid, I was

6   pointing out to you what is on this website under the contact.

7   It says 14920 Huffmeister Road in Cypress, Texas, and you were

8   telling me that that's not an address you are familiar with; is

9   that correct?

10      A.   That right.

11      Q.   And the phone number below listed as (832) 374-4288,

12  and that's also not a correct phone number for you or your

13  wife; is that accurate?

14      A.   That's accurate.

15      Q.   And one thing I found interesting about that was

16  that, it's almost your wife's phone number.  And her phone

17  number is (832) 374-4277; is that right?

18      A.   Correct.  So I'm assuming that person planted a dummy

19  number in there.  I would have to ask them.

20      Q.   Yeah.  And that info at ConquestCenters.com e-mail

21  address, is that an e-mail address that you or your wife have

22  access to?

23      A.   No.

24      Q.   At any point did you intend to open Conquest Centers

25  at the address on Cactus Wren?



Muhammad Shahid

February 23, 2024
Page 33

1      A.    No. Cactus Wren is residential you can't open a

2   therapy center there.  It needs to be in a commercial area.

3      Q.    Have you retained any attorneys to help you start

4   that Conquest Centers LLC?

5      A.    No.

6      Q.    Have you ever heard of an attorney name Brittany

7   Grace Mortimer?

8      A.    No.

9      Q.    Okay.  Can you see my screen?

10     A.    Yes.

11     Q.    This is the certificate of formation for Conquest

12  Centers LLC that you sent into my office in connection with

13  this examination under oath today, correct?

14     A.    Correct.

15     Q.    And it has the business address as 17230 Fable

16  Springs Lane in Cypress, Texas, correct?

17     A.    That's not the business address.  That's the address

18  to receive mail.

19     Q.    Okay.  Under section-C the business address of the

20  registered agent and the registered office address is 17230

21  Fable Springs Lane in Cypress, Texas 77433, am I reading that

22  correctly?

23     A.    Yeah.  That's the address to receive mail.  There is

24  no physical business there and I clarified that with the

25  Secretary of State office before I put that on there.



Muhammad Shahid                                    February 23, 2024
                                                          Page 34

```
 1        Q.   And we will attach this as exhibit three.  Mr. Shahid
 2    since you filed this certificate of formation, have you updated
 3    any of the addresses on here with the Secretary of State?
 4        A.   No.
 5             (Exhibit No. 3 was marked.)
 6        Q.   Let me stop sharing my screen.  And I will share one
 7    more time.  I want to go back to that website so we can
 8    document it for the record.  This is the website we were
 9    looking at.
10             And this is the one that you had hired somebody
11    to start building for you when you started the business?
12        A.   Yes.
13        Q.   So what I'm going to do is take a screen grab of it
14    and we will attach that as exhibit four.  And then for the
15    record I will read out that URL, which is
16    D-R-W-G-X-Z-Y-E.E-L-E-M-E-N-T-O-R.C-L-O-U-D.
17             I will stop sharing my screen.  So while I'm
18    doing this, Mr. Shahid, what is your current understanding of
19    why this claim is being investigated by Allstate?
20        A.   I don't know.  I never got a straight answer.  I
21    would like the get a straight answer.
22             (Exhibit No. 4 was marked.)
23        Q.   Okay.  Do you recall any individuals from Allstate
24    coming out to the property on Cactus Wren and speaking to your
25    wife after the loss happened?
```



1       A.   Yes.

2       Q.   And what is your -- It's my understanding that there

3  is a disagreement as far as what your wife told that person

4  when they came to the property, do you know what I'm talking

5  about?

6       A.   Yes.

7       Q.   So I know you know what I'm referring to.  It's your

8  testimony under oath that your wife did not tell that

9  individual that she had been running any kind of childcare

10 operation out of that house?

11      A.   Yes.  Correct.

12      Q.   And there's -- At no point was there any childcare

13 operation being run out of that address on Cactus Wren from the

14 time you bought it until the loss happened?

15      A.   Until today I would say there is no childcare

16 business.

17      Q.   All right.  Let me double check something real quick.

18 When you filled out the paperwork to get the loan in order to

19 buy Cactus Wren, a lot of the times on those applications you

20 have to select what you're going to be using that property for,

21 do you recall what you selected?

22      A.   I must've selected investment property.

23      Q.   Okay.  And your other properties that you rent out

24 are in Kentucky I believe; is that right?

25      A.   Correct.



1　　　Q.　Do you rent those out fully furnished as well?

2　　　A.　Yes.　Not fully furnished.　They are furnished but

3　the tenants can bring in additional furniture if they want to.

4　　　Q.　And do you advertise those rental properties on some

5　type of listing website?

6　　　A.　Sometimes I do and sometimes I hire a realtor.　One

7　of the properties I haven't changed the tenants in a long time.

8　More than five years I've been having the same tenants there.

9　　　　　　　The other one I think the tenants have been

10　there for two or three years as well so I don't change tenants

11　very often.

12　　　Q.　And as far as what you furnish for those properties

13　in Kentucky, do you also furnish them with like children's toys

14　and stuff like the stuff we were looking at in the pictures at

15　Cactus Wren?

16　　　A.　Yes.　I always have a play room.　I think both of

17　them had play rooms and I also have office areas.　My own house

18　where I live I have a play room and I have a office so that's

19　kind of the typical design I follow.

20　　　Q.　And the security camera footage at Cactus Wren that

21　stopped working when the loss happened, how do you maintain

22　that security footage, is it on the cloud, do you have a hard

23　copy, like a closed network type thing?

24　　　A.　The footage is not recorded.　The cameras have motion

25　detection so it tracks motion.　I get a notification on my



```
 1   phone and I can click on the notification and it gives me the

 2   live feed but it doesn't record anything.

 3              If you want to record then you have to sign up

 4   for a subscription which I don't do.

 5   Q.   So you don't have any recordings of the security

 6   footage at Cactus Wren prior to January 16th, 2024?

 7   A.   I have no recordings of either property.  I only have

 8   the motion detection and live feed capability.

 9   Q.   One quick thing.  Your job at BASF, how many hours a

10   week do you typically work?

11   A.   40.

12   Q.   Okay.  And those 40 hours, do you work from home or

13   do you have to go into the office?

14   A.   Most of the time I go to the office but I can work

15   from home too from time-to-time.

16   Q.   So when you would go to the house on Cactus Wren to

17   do the work like a couple times a week like you were describing

18   earlier, was this on the weekends or during the week after

19   work?

20   A.   Sometimes it would be after hours when I get back

21   from work.  I work 6:30 to 3:30 so sometimes it would be after

22   work and sometimes it would be on weekends.  I would say the

23   bigger jobs was over the weekend.

24   Q.   All right.  I think that's pretty much all I have.

25              JORDAN KENNAMER-CHAPMAN:  Tai, is there anything
```



Muhammad Shahid                                        February 23, 2024
                                                              Page 38

1    else you wanted to ask?

2                  TAI MCKINNON:  No.

3                  JORDAN KENNAMER-CHAPMAN:  Okay.  In that case,

4    Mr. Shahid, I appreciate you taking the time to answer my

5    questions today.  We'll conduct your wife's examination under

6    oath later today at one p.m. but we can conclude yours and go

7    off the record.

8                  (Off the record at 11:36 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Muhammad Shahid

February 23, 2024
Page 39

```
 1          WITNESS CORRECTIONS AND SIGNATURE
 2   Please indicate changes on this sheet of paper, giving the
 3   change, page number, line number and reason for the change.
 4   Please sign each page of changes.
 5
 6   PAGE/LINE          CORRECTION          REASON FOR CHANGE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24                      _____
25                           MUHAMMAD SHAHID
```



1      I, MUHAMMAD SHAHID, have read the foregoing transcript and

2   hereby affix my signature that same is true and correct, except

3   as noted above on the previous pages(s), and that I am signing

4   this before a Notary Public

5

6

7                        MUHAMMAD SHAHID

8   THE STATE OF Texas)

9   COUNTY OF Harris)

10

11      Before me, Winette Smith, on this day personally appeared,

12   MUHAMMAD SHAHID, known to me or proved to me under oath or

13   through                      (description of identity card or

14   other document), to be the person whose name is subscribed to

15   the foregoing instrument and acknowledged to me that they

16   executed the same for the purposes and consideration therein

17   expressed.

18

19      Given under my hand and seal of office on this, the 23rd

20   day of February, 2024.

21

22

23                        Notary Public in and for

24                        The State of Texas

25                        Commission Expires:  04/30/2027



Muhammad Shahid

February 23, 2024
Page 41

| 1 | INSURANCE COMPANY | : | ALLSTATE INSURANCE COMPANY |
| 2 | INSURED | : | MUHAMMAD SHAHID |
| 3 | POLICY NO. | : | N/A |
| 4 | CLAIM NO. | : | 0742346539 |

5

6                          CERTIFICATION TO THE

7                       EXAMINATION UNDER OATH OF

8                            MUHAMMAD SHAHID

9                                TAKEN ON

10                          FEBRUARY 23, 2024

11

12

13

14

15

16      I, Winette Smith, Notary Public in and for the State of

17 Texas, hereby certify that this examination under oath

18 transcript is a true record of the testimony given by with

19 witness named herein, after said witness was duly

20 sworn/affirmed by me.

21      I further certify that I am neither attorney nor counsel

22 for, related to, nor employed by any of the parties to the

23 action in which this testimony was taken.  Further, I am not a

24 relative or employee of any attorney of record in this cause,

25 nor do I have a financial interest in the action.



Muhammad Shahid

February 23, 2024
Page 42

1      The original examination under oath transcript was

2  delivered to the attorney party who asked the first question

3  appearing in the transcript on February 23, 2024.  JORDAN

4  KENNAMER-CHAPMAN, was the counsel present at the time of the

5  taking of this examination under oath.

6

7

8

9

10

11

12

13

14  _____

15  WINETTE SMITH

16  Notary Public in and for

17  The State of Texas

18  My Commission expires 04/30/2027

19

20

21  Magna Legal Services

22  700 Milam St. Ste.  1300

23  Houston, Texas 77002

24  866 624-6221

25  WWW.MagnaLS.com



Muhammad Shahid

February 23, 2024
Index: 0742346539..BASF

---

**0**

**0742346539** 4:25

---

**1**

**1** 22:11
**10** 13:17
**10:00** 4:2
**10:48** 27:8
**11:08** 27:10
**11:36** 38:8
**11th** 31:11
**14902** 10:3 30:21 31:5
**14920** 32:7
**15** 25:13 27:2
**16th** 13:23 14:12,15 37:6
**17** 13:24
**17-page** 21:13
**17230** 9:21 33:15,20
**17th** 13:13 14:10,21 19:21
**18th** 9:19
**1985** 9:19
**1st** 19:17

---

**2**

**2** 30:19
**2018** 15:21
**2023** 12:3 31:11
**2024** 4:2 12:16 13:14 19:17 37:6
**225 436-9320** 27:14 31:2
**23** 4:2

---

**3**

**3** 34:5
**3:30** 37:21

---

**4**

**4** 34:22
**40** 37:11,12
**401K** 17:19

---

**6**

**6:30** 37:21

---

**7**

**77433** 9:21 33:21

---

**8**

**832 374-4277** 27:21 32:17
**832 374-4288** 28:3 32:11

---

**9**

**90** 13:11

---

**A**

**a.m.** 4:2 13:17 27:8,10 38:8
**access** 32:22
**account** 17:21
**accurate** 6:18 32:13,14
**accurately** 7:17,18 8:3
**add** 18:21,24
**ADDA** 28:16
**added** 22:9,10,25 25:25
**additional** 36:3
**address** 9:20,24 10:2,6,9,12,18,19
   11:24 16:23,25 17:1 18:5 26:20
   29:23 30:24 31:23,24 32:8,21,25
   33:15,17,19,20,23 35:13
**addresses** 34:3
**ADHD** 16:8 28:16
**administering** 4:6

---

**advertise** 36:4
**advertised** 19:23
**agent** 33:20
**agree** 9:12 25:16 30:20
**agreement** 4:4
**ahead** 8:16 27:2
**Allstate** 4:12,22,23 11:4,15 34:19,
   23
**answering** 6:24 7:13 9:6
**answers** 6:25 7:18 8:3
**apologize** 24:14
**appearance** 4:10
**applications** 35:19
**appreciated** 9:1
**approximately** 22:20
**area** 13:22 18:25 28:12 33:2
**areas** 36:17
**assigned** 4:23
**associate** 17:1
**Association** 28:13
**assume** 6:4
**assuming** 32:18
**attach** 22:4 30:12 34:1,14
**attorney** 4:21 33:6
**attorneys** 33:3
**audio** 5:22
**authorized** 30:25
**autism** 16:8 28:16,17

---

**B**

**back** 7:9,21 11:16,19,21 14:1
   24:17 26:25 27:3,5,9 34:7 37:20
**background** 9:17 16:9
**ball** 23:19
**balls** 23:19
**BASF** 15:17 22:2 37:9



**basic** 9:17

**basically** 16:12

**big** 6:20 12:25

**bigger** 37:23

**birth** 9:18

**bit** 5:5,8 6:17 15:1 29:7 30:9

**blue** 11:8,11

**board** 22:6,14,18,20 26:8,11

**boo** 11:9

**books** 22:7

**bother** 26:5

**bottom** 22:21

**bought** 35:14

**boxing** 23:9

**break** 27:3

**breaking** 32:2

**bring** 36:3

**Brittany** 33:6

**brought** 23:7,22 24:8

**build** 29:4 31:21

**building** 29:5 34:11

**bunch** 21:13

**burst** 10:2 13:9,12 14:22 18:20
21:4

**bursting** 20:7

**business** 15:18,24 16:1,5,7,19,20,
22,23 17:10,11,16,21 19:7 21:25
22:1 28:5,7,9 29:3,9,12,23 31:25
33:15,17,19,24 34:11 35:16

**businesses** 26:15,19

**buy** 35:19

---

**C**

**Cactus** 10:3,4 11:25 12:17 14:10,
17 15:8 17:1 18:5 19:5,13,24
21:11,16 26:15 27:17,23 30:21
31:5,6,12 32:25 33:1 34:24 35:13,
19 36:15,20 37:6,16

**calendar** 22:25

**call** 4:22

**called** 13:25 14:2 25:11

**camera** 27:4,6 36:20

**cameras** 19:14,16 36:24

**capability** 37:8

**car** 21:25

**case** 5:24 8:24 11:5 38:3

**cash** 12:4

**catch** 7:6,23

**caused** 9:23

**caved** 13:20

**ceiling** 13:20,21

**cell** 27:14

**cellphone** 13:25 27:12,15,18,20,
22

**center** 33:2

**Centers** 16:2,22 17:2,8 28:5,25
29:19 30:10,16 32:24 33:4,12

**certificate** 33:11 34:2

**chair** 24:24

**chairs** 18:9,13,14,17,18

**chances** 9:12

**change** 36:10

**changed** 27:25 28:1 36:7

**check** 14:2 35:17

**chemical** 15:19

**child** 23:10 25:22

**childcare** 26:19 35:9,12,15

**children** 18:1 23:10

**children's** 36:13

**circular** 24:17 25:14

**claim** 4:23,24 9:22 34:19

**clarified** 33:24

**clarify** 6:1 7:24

**click** 37:1

**closed** 36:23

**cloud** 36:22

**color** 11:8

**commercial** 33:2

**communicate** 7:20

**communities** 16:14

**companies** 17:9,19

**company** 13:21 14:8 15:19 25:12

**complete** 21:19 29:5

**completed** 10:13 13:9,11 20:25
21:3

**conclude** 38:6

**concluding** 8:21

**conditions** 16:8,15 28:20

**conduct** 38:5

**conducted** 4:4

**confirm** 19:11

**connection** 33:12

**Conquest** 16:2,22 17:2,8 28:5,25
29:19 30:10,15 32:24 33:4,11

**Conquestcenters.com** 32:20

**considered** 16:18

**contact** 11:3 20:20 25:8 32:6

**contractors** 20:17,20 25:1,3,4,8,
19

**conversely** 11:9

**copy** 10:13,16,17 11:19 36:23

**Corporation** 15:17

**correct** 5:10,14 9:24 11:25 12:1
13:14,15 15:5 16:4 20:18 21:11
22:3 23:17,24 24:22,23 25:21
27:19 31:2,6,7,21 32:9,12,18
33:13,14,16 35:11,25

**correction** 11:12

**correctly** 33:22

**counsels** 4:9

**couple** 7:5 14:19 15:21 19:22
20:11 37:17

**court** 4:6 6:15 8:10,14 10:24 11:8,
14

**cover** 26:24



Muhammad Shahid

February 23, 2024
Index: covered..front

**covered** 26:24

**Crafts** 25:11

**Credit** 12:8

**criminal** 5:16

**current** 9:20 34:18

**cuts** 5:22

**Cypress** 9:21 10:6 32:7 33:16,21

---

**D**

**D-R-W-G-X-Z-Y-E.E-L-E-M-E-N-T-O-R.C-L-O-U-D.** 34:16

**damage** 9:23

**database** 31:4

**date** 4:2 9:18 21:1 23:6 30:13,14 31:14

**daughter** 26:12

**day** 12:8 14:12,18 19:21

**day-to-day** 7:20

**decade** 17:25

**decide** 16:12

**decorations** 24:18

**default** 17:14

**delivered** 10:16

**demand** 28:11

**deposition** 5:2

**describe** 22:6

**describing** 37:17

**design** 36:19

**desk** 22:7

**detection** 36:25 37:8

**determine** 16:20

**development** 29:3

**difficult** 8:4

**difficulty** 6:8

**dining** 18:14,25

**disagreement** 35:3

**disconnected** 19:19

**discover** 13:16

**discovered** 13:13,19 14:22

**discussing** 28:6

**document** 34:8

**documents** 9:4 29:11

**door** 13:18 25:23 26:4

**doors** 22:7 26:5

**double** 35:17

**draining** 14:1

**draw** 22:14,18

**Drive** 10:3 30:22 31:6,13

**dryer** 18:10

**duly** 4:14

**dummy** 32:18

---

**E**

**e-mail** 10:9,12,15,18,19 32:20,21

**e-mailed** 11:18

**earlier** 8:8 37:18

**earn** 15:2,3,14

**effect** 8:12

**effects** 8:20

**efficient** 5:7

**electricity** 19:19

**employed** 17:24

**end** 7:23 8:18 11:1,16 20:3 32:3

**entered** 14:4

**enterprise** 17:13

**entity** 17:12

**envelope** 11:20,21

**event** 28:19

**events** 28:17,18

**exact** 21:1 23:6 31:14

**examination** 4:3,7,15 5:1 7:5,22 8:21 9:10 21:20 33:13 38:5

**exhibit** 22:4,11 30:12,19 34:1,5,14, 22

---

**F**

**Fable** 9:21,24 10:6,19 33:15,21

**fair** 6:6,7

**familiar** 32:8

**family** 19:25 20:2

**feasibility** 16:20

**February** 4:2 12:16 20:3

**Fed** 10:16

**feed** 37:2,8

**feedback** 28:22

**feel** 27:4

**feet** 22:21

**fence** 14:1

**file** 22:24

**filed** 29:11 34:2

**filled** 35:18

**finance** 12:5,6

**find** 7:21

**fine** 5:23

**finish** 6:23,25 7:7,8,9 27:1,6

**fixtures** 13:6

**flip** 12:14

**follow** 36:19

**footage** 36:20,22,24 37:6

**formation** 33:11 34:2

**forming** 28:6

**forward** 7:22

**found** 14:4 31:16 32:15

**free** 27:4

**freeze** 13:23 14:14

**Friday** 4:2

**friends** 19:25

**front** 9:5



Muhammad Shahid

February 23, 2024
Index: frozen..kind

**frozen** 9:23

**full** 4:17 14:23

**full-time** 15:15

**fully** 8:19 19:3 21:3 36:1,2

**furnish** 12:22 18:21 36:12,13

**furnished** 18:25 19:3 36:1,2

**furnishings** 18:6,21

**furniture** 18:14 36:3

**furtherance** 28:8

**G**

**garage** 14:1

**gears** 14:25

**generally** 5:6

**generate** 17:15

**generated** 17:14

**ghost** 11:9

**give** 10:15 14:9

**glue** 22:7

**goal** 16:11

**good** 4:17 10:9 27:7

**goofy** 7:15

**grab** 34:13

**Grace** 33:7

**greatly** 9:1

**green** 11:11

**grocery** 14:3

**ground** 22:21

**groups** 28:12,17

**H**

**Haaris** 4:19 31:1

**Haaris_shahid@hotmail.com.** 10:10

**halfway** 29:6

**hand** 5:9

**handle** 25:23

**happened** 19:18 20:4 34:25 35:14 36:21

**happy** 7:9

**hard** 7:16 8:9 22:23 36:22

**head** 7:16,25 20:23 30:18

**hear** 5:21,23 6:8,10,11,13 8:9

**heard** 33:6

**high** 26:9

**hire** 16:11 36:6

**hired** 20:2,4 31:16 34:10

**hit** 7:3

**home** 16:23 37:12,15

**homemaker** 17:23

**hot** 10:19

**hours** 37:9,12,20

**house** 12:21 13:3 14:4 21:15,22,25 35:10 36:17 37:16

**Houston** 28:13

**Huffmeister** 32:7

**I**

**ID** 29:9

**idea** 16:18,19

**immediately** 14:4

**important** 5:19

**importantly** 5:8

**incident** 19:18,21 20:3

**include** 15:8

**income** 15:2,3,13,14 17:17

**incorporated** 17:12

**incorrect** 9:25 30:23

**individual** 35:9

**individuals** 25:12 34:23

**inflatable** 23:8,9 24:1,11

**info** 32:20

**information** 20:20 25:8 29:22 31:7

**inside** 18:18 21:10,15

**install** 19:12

**installed** 19:14 26:5

**instillation** 14:13

**intake** 14:13

**intend** 16:5 32:24

**interest** 16:12 17:21

**interested** 20:1,2 28:21

**interesting** 31:9,10 32:15

**interrupt** 7:4,8

**interrupted** 7:10

**intrigued** 16:12

**investigated** 34:19

**investment** 10:1 12:11,12 15:3,6 19:2 35:22

**issued** 31:11

**J**

**January** 13:13,23,24 14:21 18:20 19:16,21 37:6

**job** 15:15 37:9

**jobs** 37:23

**joining** 4:20

**Jordan** 4:11,16,21 27:11 32:4,5 37:25 38:3

**July** 9:19

**K**

**Kennamer-chapman** 4:11,12,16, 21 27:11 32:4,5 37:25 38:3

**Kentucky** 15:11,12 27:25 35:24 36:13

**kids** 22:13,16,17,19 26:3,8

**kind** 7:14 8:7 9:3 11:2,12 12:24 15:18 16:5,10,16 23:8 24:4 26:19, 23 28:11,20,21 35:9 36:19



---

**L**

**Lane** 9:21,24 10:6 33:16,21

**learn** 22:14

**Lebron** 15:12

**left** 13:10 18:7,10

**legal** 4:5,17

**lender** 12:7

**listed** 20:5 32:11

**listing** 36:5

**live** 36:18 37:2,8

**lived** 10:7 16:13

**lives** 7:20

**living** 17:22 18:25 19:6

**LLC** 15:25 16:2,3,23 17:2,8,15
 28:5,25 29:19 30:5,10 33:4,12

**loan** 35:18

**located** 21:21,23 31:5

**location** 29:23 30:21 32:1

**lock** 22:7

**long** 10:7 15:20 19:20 24:25 36:7

**loss** 11:24 23:7 25:4 34:25 35:14
 36:21

**lost** 20:4

**lot** 7:20 13:1,2 35:19

**Louisville** 15:11

---

**M**

**made** 10:24 11:14 28:8 31:18,19

**Magna** 4:5

**mail** 10:19 33:18,23

**main** 10:22 13:6

**maintain** 36:21

**make** 7:10,17 8:2 11:22 26:24

**makes** 11:9

**making** 11:13

**manners** 7:19

**manufacturing** 15:19

**marked** 22:11 30:19 34:5,22

**Market** 28:10

**matting** 24:5

**Mckinnon** 4:22 38:2

**means** 4:8 5:12,16

**meant** 11:10

**mechanism** 25:23

**meet** 16:14

**mentioned** 18:20 20:10,16

**mentioning** 8:8

**met** 28:19

**mic** 27:5

**microphone** 27:4

**middle** 25:14

**minute** 8:24 21:7 27:2,3

**mistakes** 10:24 11:14

**moment** 24:22

**months** 10:8 30:4

**morning** 4:17 13:18

**mortgage** 12:7

**Mortimer** 33:7

**motion** 36:24,25 37:8

**mount** 23:5

**mounted** 23:3

**move** 7:1

**moved** 25:1,19

**Muhammad** 4:3,13,19 31:1

**Multiple** 13:5

**must've** 35:22

**mute** 27:3

---

**N**

**names** 20:20 25:8

**national** 28:15 29:17

**needed** 12:21,22,25 13:4,5 18:21
 29:25

**network** 36:23

**night** 13:23 20:8

**nod** 7:15

**note** 10:25 11:5

**notification** 36:25 37:1

**notified** 14:6

**NPI** 29:14,18,22,24 30:3,10,15
 31:4,11

**number** 4:24 17:14 27:14,18,20,
 22,24,25 28:3 29:9,14,18,22,24
 30:3,10,15 31:1,2,11 32:1,11,12,
 16,17,19

**numbers** 27:13

---

**O**

**oath** 4:3,7 5:1,13,16 7:5,22 8:22
 9:10 21:20 33:13 35:8 38:6

**obtain** 29:18,21 30:3

**obtained** 29:9

**obvious** 13:2

**occurred** 11:24

**occurrence** 7:4

**office** 16:23 18:14 19:1 28:8 33:12,
 20,25 36:17,18 37:13,14

**official** 30:25

**open** 26:4 32:24 33:1

**opened** 13:18

**operated** 26:15,19

**operation** 35:10,13

**opportunity** 10:23 11:5

**order** 6:18 26:9 35:18

**overhear** 9:10,14

**overseeing** 20:14,16

**owner** 18:7 19:5

**owners** 13:1

**ownership-interest** 17:8 28:24



## P

**p.m.** 38:6

**paid** 29:2

**paint** 13:2,10 26:4

**painting** 12:22,24,25 13:1 20:14, 15 26:3

**pandemic** 7:3

**paperwork** 35:18

**part** 15:2 18:10

**parties** 4:4

**Pasadena** 21:24

**pay** 12:4

**PDF** 21:13 22:24 24:4 30:11

**penalty** 5:17

**people** 12:12 16:8,14,17 28:19

**percent** 13:11

**Perfect** 6:4

**period** 14:20

**perjury** 5:17

**person** 29:4 32:18 35:3

**phone** 28:3 31:1,2 32:1,11,12,16 37:1

**photo** 21:10 22:5 24:14 25:15

**photos** 21:14,15

**physical** 10:16,17 11:19 31:25 33:24

**physically** 31:5

**pictures** 23:16 36:14

**piece** 29:22

**pipe** 9:23 10:2 13:9,12 14:22 18:20 20:7 21:4

**pipes** 14:13,14,16

**pit** 23:19

**places** 10:20

**plan** 9:5 17:20

**planted** 32:18

**platform** 19:23

**play** 19:1 22:13,15,18 23:15 24:25 25:1,18 36:16,17,18

**point** 5:21 7:7 14:2 18:6 19:23 20:7,21 32:24 35:12

**pointing** 32:6

**pool** 13:4,5 18:17 20:21,25 21:3

**portion** 12:5

**position** 9:13

**posted** 28:21

**potential** 16:18

**practice** 29:23 30:21,24

**preparing** 14:14 20:1

**pretty** 14:19 21:1 26:10 37:24

**previous** 13:1 18:7 19:5

**printout** 30:10

**prior** 14:9,15 20:7 37:6

**problem** 32:4

**problems** 26:11

**process** 5:6

**properties** 15:3,6,13,24 19:2 35:23 36:4,7,12

**property** 10:1 12:2,4,9,11,13,17 13:17 14:10,17,21,23 17:10,11,16 18:20,22 19:6,13,24 20:1,8 21:2,11 22:9 23:7,12 26:14 27:17,23 31:12 34:24 35:4,20,22 37:7

**provide** 16:7 25:10 29:22 30:2

**provided** 10:18,19

**provider** 29:17,23 30:21 31:5

**providing** 29:24

**pump** 13:4

**purchase** 12:2 18:19

**purchased** 12:4,9,17 14:21 17:7 18:5 19:13 21:2 22:8 26:14 27:17, 23 31:12

**purchasing** 12:10

**purpose** 12:15

**put** 9:14 11:21 23:13,14,19 24:5,24 33:25

**puzzle** 24:5

## Q

**question** 5:25 6:10 7:1 30:14 32:3

**questions** 5:4,20 6:5,23 7:13 8:21 9:6,17 11:3 38:5

**quick** 35:17 37:9

**quickly** 21:1

## R

**raise** 5:9

**reach** 20:2 26:11,13

**read** 34:15

**reading** 33:21

**ready** 27:6

**real** 35:17

**realize** 24:14

**realtor** 36:6

**reason** 5:21 12:9,20 17:5

**reasons** 10:11,22

**recall** 18:8,11 21:1 27:24 29:24 31:14 34:23 35:21

**receive** 33:18,23

**recent** 15:22

**recognize** 16:15

**record** 4:1,10 8:23 9:15 27:8,9 34:8,15 37:2,3 38:7,8

**recorded** 36:24

**recordings** 37:5,7

**records** 9:5

**reduced** 6:16

**referring** 25:3 35:7

**reflected** 7:17,18 8:3

**registered** 15:25 30:5 33:20

**registering** 28:7

**regularly** 14:19

**related** 8:7 9:3



**relates** 9:23

**relating** 29:11

**relying** 9:5

**remember** 20:22 23:6 24:25 29:25 30:1,17

**remodelling** 12:14

**remotely** 4:4,7

**renovation** 13:8

**rent** 12:13,23 19:2 35:23 36:1

**rental** 15:13,24 17:10,11,15 36:4

**rented** 19:24

**renting** 12:15 19:6 20:3

**repairs** 12:22 13:4,5 20:14,21,25 21:3

**repeat** 6:1,10 8:9,12 32:3

**rephrase** 6:1

**replace** 13:6

**reporter** 4:1,6 6:15 8:10,14 10:24 11:8,14 27:9 32:2

**reporting** 4:7

**research** 28:10,11,23

**researching** 16:19

**residential** 9:20 10:12,18 12:18 19:10 33:1

**retained** 31:20 33:3

**return** 17:13

**revert** 7:21

**review** 10:23

**ring** 23:8,9 24:1,11

**Road** 32:7

**role** 15:22

**roles** 15:21

**room** 9:9,13 18:14,25 19:1 22:13, 15,18 23:15,25 24:10,17,21,25 25:2,13,18 36:16,18

**rooms** 12:25 24:17 36:17

**rude** 8:4

**rug** 24:18 25:14

**run** 16:5 17:11 35:13

**running** 35:9

_____

**S**
_____

**safety** 25:22

**saving** 17:20

**scan** 11:18

**scheduled** 21:19

**scratch** 17:7

**screen** 21:6 26:7 30:6 33:9 34:6, 13,17

**scroll** 21:14

**search** 30:11

**searched** 30:9,14

**Secretary** 28:7 33:25 34:3

**section-c** 33:19

**security** 19:12,14,16 36:20,22 37:5

**select** 35:20

**selected** 35:21,22

**self-addressed** 11:20

**self-explanatory** 11:2

**send** 10:20 11:16,17,19,21

**sense** 7:11 11:22

**September** 12:3 31:11

**Services** 4:6

**set** 19:1

**Shahid** 4:3,13,19,20 8:23 31:1 32:5 34:1,18 38:4

**shake** 7:15,25

**share** 21:6 30:6 34:6

**sharing** 26:7 34:6,17

**shopping** 14:3

**show** 31:15

**shown** 17:13 24:17

**shows** 31:4

**side** 23:10

**sign** 11:15,21 37:3

**signature** 11:15,21

**sir** 5:3

**sizes** 18:17

**slide** 23:19 24:11

**small** 18:16

**Smith** 4:5

**snarky** 8:4

**Society** 28:15,16

**son** 26:10

**sound** 11:9 22:22

**sounds** 7:14 15:2 27:7

**sources** 15:14 17:17

**space** 19:1

**speaking** 5:6 13:12 34:24

**specialist** 4:23

**spell** 8:13,15,17,19

**spellings** 8:25

**spoke** 19:25

**spoken** 29:7

**Springs** 9:21,24 10:6,19 33:16,21

**stamped** 11:20

**stand** 26:9

**stands** 29:17

**start** 6:24 9:17 16:12 31:16 33:3 34:11

**started** 5:4 16:1,24 21:2 25:4 29:5, 6 34:11

**starting** 16:21 28:9

**state** 4:9,17 28:7 33:25 34:3

**states** 16:13

**stay** 8:24 20:8

**stenographic** 4:8

**steps** 28:6,8

**stocks** 17:19,20

**stool** 26:9

**stop** 7:7 26:7 34:6,17



**stopped** 36:21

**store** 14:3

**straight** 34:20,21

**structure** 31:22

**stuff** 24:10 25:14,18 36:14

**subject** 5:16

**subscription** 37:4

**support** 16:15 28:12,17

**Swan** 20:21

**swear** 5:9

**switch** 14:25

**sworn** 4:14

**syndrome** 16:8 28:13,14,15

**system** 19:15

**systems** 19:12

---

**T**

**table** 24:18,24

**tables** 18:9,13,16 25:16

**Tai** 4:22 37:25 38:2

**taking** 6:15 11:7 38:4

**talk** 4:24 6:17,22

**talking** 9:4 11:13 18:14,15 24:6 35:4

**tall** 26:10

**tax** 17:13 29:9,11

**technical** 6:7

**television** 23:2,5

**telling** 32:8

**ten** 24:16 26:18 27:2

**tenants** 12:18 36:3,7,8,9,10

**testified** 4:14

**testify** 5:15

**testifying** 5:12

**testimony** 5:16 35:8

**Texas** 9:21 10:3 11:25 12:8 21:24 28:7,16 32:7 33:16,21

**therapist** 16:11

**therapy** 16:7,10,16 28:12,21 33:2

**thing** 9:3 11:10 12:25 22:7 32:15 36:23 37:9

**things** 6:19 7:16 8:13 12:14,23 13:5,7 18:7 22:14 27:11 31:10

**time** 4:2 6:21 13:9 14:11,16,20 17:24 18:19 26:14,18 28:1 30:4 31:19 34:7 35:14 36:7 37:14 38:4

**time-to-time** 8:14 37:15

**times** 7:5 8:8 14:19 20:11 35:19 37:17

**tiny** 24:18

**tippy** 26:12

**today** 4:20,22,24 5:13 6:5 7:13 8:20 9:6,22 21:20 33:13 35:15 38:5,6

**today's** 4:1 30:14

**toes** 26:12

**told** 35:3

**Tomball** 10:3 11:25

**tools** 26:4

**top** 20:22 30:13,18

**total** 15:7

**touch** 26:4

**touchups** 13:1,2

**toys** 36:13

**tracks** 36:25

**transcribed** 10:25 11:6,7

**transcript** 6:16,19 7:17 8:3,15 10:13,20,22 11:16

**truth** 5:9,10

**turn** 27:4,5

**TV** 24:1,11

**type** 11:10 36:5,23

**typical** 36:19

**typically** 37:10

---

**U**

**U-N-D-I-N-E** 14:8

**uh-huh** 7:16 8:1

**uh-uh** 7:16

**understand** 5:12,15,20,24,25 6:2, 11 8:6,10 28:20

**understanding** 15:23 19:10 29:21 34:18 35:2

**understood** 6:5

**Undine** 13:22 14:8

**unintentionally** 7:4

**Union** 12:8

**update** 31:7

**updated** 34:2

**UPS** 10:16

**URL** 34:15

**usual** 7:3

**utility** 14:8

**utilized** 27:18,23

---

**V**

**verbally** 7:14

**version** 25:15

**view** 25:13

---

**W**

**W-R-E-N** 10:5

**walkthroughs** 13:24

**wall** 22:8 23:2 24:1,18 25:14

**walls** 13:2,10

**wanted** 38:1

**washer** 18:9

**water** 9:23 13:19,21,25 14:7,8

**watering** 13:20

**website** 20:5 29:4 31:15,16,20 32:6 34:7,8 36:5



**website's** 28:22

**week** 14:19,23,24 20:11 37:10,17,
18

**weekend** 37:23

**weekends** 37:18,22

**weeks** 10:14 19:22

**white** 22:5,20 26:8

**wife** 13:17 14:2,9,12,16,22 16:9
17:4,22 18:1 20:8 22:16 26:15,19
28:25 32:13,21 34:25 35:3,8

**wife's** 21:20 27:20 32:16 38:5

**Winette** 4:5

**word** 10:4

**words** 7:14

**work** 5:6 12:21,24 13:22 20:13,16,
17 21:2 22:2 25:4 26:6 37:10,12,
14,17,19,21,22

**worked** 15:20

**working** 19:16 22:17 31:17 36:21

**world** 7:23

**wrap** 14:12,16

**Wren** 10:3,5 11:25 12:17 14:10,17
15:8 17:1 18:6 19:5,13,24 21:11,16
26:15 27:17,23 30:21 31:5,6,12
32:25 33:1 34:24 35:13,19 36:15,
20 37:6,16

**write** 26:8

**written** 6:16

**wrong** 32:1

**wrote** 11:9

---

**Y**

---

**y'all** 23:22 24:8 27:23

**year** 10:8 28:1,18

**years** 16:13 26:10,18 36:8,10

---

**Z**

---

**zoom** 4:22 5:22 7:2



# Exhibit 8



**Anthony (Tony) Anderson**
tonyanderson@kw.com
Ph: 281-546-0716
Keller Williams Realty Professionals
http://www.jogonhome.com/

Property Type is 'Rental'   Status is 'Active'   Status is 'Sold'   Status Contractual Search Date is 05/13/2024 to 02/13/2024   Beds is 4+   Baths Full is 3+   Building SqFt is 2200 to 3200   Lot Size is 18000 to 25000   Latitude, Longitude is around 30.16, -95.63

# Market Analysis Summary | Rental

Listings as of 5/13/2024 at 5/13/2024  5:44:03PM, Page 1 of 2

| # | MLS # | Address | Subdivision | Pool | BR | FB | HB | # Gar | Bld SqFt | Yr Blt | Lot SF | List Price | LP/SqFt | CDOM | Cls Date | Lease Price | LsP/SqFt | Ls/LP% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Listings: Active** |
| 1 | 35555358 | 10071 Woodhollow Drive | Whispering Oaks 02 | No | 4 | 3 | 0 | 2 | 2,461 | 1974 | 22,950 | $2,200 | $0.89 | 84 | | | | |
| 2 | 29982357 | 16734 Wine Meadow Court | Cypress Point Lake Estates 02 | No | 4 | 3 | 1 | 3 | 2,940 | 2003 | 20,704 | $3,100 | $1.05 | 18 | | | | |
| 3 | 19579591 | 2438 Carriage Lamp Lane | Carriage Hills 02 | No | 4 | 4 | 1 | 2 | 3,060 | 1984 | 20,000 | $4,850 | $1.58 | 61 | | | | |
| | | | Min | | 4 | 3 | 0 | 2 | 2,461 | 1974 | 20,000 | $2,200 | $0.89 | 18 | | | | |
| | | | Max | | 4 | 4 | 1 | 3 | 3,060 | 2003 | 22,950 | $4,850 | $1.58 | 84 | | | | |
| | | | Avg | | 4 | 3 | 1 | 2 | 2,820 | 1987 | 21,218 | $3,383 | $1.17 | 54 | | | | |
| | | | Med | | 4 | 3 | 1 | 2 | 2,940 | 1984 | 20,704 | $3,100 | $1.05 | 61 | | | | |
| **Listings: Sold** |
| 1 | 19342736 | 5810 Sequoia Trace Court | Windrose | No | 4 | 3 | 0 | 3 | 2,732 | 2001 | 18,060 | $2,995 | $1.10 | 68 | 04/02/24 | $2,850 | $1.04 | 95.16 |
| 2 | 67156787 | 21263 Hidden Bend Loop | Magnolia Reserve 02 | No | 4 | 3 | 0 | 3 | 3,008 | 2021 | 18,740 | $3,800 | $1.26 | 8 | 04/29/24 | $3,750 | $1.25 | 98.68 |
| | | | Min | | 4 | 3 | 0 | 3 | 2,732 | 2001 | 18,060 | $2,995 | $1.10 | 8 | | $2,850 | $1.04 | 95.16 |
| | | | Max | | 4 | 3 | 0 | 3 | 3,008 | 2021 | 18,740 | $3,800 | $1.26 | 68 | | $3,750 | $1.25 | 98.68 |
| | | | Avg | | 4 | 3 | 0 | 3 | 2,870 | 2011 | 18,400 | $3,398 | $1.18 | 38 | | $3,300 | $1.15 | 96.92 |
| | | | Med | | 4 | 3 | 0 | 3 | 2,870 | 2011 | 18,400 | $3,398 | $1.18 | 38 | | $3,300 | $1.15 | 96.92 |

This represents an estimated sale price for this property.  It is not the same as the opinion of value in an appraisal developed by a licensed appraiser under the Uniform Standards of Professional Appraisal Practice.
Copyright: Houston Association of REALTORS© 2024 All rights reserved.
Information is believed to be accurate but is not guaranteed

**Anthony (Tony) Anderson**
tonyanderson@kw.com
Ph: 281-546-0716
Keller Williams Realty Professionals
http://www.jogonhome.com/

Property Type is 'Rental'   Status is 'Active'   Status is 'Sold'   Status Contractual Search Date is 05/13/2024 to 02/13/2024   Beds is 4+   Baths Full is 3+   Building SqFt is 2200 to 3200   Lot Size is 18000 to 25000   Latitude, Longitude is around 30.16, -95.63

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Total | Avg | | 4 | 3 | 0 | 3 | 2,840 | 1997 | 20,091 | $3,389 | $1.18 | 48 | $3,300 | $1.15 | 38.77 |
| | Listings | Med | | 4 | 3 | 0 | 3 | 2,940 | 2001 | 20,000 | $3,100 | $1.10 | 61 | $3,300 | $1.15 | 96.92 |

### Quick Statistics  ( 5 Listings Total )

| | Min | Max | Average | Median |
|---|---|---|---|---|
| List Price | $2,200 | $4,850 | $3,389 | $3,100 |
| Sold Price | $2,850 | $3,750 | $3,300 | $3,300 |
| LP/SF | $0.89 | $1.58 | $1.18 | $1.10 |
| SP/SF | $1.04 | $1.25 | $1.15 | $1.15 |

*Presented by: Anthony Anderson*
This represents an estimated sale price for this property.  It is not the same as the opinion of value in an appraisal developed by a licensed appraiser under the Uniform Standards of Professional Appraisal Practice.
Copyright: Houston Association of REALTORS© 2024 All rights reserved.
Information is believed to be accurate but is not guaranteed

# Exhibit 7

### SWORN STATEMENT IN PROOF OF LOSS
#### to
### ALLSTATE INDEMNITY COMPANY

Policy No. ___000436220450_____          Claim No. ___0742346539___

To the __Allstate Indemnity Company___, Northbrook, Illinois

At time of loss, by the above indicated policy of insurance you insured  Muhammad Shahid  Ujala Haaris

#### INSURED'S NAME

against loss by ____Water Damage_____ _____ to the property described under Schedule "A," according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

**1. Time and Origin:** A ____water damage_____ loss occurred about the hour of ___10___ o'clock ___A___M., On the __17__ day of ___January___ 20_24_. The cause and origin of the said loss were: __water damage from frozen__ ___pipe break destroyed home___

**2. Occupancy:** The building describe, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever: __Investment Property_____

**3. Title and Interest:** At the time of the loss the interest of your insured in the property described therein was _owner of property_ _____ No other person or persons had any interest therein or incumbrance thereon, except: _Texas Bay Credit Union_____

**4. Changes:** Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: _N/A_____

**5. Total Insurance:** The total amount of insurance upon the property described by this policy was, at the time of the loss, $___400,000_____, as more particularly specified in the apportionment attached under Schedule "C," besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. The Actual Cash Value of said property at the time of the loss was . . . . . . . . . . . . . . . . . . . . . . . $  400,000

7. The Whole Loss and Damage was . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  137,525.63

8. The Amount Claimed under the above numbered policy is . . . . . . . . . . . . . . . . . . . . . . . . . . $  137,525.63

The said loss did not originate by any act, design or procurement on the part of this insured, or this affiant; nothing has been done by or with the privity or consent of this insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

**Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.**

State of __Texas_____          Signature _____

County of __Harris_____          Signature _____

Subscribed and sworn to be before me this __23__ day of ___February_____ 20_24_.

by ___MUHAMMAD  SHAHID___ Notary Public

ARFEB HUSSAIN QURESHI
Notary Public, State of Texas
Comm. Expires 08-10-2026
Notary ID 133260281

0742346539 ATM

## SCHEDULE 'A' - POLICY FORM

Policy Form No. 000436220450        Effective Date 9/1/2023
Item 1.  $Amount on 127,086 Date 01/17/2024
Item 2.  $Amount on 10,480 Date 01/17/2024
Item 3.  $Amount on         Date
Situated Location 14902 Cactus wren Dr, Tomball, TX, 77377
Coinsurance, Average, Contribution, or Deductible Clauses, if any Other
Loss, if any, payable to Loss Payee

## SCHEDULE "B" - STATEMENT OF ACTUAL CASH VALUE AND LOSS AND DAMAGE

|  | ACTUAL CASH VALUE | LOSS AND DAMAGE |
|---|---|---|
| Item 1. Property Damage | $400,000 | $127,065.60 |
| Item 2. Personal Property | $10,460.03 | $10,460.03 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Totals: | $410,460.03 | $137,525.63 |

## SCHEDULE "C" - APPORTIONMENT

| POLICY NO. | EXPIRES | NAME OF COMPANY | ITEM NO. INSURES | PAYS | ITEM NO. INSURES | PAYS |
|---|---|---|---|---|---|---|
| 436220450 | 09/01/2024 | AllState | 11 | $127,065.60 |  |  |
| 436220450 | 09/01/2024 | AllState | 18 | $10,460.03 |  |  |
| Totals: |  |  |  |  |  |  |

_____ EMMANUEL MUNIZ _____ Adjuster

### RELEASE AND AUTHORIZATION OF PAYMENT

The undersigned hereby acknowledges that the repair or replacement of the loss and damage resulting from _____ which occurred on or about the _____ day of _____ 20_____ has been made to his entire satisfaction and agrees that the payment of the sum of _____ dollars ($_____) by the Allstate Indemnity Company of Northbrook, Illinois, to _____ shall constitute a full performance of the obligations of the Insurer under its policy.
In consideration of such payment the _____ company is hereby discharged and forever released from any and all claims and demands under its policy No. _____ resulting from the occurrence of loss above described.
Signed this _____ day of _____ 20 ____, at _____, state of _____
_____ INSURED _____

Witnesses _____    INSURED _____

_____    MORTGAGEE _____

Signature: _____  02/23/2024

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

| Item # | Room | Brand or Manufacturer | Model# | Item Description | Original Vendor | Quantity Lost | Item Age (Years) | Item Age (Months) | Condition (New, Above Average, Average, Below Average) | Cost to Replace Pre-Tax (each) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dining area & living room | | | Sofa set, 2 coffee tables, dining table & chairs, Luna Furniture | | 1 | | 3 | New | $3,139.75 |
| 2 | Dining area & living room | | | Living room & dining area rugs | Walmart | 1 | | 3 | New | $821.63 |
| 3 | Room to right of foyer | | | Two desks | Walmart | 1 | | 4 | New | $701.46 |
| 4 | Room to right of foyer | | intel i7 850-G3 | HP Elitebook Laptop | Walmart | 1 | | 4 | New | $276.64 |
| 5 | Room to right of foyer | | MFC-J4904QW | Printer | Brother International | 1 | | 4 | New | $378.86 |
| 6 | Room to right of foyer | Acer | | Monitor, keyboard & mouse | Walmart | 1 | | 4 | New | $269.39 |
| 7 | Kitchen | | | Kitchen runner & entrance rug | Marshalls | 1 | | 3 | New | $788.69 |
| 8 | Play room | | | Ball Pit | Walmart | 1 | | 3 | New | $252.49 |
| 9 | Play room | | | Play Blocks | Walmart | 1 | | 3 | New | $260.11 |
| 10 | Living room | | | Four Plants | Burlington | 1 | | 3 | New | $352.72 |

PROF016

0742346539 ATM

PROF0016

0742346539 ATM

| Item # | Room | Brand or Manufacturer | Model# | Item Description | Original Vendor | Quantity Lost | Item Age (Years) | Item Age (Months) | Condition (New, Above Average, Average, Below Average) | Cost to Replace Pre-Tax (each) |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | Laundry | Samsung | | Washer | | 1 | | | Above average | $1,049 |
| 12 | Laundry | Samsung | | Dryer | | 1 | | | Above average | $1,049 |
| 13 | Room to right of foyer | | | Rug | Walmart | 1 | | 4 | New | $206.74 |
| 14 | Room to right of foyer | | | Rug | Walmart | 1 | | 4 | New | $199.70 |
| 15 | Living room | | | Accent table | TJ Max | 1 | | 3 | New | $230.55 |
| 16 | Hallway | | | Accent table | Walmart | 1 | | 3 | New | $157.00 |
| 17 | Dining area | | | Curtains | Walmart | 1 | | 3 | New | $161.06 |
| 18 | Living room | | | Curtains | Walmart | 1 | | 3 | New | $165.24 |
| 19 | | | | | | | | | | |
| 20 | | | | | | | | | | |

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

Signature:

02/23/2024

## SWORN STATEMENT IN PROOF OF LOSS
### to
### ALLSTATE INDEMNITY COMPANY

Policy No. ___000436220450_____          Claim No. ____0742346539___

To the ___Allstate Indemnity Company____ , Northbrook, Illinois
At time of loss, by the above indicated policy of insurance you insured ___Muhammad Shahid  Ujala Haaris_____

### INSURED'S NAME

against loss by ____Water Damage_____ to the property described under Schedule "A," according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. **Time and Origin:** A ____water damage_____ loss occurred about the hour of ___10_____ o'clock ___AM.,
   On the __17__ day of __January__ 20_24_. The cause and origin of the said loss were: _water damage from frozen___ _pipe break destroyed home__

2. **Occupancy:** The building describe, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever: __Investment Property__

3. **Title and Interest:** At the time of the loss the interest of your insured in the property described therein was _owner of property_ _____ No other person or persons had any interest therein or incumbrance thereon, except: _Texas Bay Credit Union_____

4. **Changes:** Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: __N/A_____

5. **Total Insurance:** The total amount of insurance upon the property described by this policy was, at the time of the loss, $_400,000_____ , as more particularly specified in the apportionment attached under Schedule "C," besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. The Actual Cash Value of said property at the time of the loss was . . . . . . . . . . . . . . . . . . . . . . $ _400,000_____

7. The Whole Loss and Damage was . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _137,525.63_____

8. The Amount Claimed under the above numbered policy is . . . . . . . . . . .'. . . . . . . . . . . . . . . . $ _137,525.63_____

The said loss did not originate by any act, design or procurement on the part of this insured, or this affiant; nothing has been done by or with the privity or consent of this insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

**Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.**

State of ___Texas_____          Signature _____

County of ___Harris_____          Signature _____

Subscribed and sworn to be before me this ___27___ day of ___February_____ 20_24_.

_by  Ujala  Harris_ , _____ Notary Public

AREEB HUSSAIN QURESHI
Notary Public, State of Texas
Comm. Expires 08-10-2025
Notary ID 133260291

0742346539 ATM

## SCHEDULE 'A' - POLICY FORM

Policy Form No. 000436220450        Effective Date 9/1/2023
Item 1.    $Amount on 127,068 Date 01/17/2024
Item 2.    $Amount on 10,480 Date 01/17/2024
Item 3.    $Amount on        Date
Situated Location 14902 Cactus wren Dr, Tombell, TX, 77377
Coinsurance, Average, Contribution, or Deductible Clauses, if any Other
Loss, if any, payable to Loss Payee

### SCHEDULE "B" - STATEMENT OF ACTUAL CASH VALUE AND LOSS AND DAMAGE

|  | ACTUAL CASH VALUE | LOSS AND DAMAGE |
|---|---|---|
| Item 1. Property Damage | $400,000 | $127,065 60 |
| Item 2. Personal Property | $10,460 03 | $10,460 03 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Totals: | $410,460 03 | $137,525 63 |

### SCHEDULE "C" - APPORTIONMENT

| POLICY NO. | EXPIRES | NAME OF COMPANY | ITEM NO. INSURES | PAYS | ITEM NO. INSURES | PAYS |
|---|---|---|---|---|---|---|
| 436220450 | 09/01/2024 | AllState | 11 | $127,065 60 |  |  |
| 436220450 | 09/01/2024 | AllState | 18 | $10,460.03 |  |  |
| Totals: |  |  |  |  |  |  |

_____ EMMANUEL MUNIZ _____ Adjuster

### RELEASE AND AUTHORIZATION OF PAYMENT

The undersigned hereby acknowledges that the repair or replacement of the loss and damage resulting from _____
which occurred on or about the _____ day of _____ 20_____ has been made to his entire
satisfaction and agrees that the payment of the sum of _____ dollars ($_____)
by the Allstate Indemnity Company of Northbrook, Illinois, to _____
shall constitute a full performance of the obligations of the Insurer under its policy.
In consideration of such Payment the _____ company is hereby discharged and forever released from
any and all claims and demands under its policy No. _____ resulting from the occurrence of loss above
described.
Signed this _____ day of _____ 20 _____, at _____, state of _____
_____ INSURED _____

Witnesses _____    INSURED _____

_____    MORTGAGEE _____

PIIGF0016

0742316539 ATM

| Item # | Room | Brand or Manufacturer | Model# | Item Description | Original Vendor | Quantity Lost | Item Age (Years) | Item Age (Months) | Condition (New, Above Average, Average, Below Average) | Cost to Replace Pre-Tax (each) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dining area & living room | | | Sofa set, 2 coffee tables, dining table & chairs | Luna Furniture | 1 | | 3 | New | $3,139.75 |
| 2 | Dining area & living room | | | Living room & dining area rugs | Walmart | 1 | | 3 | New | $821.63 |
| 3 | Room to right of foyer | | | Two desks | Walmart | 1 | | 4 | New | $701.46 |
| 4 | Room to right of foyer | | 850 G3 intel I7 | HP Elitebook Laptop | Walmart | 1 | | 4 | New | $276.64 |
| 5 | Room to right of foyer | | MFCJ6940DW | Printer | Brother International | 1 | | 4 | New | $378.86 |
| 6 | Room to right of foyer | | Acer | Monitor, keyboard & mouse | Walmart | 1 | | 4 | New | $269.39 |
| 7 | Kitchen | | | Kitchen runner & entrance rug | Marshalls | 1 | | 3 | New | $788.69 |
| 8 | Play room | | | Ball Pit | Walmart | 1 | | 3 | New | $252.49 |
| 9 | Play room | | | Play Blocks | Walmart | 1 | | 3 | New | $260.11 |
| 10 | Living room | | | Four Plants | Burlington | 1 | | 3 | New | $352.72 |

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

Signature :

2/23/24

PRO7016

0742346539 ATM

| Item # | Room | Brand or Manufacturer | Model# | Item Description | Original Vendor | Quantity Lost | Item Age (Years) | Item Age (Months) | Condition (New, Above Average, Average, Below Average) | Cost to Replace Pre-Tax (each) |
|--------|------|----------------------|--------|-----------------|-----------------|---------------|------------------|-------------------|------------------------------------------------------|--------------------------------|
| 11 | Laundry | Samsung | | Washer | | 1 | | | Above average | $1,049 |
| 12 | Laundry | Samsung | | Dryer | | 1 | | | Above average | $1,049 |
| 13 | Room to right of foyer | | | Rug | Walmart | 1 | | 4 | New | $206.74 |
| 14 | Room to right of foyer | | | Rug | Walmart | 1 | | 4 | New | $199.70 |
| 15 | Living room | | | Accent table | TJ Max | 1 | | 3 | New | $230.55 |
| 16 | Hallway | | | Accent table | Walmart | 1 | | 3 | New | $157.00 |
| 17 | Dining area | | | Curtains | Walmart | 1 | | 3 | New | $161.06 |
| 18 | Living room | | | Curtains | Walmart | 1 | | 3 | New | $165.24 |
| 19 | | | | | | | | | | |
| 20 | | | | | | | | | | |

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

Signature: _(signature)_ 2/23/24

**Haaris Shahid**

| | |
|---|---|
| **From:** | Haaris Shahid <haaris_shahid@hotmail.com> |
| **Sent:** | Tuesday, February 13, 2024 2:35 PM |
| **To:** | Haaris Shahid |
| **Subject:** | [EXT] Fwd: Receipt for order #H42891 |
| **Attachments:** | Luna Furniture - Harwin Store Order 2891 EMV Receipt.pdf |

Best Regards,

Haaris Shahid

Begin forwarded message:

> **From:** Luna Furniture - Harwin Store <store+64504430845@t.shopifyemail.com>
> **Date:** February 13, 2024 at 11:30:51 AM CST
> **To:** haaris_shahid@hotmail.com
> **Subject: Receipt for order #H42891**
> **Reply-To:** Luna Furniture - Harwin Store <customerservice@lunafurn.com>

# Luna Furniture - Harwin Store

ORDER #H42891

## Thank you for your purchase!

Visit our store

## Order summary

 Reston Cappuccino Pedestal Square Coffee Table × 1                                    $139.00

Bladen Coffee Living Room Set × 1                                    $1,259.00
DISCOUNT ( $31.00)                                    $1,225.00

 **Conner Espresso Counter Height Dining Set × 1**
Table & 8 Counter Chair

$1,039.00

 **Porter Rustic Brown Sofa/Console Table × 1**

$379.00

| | |
|---|---|
| Subtotal | $2,785.00 |
| Order discount | -$83.55 |
| Discount (-$83.55) | |
| Shipping | $199.00 |
| Taxes | $239.30 |
| Total | $3,139.75 USD |
| | You saved $114.55 |
| Mastercard (ending in 3915) | $1,500.00 |
| Visa (ending in 4725) | $1,639.75 |

## Customer information

Shipping address
Haaris Shahid
14902 cactus wren dr
Tomball TX 77377
United States

Shipping method

2

Your Order Number: **0000592066**
Order Date: September 22, 2023
Order Total: **$378.86**

**SHIPPING INFORMATION**

Muhammad Shahid

17230 FABLE SPRINGS LN ,
CYPRESS , TX 77433-6468

**BILLING INFORMATION**

Muhammad H Shahid

17230 FABLE SPRINGS LN ,
CYPRESS , TX 77433-6468

**ORDER DETAILS**

| Item | Description | Quantity | Availability | Price |
|------|-------------|----------|--------------|-------|
| MFCJ6940DW | COLOUR INKJET MFC 4-IN-1 | 1 | In stock | $349.99 |

| | |
|---|---|
| Merchandise Total | $349.99 |
| Shipping/Handling | $0.00 |
| Your States Sales Tax | $28.87 |
| **Order Total** | **$378.86** |